IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

RANDY WILLIAM GAY                                                    PETITIONER

v.                                    Civil No. 6:23-cv-06011

DEXTER PAYNE, DIRECTOR,
ARKANSAS DIVISION OF CORRECTION                                     RESPONDENT

## OPINION AND ORDER

In March 2015, the Petitioner, Randy W. Gay ("Gay"), was convicted of the capital murder of Connie Snow by a jury in the 18th Judicial District-East, Garland County Circuit Court located in Garland County, Arkansas, with Judge John Homer Wright presiding. The jury imposed the death penalty.

The matter comes before the Court on a Habeas Corpus Petition filed pursuant to 28 U.S.C. § 2254. ECF No. 2. Gay asks the Court to vacate the judgment of the Garland County Circuit Court convicting him of capital murder and sentencing him to death. Respondent ("the State") has responded and lodged the state court record. ECF No. 13-14 & 18. Gay filed a reply brief. ECF No. 27. The issue currently before the Court is whether Gay has procedurally defaulted on one or more of his claims.

## I. FACTUAL BACKGROUND

In the Arkansas Supreme Court's opinion denying Gay's postconviction Motion filed pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure, the court summarized the facts regarding the murder of Connie Snow as follows:

> James Westlake testified that he and his family operated a timber business in Garland County in 2011. James testified that he paid Gay "a few hundred dollars each week" to "keep an eye" on their equipment overnight. On May 10, 2011,

1

James, Jim Westlake, and Rickey Stewart were attempting to repair machinery at their logging business in a wooded area located in Garland County. Around 5:00 p.m. that day, Gay arrived in a pickup truck, and Snow was in the passenger seat. Gay got out of his truck and went to speak to James, leaving Snow in the vehicle. Gay told James that he was using Snow to obtain information about drug trafficking in the national forest and that she was probably going to jail. James noticed that Snow was attempting to say something to Gay from the vehicle, and when he told Gay, Gay then ordered Snow out of the truck. Snow did not comply and Gay went back to his truck, retrieved a shotgun, and again ordered Snow out of the truck. James testified that Snow was getting out of the truck, that he did not believe Gay was going to take any action, and that James turned away from the truck and back to the machinery when he heard a loud "BOOM." James testified that he turned around and saw Snow's body on the ground and that Gay was holding the gun toward the ground. James testified that he immediately told Gay, "I didn't see anything." James testified that Gay calmly walked over and asked him if he had any plastic, and he responded that he did not. He then asked James to help him get his tailgate open. James said he was somewhat in shock and did not know whether Gay was going to kill the rest of them or what his next move was. James went over and helped with the tailgate and then checked on his elderly father. James testified that while he went to check on his dad, he kept his eyes on Gay because he did not know what was going to happen and watched Gay drag Snow over and load her into his truck bed. Gay then loaded Snow's body into his truck, left the site, and gave James a "thumbs up" on the way out. James testified that Gay then called him on his cell phone and asked if everything was "alright between them." James explained that they were loading logs and did not mention Snow because he was afraid, he did not know where Gay was, and that he and his employees were unarmed. James testified that he and his employees left together and that once they were back out of the woods safely to the highway, he, his brother, and Rickey called law enforcement and waited for them to arrive.

Rickey testified that when Gay summoned Snow from the truck, she failed to move. Gay then grabbed a bolt-action shotgun from the toolbox in the back of his truck, stuck it through the open driver's-side window, and again ordered her out of the vehicle. Snow still did not move. Gay walked to the back of his truck, propped his elbow on the vehicle, again pointed the gun at Snow, and yelled, "I told you to get the fuck outa my truck." Snow stepped out of the truck, keeping her back to the inside of the open door, and said, "What are you gonna do, shoot me?" Rickey heard Gay click off the gun's safety, and Gay then shot Snow in the right side of her face, killing her. Gay asked James if he had any plastic, and when James stated that he did not, Gay asked him to help him lower the tailgate of his truck. Gay dragged Snow by the belt loops of her jeans and her hair to the back of his truck and threw her body into the truck bed. He then drove away from the work site, giving James a "thumbs up" on the way out. James indicated that Gay phoned him several minutes later to see if everything was okay and to tell him that he "got

everything taken care of." James and the others then notified law enforcement of the murder.

That evening, Gay attended a bonfire at the home of Larry and Vera Nevels and stayed the night with his girlfriend, Latonya McElroy. The next morning, he told McElroy that he had to "get rid of" something. He was arrested as he got into his car to leave the apartment. Gay claimed that he had a severe drinking problem and that he did not remember what happened the previous day. Snow's body was located four days later, on May 14, 2011, approximately 1.2 miles from the shooting in a shallow creek bed. On the other side of the creek, officers located Snow's hair and her scalp. It was evident that animals had predated on the body. Gay was charged with premeditated capital murder, and the State sought the death penalty.

*Gay v. State,* 2022 Ark. 23, *2-4 (Ark. 2022) ("Gay III") (not reported in Southwestern Reporter).

## II.  PROCEDURAL HISTORY

Prior to the charges at issue here, Gay had been convicted of (1) murdering his father-in-law James Kelly on August 12, 1978; (2) murdering his father, Glen Gay on May 4, 1991; and (3) terroristic threatening.   ECF No. 14-8, pp. 99-102 (Kelly); ECF No. 14-8, pp. 104-106 (Glen); ECF No. 14-8, pp. 108-109 (terroristic threatening).[1]

On June 24, 2011, Gay was charged with the first-degree murder of Snow and possession of a firearm by certain persons, a class B felony.   ECF No. 14-2, pp. 35-37.   The State also sought enhancement of the penalty as a habitual offender.   ECF No. 14-2, pp. 36-37.

On July 11, 2011, Gay was arraigned.   ECF No. 14-3, pp. 101-103.   Gay was represented by an appointed public defender, Mark Fraiser ("Fraiser").   ECF No. 14-3, pp. 102-103.   On September 1, 2015, a First Amended Information was filed charging Gay with capital murder, possession of a firearm by certain persons, and a felony firearm enhancement was sought.   ECF

---

[1] ECF No. 14 contains the corresponding Bates numbers of the exhibit pages; it lists the first and last page (beginning with RWG000001 to RWG015948) contained in each document numbered ECF No. 14-1 through ECF No. 14-56.

No. 14-2, pp. 83-85.   On October 31, 2011, J. Sky Tapp ("Tapp) and Kayla M. Barnett were substituted as counsel for Gay.   ECF No. 14-2, p. 86.   On November 14, 2011, Gay was arraigned on the First Amended Information.   ECF No. 14-3, pp. 118-119.

## A.   The First Trial

On April 8, 2013, jury selection began.   ECF No. 14-3, p. 247.   Meeting in chambers prior to the start of the trial, the court agreed to read a stipulation about why the case was being prosecuted in state court rather than a federal court prior to the beginning of opening statements. ECF No. 14-3, p. 248-49.   Note was made that the crime of being a felon in possession of a firearm was severed from the capital murder charge.   ECF No. 14-3, p. 249-50.   Tapp renewed all his prior motions.   ECF No. 14-3, pp. 250-51.   The court stated it would individually *voir dire* prospective jurors.   ECF No. 14-3, p. 252.   Any jurors who had knowledge of Gay's prior convictions would be excused for cause.   ECF No. 14-3, p. 253.   The State indicated it had no Rule 404(b) evidence.   ECF No. 14-3, p. 255.   The parties agreed that no one would ask questions about any underlying circumstances that would involve Gay's prior convictions or his prison terms.   ECF No. 14-3, pp. 260-61.

*Voir dire* began at 9:09 a.m. on April 8, 2013.   ECF No. 14-3, pp. 27-79.   On April 12th, the twelfth juror was selected.   ECF No. 14-4, p. 457.   Jury selection continued to seat alternate jurors.   The first alternate was selected, and the court recessed until the following Monday, April 15, 2013.   ECF No. 14-4, pp. 560-61.   Seated juror number eleven expressed doubt on whether she could consider the total range of penalties.   ECF No. 14-4, pp. 562-63.   The court indicated that if it struck the juror, the alternate would be moved in place as a juror.   ECF No. 14-4, p. 564. Tapp requested an additional strike.   ECF No. 14-4, pp. 566-67.   The court took the position that

4

there would be no jury selection involved.   ECF No. 14-4, p. 567.   Tapp moved for mistrial if the juror was going to be excused for cause. ECF No. 14-4, p. 581.    The juror was removed for cause. ECF No. 14-4, p. 582.   Tapp then made a motion with respect to alternate one on the basis he had been "tweeting" about the case while in the jury room.   ECF No. 14-4, pp. 583-84.   Tapp renewed his motion to have the jury sequestered.   ECF No. 14-4, pp. 585-86. The court moved alternate one to the jury as juror number twelve. ECF No. 14-4, pp. 587-88.   The court continued selecting alternates and two more were seated.   ECF No. 14-4, p. 614;   ECF No. 14-4, p. 682.   After another prospective alternate testified that jurors had talked about what was in the newspaper that morning and offered opinions about Tapp's abilities, the court granted a mistrial.   ECF No. 14-4, pp. 789-90.

### B.   Second Trial

At an attorney review hearing held on November 4, 2013, it was noted that Gay continued to be represented by Brian Johnson ("Johnson") and Brandon Crawford ("Crawford"); Tapp filed a motion with the Arkansas Supreme Court to remain on the case despite his interim suspension. ECF No. 14-4, pp. 798-800.   The next attorney review hearing was held on December 2, 2013. ECF No. 14-4, p. 801.   The Arkansas Supreme Court denied Tapp's motion.   ECF No. 14-4, p. 802.   Gay requested that Fraiser be appointed to represent him.   *Id.*   Gay was directed to complete an application for court appointed counsel.   *Id.*   Later that same day, the application was completed, and Gay was found to be indigent.   ECF No. 14-4, pp. 803-04.   Fraiser accepted the appointment and agreed to allow Johnson and Crawford to participate in the case.   ECF No. 14-4, pp. 804-05.   Ashley Hornibrook ("Hornibrook") was assigned to be the mitigation expert. ECF No. 14-4, p. 805.   Note was made that Mr. Dale E. Adams ("Adams") would also be involved

since he was death certified.[2]  *Id.*

On October 14, 2014, Gay requested severance of the firearm charge from the capital murder charge.  ECF No. 14-2, pp. 600-01.  The motion was granted.  ECF No. 14-2, p. 602. Trial was scheduled for March 10th-13th, 2015, and March 16th-20th, on the capital murder, felony firearm enhancement, and habitual offender charges.  ECF No. 14-2, p. 607.  The trial date was changed to begin on March 11, 2015.  ECF No. 14-2, p. 618.  Gay also filed a motion to prevent death qualification of the jury.  ECF No. 14-3, p. 200.  The court ruled that the jury could be death qualified.  ECF No. 14-3, p. 201.

On March 11, 2015, jury selection began.  ECF No. 14-5, p. 24.  The court determined it would begin jury selection by informing all present jurors that the selection and trial would take two weeks and then address the issues of hardship and knowledge of witnesses.  ECF No. 14-5, pp. 39, 50-51.  After that it would individually *voir dire* each juror regarding his or her knowledge of the case until it had reached three jurors who had not been stricken.  ECF No. 14-5, pp. 40-41. Thereafter, the remaining *voir dire* would be done to panels of three jurors.  ECF No. 14-5, pp. 41-42.  By March 13, 2015, twelve jurors and two alternates had been selected.  ECF No. 14-5, p. 955.

The evidentiary portion of the trial was scheduled to begin at 8:30 am the following Monday, March 16, 2015.  ECF No. 14-5, p. 957.  The jury was sworn in and instructed by the

---

[2] Death certified refers to an attorney who has been certified by the Public Defender Commission to handle death-penalty cases or one qualified under specific guidelines.  *Davis v. State,* 44 S.W.3d 726, 733 (Ark. 2001) (citing Arkansas Rule of Criminal Procedure 37.5(c)(1) which applies to post-conviction proceedings and sets forth specific guidelines for an attorney to be qualified to handle a death-penalty case); *See also* Arkansas Public Defender Commission minimum standards for eligibility for assignment in a death penalty case.

Court.   ECF No. 14-5, 968-973.   After calling eighteen witnesses and recalling one, the State rested.   ECF No. 14-6, p. 463.   Fraiser moved for a directed verdict on the charge of capital murder.   ECF No. 14-6, p. 464.   Fraiser argued that the State had not shown that Gay formed the necessary intent and had proved only first-degree murder.   ECF No. 14-6, pp. 464-466.   The Court denied the motion stating it believed it was for the jury to determine if Gay had acted with premeditation and deliberation.   ECF No. 14-6, p. 466.   Fraiser renewed his objection to the procedure the Court utilized in selecting the alternate jurors.   *Id*.   He also renewed his objection to the Court's overruling of his requests for jurors to be stricken for cause.   *Id*.   These were noted for the record.   *Id*.   Fraiser advised the Court that the defense would rest without calling any witnesses.   ECF No. 14-6, p. 468.

On March 17, 2015, the jurors began their deliberations at 2:54 pm.   ECF No. 14-6, p. 533.   At 3:32 pm, the jurors returned from deliberations.   ECF No. 14-6, p. 534.   The jury foreperson was Franklin Palmquist.   *Id*.   Gay was found guilty of capital murder and of employing a firearm as a means of committing the homicide.   ECF No. 14-6, p. 535.   The jury was polled, and all 12 jurors indicated the verdict was theirs.   ECF No. 14-6, pp. 535-36.   *See also* ECF No. 14-3, pp. 62-63, 80-81 (verdict forms).

On March 18, 2015, prior to the beginning of the penalty phase, Fraiser renewed all motions made at the close of the State's case.   ECF No. 14-6, p. 538.   Fraiser raised the issue of whether certain facts that he deemed non-disclosed aggravating circumstances could be utilized by the State.   ECF No. 14-6, pp. 538-39.   The court granted Fraiser's motion and limited the testimony "from anyone relative to the aggravators that have been disclosed . . . [to] those . . .   immediately surrounding the act that [Gay] was convicted of."   ECF No. 14-6, pp. 544-45.

7

The State called eight witnesses and the defense called six witnesses.   ECF No. 14-6, p. 553 to ECF No. 14-7, p. 31.   Both sides rested.   ECF No. 14-7, p. 38.   The defense rested without Gay testifying.   *Id.*   The State offered no rebuttal testimony.   *Id.*   Court was adjourned for the day to begin at 8:30 am on March 19, 2015.   ECF No. 14-7, p. 34, 38.   After discussions with counsel regarding jury instructions and verdict forms, the trial resumed at 9:18 am.   ECF No. 14-7, p. 65.   The court read the jury instructions.   ECF No. 14-7, pp. 65-78.   The State gave its closing argument.   ECF No. 14-7, pp. 78-93.   The defense gave its closing argument.   ECF No. 14-7, pp. 94-121.   The State presented rebuttal.   ECF No. 14-7, pp. 122-36.

The jury retired to deliberate at 11:41 am and at 12:21 pm asked for a lunch break.   ECF No. 14-7, p. 139.   Deliberations were resumed at 1:47 pm.   ECF No. 14-7, p. 140.   The jury returned its verdict at 4:08 pm.   *Id.*

The jury returned the following verdict forms.   Form 1 dealt with aggravating circumstances.   ECF No. 14-3, p. 64.   The jury found Gay had committed:   the felony offense of murder in the second degree in Garland County on August 12, 1978; the felony offense of murder in the second degree in Montgomery County on May 4, 1991; and the felony offense of terroristic threatening in Garland County on October 5, 2007.   *Id.*   Form 2 dealt with mitigating circumstances.   ECF No. 14-3, pp. 65-76.   Seventy-three mitigating factors were listed.[3]   With respect to each mitigating factor, the jurors were asked to place a check mark beside one of three statements:

    ___ All members of the jury find that this circumstance probably exists.
    ___ At least one, but not all members of the jury find that this circumstance probably exists.

---

[3] The mitigating circumstances are not consecutively numbered, and several numbers are repeated. more than once.   ECF No. 14-3, pp. 65-76.

___ No member of the jury finds that this circumstance probably exists.

*Id.* The jurors were also given additional space to list any other mitigating circumstances they found probably exists.   ECF No. 14-3, pp. 77-79.

Form 3 advised the jury that its final conclusions must be unanimous and indicated by placing a check mark in the appropriate place.    ECF No. 14-3, p. 80.   The jury was given three paragraphs:

> (A)( ) THE STATE HAS PROVED BEYOND A REASONABLE DOUBT ONE OR MORE AGGRAVATING CIRCUMSTANCES.
>
> (IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (A), THEN SKIP (B) AND (C) AND SENTENCE RANDY WILLIAMS GAY TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)
>
> (B)( ) THE AGGRAVATING CIRCUMSTANCES OUTWEIGH BEYOND A REASONABLE DOUBT ANY MITIGATING CIRCUMSTANCES FOUND BY ANY JUROR TO EXIST.
>
> (IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (B), THEN SKIP (C) AND SENTENCE RANDY WILLIAM GAY TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)
>
> (C)( ) THE AGGRAVATING CIRCUMSTANCES JUSTIFY BEYOND A REASONABLE DOUBT A SENTENCE OF DEATH.
>
> (IF YOU DO NOT UNANIMOUSLY AGREE TO CHECK PARAGRAPH (C), THEN SENTENCE RANDY WILLIAM GAY TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.)
>
> IF YOU HAVE CHECKED PARAGRAPHS (A), (B) AND (C), THEN SENTENCE RANDY WILLIAM GAY TO DEATH ON FORM 4.
>
> OTHERWISE, SENTENCE RANDY WILLIAMS GAY TO LIFE IMPRISONMENT WITHOUT PAROLE ON FORM 4.

*Id.* The jury checked paragraphs (A), (B), and (C).   *Id.*   On Form 4 the jury checked death and each juror signed the form.   ECF No. 14-3, p. 81.

9

The jury was discharged after the court read Form 4 and polled the jury.   ECF No. 14-7, p. 141-43.   The defense indicated it was concerned because there were at least "two or three findings that the jury checked off that there was no evidence" of the mitigating circumstance when evidence in fact existed.   ECF No. 14-8, pp. 144-45   The defense asked the court to continue the sentencing to allow the defense an opportunity to explore what if any remedy they had.   ECF No. 14-7, p. 145.   If the court declined to continue the sentencing, the defense asked that the death verdict be set aside and a sentence of life without parole imposed.   *Id*.   The defense's requests were denied.   *Id.*   However, the firearm enhancement was withdrawn by the State since no evidence was put before the jury on it and the jury had already been discharged.   ECF No. 14-7, p. 146.   The defense next asked for the court to run any sentence concurrently with the sentence Gay was already serving.   *Id*.   The court sentenced Gay to death by lethal injection.   ECF No. 14-7, p. 147.

On March 20, 2015, a sentencing order was entered reflecting the jury's verdict of capital murder and the imposition of the death penalty.   ECF No. 14-3, pp. 57-61.   On March 23, 2015, Gay filed a notice of appeal.   ECF No. 14-3, p. 52.   On August 25, 2015, an automatic temporary stay of the execution date of September 19, 2015, was entered pursuant to Rule 10 of the Arkansas Rules of Appellate Procedure—Criminal.    ECF No. 14-3, p. 89.

The State's exhibits are in the record at ECF No. 14-8, pp. 1-115. Defense exhibits are in the record at ECF No. 14-8, pp. 115-156;[4] 161-228.   The Court's exhibit is in the record at ECF No. 14-8, pp. 157-158.

---

[4] These exhibits include proffered instructions.

## C. Direct Appeal

Gay filed a timely notice of appeal on March 23, 2015.    ECF No. 14-3, p. 52.    The appeal record was lodged with the Clerk of Court on November 13, 2015.    ECF No. 14-10, p. 23.    Fraiser withdrew as counsel on direct appeal and Adams was appointed to represent Gay.    ECF No. 14-10, p. 26.    Adams filed a motion to supplement the record with the supplemental juror questionnaires completed by prospective jurors before the trial.    ECF No. 14-10, p. 29.    The questionnaires were made part of the record.    ECF No. 14-10, pp. 35 through ECF No. 14-11, p. 398.    The record was also supplemented with the list of jurors removed for cause or because of peremptory strikes by both sides.    ECF No. 14-11, pp. 399-402.

The following arguments were raised:

(1)   The Trial Court violated Gay's right to a fair and impartial trial by allowing his entire pen pack to be submitted to the jury.

(2)  The Trial Court erred by violating Gay's right to due process by refusing to allow defense counsel to question potential jurors in-depth regarding their views on the death penalty and mitigation.

(3)  The Trial Court's inconsistent approach to rehabilitative questions to veniremen resulted in the improper removal of jurors for cause that denied Gay the right to a fair and impartial jury.

(4)  The Trial Court erred in granting the State's motion for a mental evaluation over Gay's objection.

(5)  The Trial Court erred in refusing to allow jury instructions AMCI 202 and 206 which were proffered by the defense.

(6)  The Trial Court erred in denying the defense mitigator of lingering doubt in the penalty phase.

(7)  The Trial Court erred for refusing to allow Gay to introduce as a mitigating circumstance that Gay had a calming influence on others while in custody.

ECF No. 14-12, p. 13.

11

On December 8, 2016, the Arkansas Supreme Court issued an opinion finding no reversible error was committed by the Garland County Circuit Court.  ECF No. 14-17, pp. 1-18; *Gay v. State,* 506 S.W.3d 851 (Ark. 2016) ("Gay I").

### D. Rule 37 Petition

On May 26, 2017, Gay filed a Petition to Vacate pursuant to Rule 37.5 of the Arkansas Rules of Criminal Procedure.  ECF No. 14-19, pp. 36-45.  Public Defender Blake Hendrix was appointed to represent Gay.  ECF No. 14-19, pp. 34-35.  A hearing was held on December 6-7, 2018.  ECF No. 14-19, p. 25.  On February 6, 2019, the court entered a decision letter.  *Id.*  On March 5, 2019, an order was entered denying the Rule 37 Petition.  ECF No. 14-19, pp. 90-93.  A notice of appeal was filed on April 1, 2019.  ECF No. 14-19, pp. 94-95.

Gay raised numerous arguments in his Rule 37.5 petition.  First, Gay maintained he had been denied the right to a fair and impartial jury under the Fifth, Sixth, and Fourteenth Amendments and Article 2, Sections 8 and 10 of the Arkansas Constitution.  ECF No. 14-19, p. 36.  Gay set forth the following grounds for relief:

    (a) One or more jurors were disqualified because they would automatically vote for the death penalty for a homicide offense;

    (b) One or more qualified jurors were disqualified even though they were not substantially impaired in their ability to consider a death sentence;

    (c) None of the jurors were asked if he or she could consider and give effect to mitigating evidence, and, therefore, Gay was tried to a jury that was disqualified;

    (d) At least five jurors stated they would not consider intoxication as a mitigating factor (despite its recognition as both a statutory and non-statutory mitigating factor) and should have been disqualified;

    (e) Trial counsel was precluded from asking the venire whether the members could consider mitigating factors particular to Gay;

(f) One or more jurors who stated opposition to a life-without-parole sentence were wrongly qualified based on their affirmative responses to the State and the Court that they would "follow the law; and

(g) A prospective juror who voiced concerns about the death penalty was wrongly struck for cause even though she unequivocally stated she would follow the law.

*Id.*, pp. 36-37.

Second, Gay maintained he was denied the right to effective representation in violation of the Sixth Amendment and Article 2, Sections 8 and 10 of the Arkansas Constitution because of the following prejudicial acts or omissions:

(a) Trial counsel failed to conduct a reasonable *voir dire* to challenge for cause, or exercise a peremptory challenge to strike, one or more jurors who said they would automatically vote for the death penalty for a homicide offense;

(b) Trial counsel failed to adequately rehabilitate one or more potential jurors who expressed reservations about imposing the death penalty;

(c) Trial counsel failed to conduct a reasonable *voir dire* to ensure that all (or any) jurors could consider mitigating evidence;

(d) Trial counsel failed to conduct a reasonable *voir dire* to ensure that all (or any) jurors could consider mitigating evidence specific to Gay;

(e) Trial counsel failed to object or move to disqualify at least five jurors who stated, in response to the State's *voir dire,* that they would not consider intoxication as a mitigating factor;

(f) Trial counsel introduced Gay's entire "pen pack" as a mitigating circumstance, but it contained prejudicial and inadmissible evidence rendering it an unauthorized non-statutory aggravating factor;

(g) Trial counsel failed to object to improper victim-impact evidence;

(h) Trial counsel introduced evidence of the unsolved murder of Scott Garner without connecting it to any mitigating factor and, as a result, the evidence acted as a non-statutory aggravating factor;

(i) Trial counsel failed to make an effective penalty-phase closing argument failing to address any mitigating circumstances;

(j) Trial counsel failed to effectively prepare for trial and sentencing or conduct a reasonable investigation or make reasonable decisions that a particular investigation was unnecessary within the meaning of *Strickland v. Washington,* 466 U.S. 668 (1984), as follows:

(i) the failure to investigate and present a meaningful theory of the defense;

(ii) the failure to investigate and present a self-defense justification and proffer a self-defense instruction;

(iii) the failure to investigate the history and record of Rickey Stewart, the only alleged eyewitness to the shooting of Snow, and to conduct an adequate cross-examination;

(iv) the failure to investigate and determine that the injuries to the victim could not have occurred as Stewart testified;

(v) the failure to investigate the background of the victim to determine a history of violence to support a guilt-phase defense or sentencing-phase mitigating factor;

(vi) the failure to investigate and present evidence that, contrary to the State's theory, Gay and the victim did not have an intimate relationship and the phone number in Gay's wallet was not the victim's;

(vii) the failure to object to the State's improper guilt-phase closing argument that the victim was left to rot, to be eaten by animals, and that she was treated like an animal;

(viii) the failure to investigate and present a meaningful theory of mitigation;

(ix) the failure to investigate and present as mitigating evidence Gay's medical health history, mental health history, and social history;

(x) the failure to investigate Gay's prior diagnosis of post-traumatic stress disorder ("PTSD") and to present evidence of the diagnosis in either the guilt or penalty phases;

(xi) the failure to retain an expert in PTSD and present expert testimony in the guilt or penalty phases;

(xii) the failure to investigate Gay's chronic alcoholism and present it as evidence of Gay's reduced mental state in the guilt phase or reduced moral culpability in the penalty phase;

14

(xiii) the failure to retain an expert in chronic alcoholism to testify to its long-term damage to the brain and consequent Neuro-Cognitive Disorders and to present this evidence as a reduced mental state in the guilt phase or reduced moral culpability in the penalty phase;

(xiv) the failure to investigate Gay as the victim of sexual abuse as a child;

(xv) the failure to retain an expert in child sexual abuse and present this evidence in mitigation;

(xvi) the failure to investigate the two second-degree murder convictions and assert a challenge to, and not to concede, them as aggravating circumstances;

(xvii) the failure to call Gay as a witness in either the guilt or penalty phases;

(xviii) the failure to investigate the aggravating factors and argue that Gay did not "commit" the aggravating factors; and

(xix) the failure of trial counsel to properly prepare mitigation witnesses and conduct proper witness examinations before the jury.

ECF No. 14-19, pp. 37-41.

Third, Gay argued the jury was not instructed that it had the discretion to impose a life-without-parole sentence even if it found aggravating circumstances existed and aggravators outweighed the mitigating factors. ECF No. 14-19, p. 41. Instead, it was told it had to impose a death sentence if found against Gay in its weighing function. *Id.*

Fourth, Gay argued that Form 2 of the death penalty verdict forms was unsigned. ECF No. 14-19, pp. 41-42. Under Ark. Code Ann. § 5-4-603, Gay maintains the jury is required to make written findings on Form 2 to ensure that it adequately considered mitigating factors. *Id.* At a minimum, the written findings require the signature of the foreperson. *Id.*, p. 42.

Fifth, Gay argued the jury's verdict forms were ambiguous. ECF No. 14-19, p. 42. Specifically, Gay pointed out that the sentencing-phase instructions required the jury to place a

checkmark by each of its findings, despite this Form 3(C), which dealt with whether the aggravators outweigh the mitigators, contained no clear checkmark but, rather an ambiguous and unclear symbol. *Id.* This rendered the jury verdict ambiguous thus depriving him of a fair sentencing proceeding. *Id.*

Sixth, Gay argued the death sentence was disproportionate to Gay's offense when compared to similar cases. ECF No. 14-19, pp. 42-43. In this regard, Gay stated the homicide offense was committed without substantial premeditation and deliberation; in the heat of the moment; while suffering from the effects of chronic alcoholism; and while suffering a mental or intellectual impairment. *Id.*

Seventh, Gay argued the aggravating factor in Ark. Code Ann. § 5-4-604(3) is unconstitutionally vague. ECF No. 14-19, p. 43. The section provides: "The person previously committed another felony offense, an element of which was the use or threat of violence to another person." *Id.* The statute and instruction given do not define "felony" or "violence" thus failing to narrow the class of death-eligible individuals. *Id.* Additionally, Gay asserted the statute and instruction was vague because, while a person may "commit" an offense, the conduct may be justified as, for example, in a case of self-defense or defense of another. *Id.*

Eighth, Gay asserted the State failed to prove beyond a reasonable doubt that the aggravating factors were felonies. ECF No. 14-19, p. 43. Specifically, Gay maintained the State produced no evidence that his prior offense were felonies and the jury was not instructed on the definition of "another felony." *Id.*

Ninth, Gay argued the State unconstitutionally argued lack of remorse as an aggravating factor. ECF No. 14-19, p. 44. Gay pointed out that Ark. Code Ann. § 5-4-604 limits the State to

providing one or more of ten specified aggravating factors.   *Id.*   Lack of remorse is not one of these factors.   *Id.*   Despite this, Gay argued the State emphasized a letter Gay's father wrote to the Arkansas Parole Board asking it to release Gay on parole, arguing to the jury that Gay was remorseless.   *Id.*

Tenth, Gay argued the State introduced improper victim-impact evidence that went beyond a glimpse of the life of the victim.   ECF No. 14-19, p. 44.   Instead, the victim-impact evidence encouraged the jury to make a comparative judgment between the life of the victim and the life of Gay, offering opinions to the jury on Gay and the appropriate punishment.   *Id.*

Eleventh, Gay argued the court failed to ensure he was provided effective assistance of counsel in view of trial counsel's acts, omissions, and health.   ECF No. 14-19, p. 44.

As previously stated, a hearing was held on the Petition on December 6-7, 2018.   ECF No. 14-20, p. 1.   Gay presented the testimony of several expert witnesses and two of Gay's former counsel Fraiser and Hornibrook.   Gay's first witness was Dr. Matthew Mendel, a clinical and forensic psychologist.   ECF No. 14-20, pp. 4-5.     Dr. Mendel conducted a psychological evaluation on Gay focusing on childhood abuse including sexual abuse.   *Id.*, p. 5.   Dr. Mendel also diagnosed Gay with alcohol dependence and depression.   *Id.*, pp. 52-53.   He explained the consequence of each diagnosis on Gay's behavior.[5]   *Id.*, pp. 52-55.

Gay's second witness was Dr. John Roache a professor in the departments of psychiatry and pharmacology at the University of Texas Health Science Center.   ECF No. 14-20, pp. 62-63.   Dr. Roache diagnosed Gay with alcohol abuse disorder (AUD) and concluded that Gay's chronic

---

[5] This portion of the opinion contains short summaries of the witnesses' testimony.   The testimony of the witnesses called at the Rule 37 hearing was extensive.

alcoholism and its effects on the brain were related "to a tendency to react emotionally and violently and impulsively." *Id.*, p. 64. Dr. Roache testified that AUD causes neurochemical changes to the brain. *Id.,* pp. 83-84.

Gay's third witness was Professor J. Thomas Sullivan, University of Arkansas at Little Rock, Bowen School of Law. ECF No. 14-20, pp. 99-100. Professor Sullivan was called to testify regarding the standard of care for capital counsel in Arkansas during 2015 when the case was tried. *Id.,* pp. 103-04. He identified several ways in which Fraiser's and/or Hornibrook's conduct fell below the relevant standard of care. *Id.,* pp. 122-202.

Gay's fourth and final witness was Hornibrook who served as mitigation specialist. ECF No. 14-20, p. 220. She could not independently recall consulting any experts and believed it would have been reflected in her notes if she had done so. *Id.,* p. 229. Hornibrook was aware that Tapp had advised Gay not to cooperate with the psychologist ordered to evaluate him. *Id.,* pp. 229-30. Had they consulted with an expert in child sexual trauma, Hornibrook did not believe Gay would have cooperated. *Id.,* p. 230. In fact, Hornibrook testified Gay "did not want us to proceed with any of that, any of those angles." *Id.,* p. 233. Hornibrook testified Gay would not even talk to her about it as a mitigation specialist. *Id.*

The State's first witness was the primary defense counsel, Fraiser. ECF No. 14-20, p. 239. During *voir dire*, Fraiser testified he did everything he could to get any jurors expressing a pro-death penalty stance excused for cause. *Id.,* p. 242. The defense team's goal was to get as many jurors as possible that were "bordering on being excluded because they couldn't consider the death penalty." *Id*. For those hesitant jurors, Frasier attempted to get them to say they would consider the death penalty. *Id.,* p. 243.

Fraiser testified that the decision was made to introduce the pen-pack as evidence of mitigating circumstances.  ECF No. 14-20, p. 245.  In deciding whether to introduce the pen-pack, the fact that Gay had been incarcerated most of his adult life and otherwise lived an isolated type of lifestyle were considered.  *Id.,* p. 247.  These facts limited the "people that could come forward and testify about Randy, the positive things about Randy."  *Id.*   By the time the decision was made, the jury had already heard that Gay had been convicted of two other homicides causing the question of whether Gay was a violent person, used weapons, or committed parole violations, the introduction of the pen-pack "seemed to [the defense team] to be minor."  *Id.*   Fraiser testified it was a strategic move which in his opinion worked because the jury did find the existence of mitigating circumstances.  *Id.,* p. 248.

Fraiser testified the defense team attempted to convince Gay to testify at least in the sentencing phase but he refused.  ECF No. 14-20, p. 250.  In fact, Fraiser testified he "implored [Gay] to do it, 'Get on the witness stand and try to save your life.'"  *Id.*

Fraiser testified Gay was not "very forthcoming about his past and wanting to—or being able to help us."  ECF No. 14-20, p. 260.  While Gay was always respectful and polite, he did not help them despite being repeatedly asked to do so.  *Id.*

With respect to the childhood abuse, Fraiser emphasized that the only sponsoring witness they had to support this was Gay's sister, Gloria Lindsay ("Lindsay").  ECF No. 14-20, p. 268.  In connection with the alleged failure to investigate and present mitigating evidence regarding Gay's medical health history, mental health history, and social history, Fraiser testified he would defer to Hornibrook on the medical and social history.  *Id.*   He knew Hornibrook had obtained Gay's school records because they had a teacher testify.  *Id.*   As far as Gay's mental health

19

history, Fraiser indicated he knew Gay had undergone a forensic examination and been found fit and competent. *Id.* Fraiser knew Gay would refuse to cooperate and based on his prior dealings with Gay knew he was "founded in reality as to time and place." *Id.* Fraiser "didn't see where— where there was anything to go forward on the mental health part of it." *Id.* Fraiser was aware of the diagnosis of PTSD because it was brought up in the pen pack. *Id.,* pp. 268-69. Fraiser deferred to Hornibrook as to any steps taken to follow up on that diagnosis. *Id.*, p. 269.

Fraiser explained that to retain an expert they had to get approval from the executive director and he did not believe simply having a diagnosis of PTSD was going to be enough. ECF No. 14-20, pp. 269-70. In his opinion, it was going to be hard to justify getting an expert on that limited scope. *Id.,* p. 270. It was made even more difficult by the fact they did not even know if Gay would cooperate. *Id.* With respect to retaining an expert in alcoholism, Fraiser testified Gay did not want to talk about his past and there was plenty of evidence introduced regarding his drinking. *Id.* On the issue of childhood sexual abuse, Fraiser pointed out that Gay was not cooperating so the only evidence they had was Lindsay's testimony and he could not tell from the mitigating factors whether the jury believed her. *Id.,* p. 271.

Fraiser was next asked about the alleged failure to investigate the circumstances of the two prior murder convictions. ECF No. 14-20, p. 271. He indicated he had reviewed the prosecutor's file on the Kelly murder and had some discovery on the Glen murder. *Id.,* pp. 271-72. Fraiser was unaware of any way to combat the aggravating circumstances regarding the convictions or to argue that a murder conviction was not a felony involving violence. *Id.,* pp. 272-73. He pointed out the State even put on evidence to support the convictions. *Id.*

Fraiser testified he had a discussion with Gay about testifying in the guilt phase of the trial

and advised him there were certain things Gay would have to explain if he took the stand.   ECF No. 14-20, p. 275.   Fraiser advised Gay not to take the stand during the guilt phase but to testify during the sentencing phase.   *Id*.   Gay took his advice not to testify during the guilt phase but then refused to testify in the sentencing phase.   *Id.,* p. 276.

Fraiser admitted that no one asked the jurors if they could give meaningful consideration and effect to any specific mitigators in the case.   ECF No. 14-20, p. 291.   However, Fraiser testified this was because they did not know at that point whether Gay would testify as a sponsoring witness "to a lot of stuff."   *Id*.   The decision to submit 75 mitigators was made after the fact.   *Id*. When asked if he did not develop the mitigators before trial, Fraiser responded that it was a work in progress.   *Id*.   Defense counsel knew intoxication would be an issue throughout the trial as well as Gay's history of it.   *Id*.   Fraiser did not ask about intoxication as a mitigator because unless Gay testified there were not going to have any evidence Gay had been drinking prior to killing Snow.   *Id.,* p. 292.   From the State's questioning, Fraiser could also tell that the State was anticipating if Gay took the stand, he was going to say he had been drinking or was drunk at the time.   *Id.,* p. 293.   Fraiser had no specific recollection of reading Gay's medical or mental health records but thought he had read the entire file.   *Id.,* p. 294.

Fraiser stated he would have "possibly" followed up with at least a consultation with an expert had he known Gay had been diagnosed with PTSD and chronic alcohol abuse.   ECF No. 14-20, p. 296.   Had Gay disclosed that he had been sexually assaulted, Fraiser testified he believes they would have tried to find an expert and see if it would help them.   *Id.,* p. 297.   Fraiser conceded that it appeared Gay had signed releases for his medical, employment, and psychological records prior to trial; subpoenas were issued but the subpoenas he was shown did not indicate if

21

they were for records.  *Id.,* pp. 300-01.

The State's second witness was Hornibrook.    ECF No. 14-20, p. 309.   Hornibrook testified the subpoenas shown to Fraiser were trial subpoenas.  *Id.,* p. 310.   The medical and mental health records had previously been obtained from these individuals.  *Id*.

When asked how many times she had tried to get Gay to give her some information on his background and what happened to him, Hornibrook answered: "Probably more times than I could count."  ECF No. 14-20, p. 313.   Gay would not participate in the conversations.  *Id.,* p. 314.

With respect to Lindsay, Hornibrook testified she attempted to meet with Lindsay when she went to see Gay but Lindsay refused.   ECF No. 14-20, p. 314.   Most of the time, Lindsay would not take her calls.  *Id.*   At one point, Lindsay told Hornibrook she would not cooperate with her.  *Id*.   Hornibrook offered to drive to Tennessee or to pay for Lindsay to come to Arkansas.  *Id*.   It was at this point, Lindsay made it difficult by demanding they transport her animals and to find a hotel that would take them that "it became almost an impossible task" for Hornibrook.  *Id.,* p. 315.   Any information Hornibrook obtained from Lindsay was piecemeal.  *Id.,* p. 317.   It was just before trial, when Lindsay finally told them about the sexual abuse.  *Id*. They did not inform Gay of the specific questions they were going to ask Lindsay because defense counsel believed, and Hornibrook still believed, Gay would not have wanted the information to come out.  *Id.*, p. 318.

In connection with jury selection, when it came time to do strikes, Hornibrook testified they would consult Gay.  ECF No. 14-20, p. 316-17.   The decision was jointly made as to whether to strike a particular juror.  *Id.,* p. 317.

Hornibrook believed she had done everything she could to investigate potential mitigation

circumstances.   ECF No. 14-20, p. 318.   On cross-examination Hornibrook stated she was aware of the contents of Gay's records and did not consult with any experts.   *Id.,* p. 319.   Hornibrook did not believe Gay would have cooperated with an expert.   *Id.,* p. 321.

The Circuit Court denied the Rule 37 petition.   Gay appealed.   The Arkansas Supreme Court initially remanded for findings of fact on Gay's eighth allegation of ineffective assistance of counsel, *i.e.,* his argument that trial counsel was ineffective for failing to adequately investigate and challenge the aggravating factors of the second-degree murders of Glen and Kelly.   *Gay v. State,* 2021 Ark 3 (Ark. 2021) (not reported in the Southwestern Reporter).   After the findings of fact were made, the Arkansas Supreme Court denied the Rule 37 petition.   *Gay v. State,* 2022 Ark. 23 (Ark. 2022) (not reported in the Southwestern Reporter).

### E.   The Habeas Petition

On January 24, 2023, Gay filed this habeas petition raising the following fourteen claims many of which contain multiple subparts:

**Claim 1**:   Trial counsel rendered constitutionally ineffective assistance at the penalty phase of Gay's trial.

### Mitigation

Claim 1-1: Counsel was ineffective for failing to investigate, develop, and present mitigating evidence.

I.   Counsel unreasonably failed to investigate evidence of childhood trauma and abuse.

II.   Counsel unreasonably failed to investigate or present evidence of trauma readily apparent from the FBI interviews.

III.   Counsel failed to investigate or explain Gay's lifelong struggle with alcohol abuse.

IV.    Counsel failed to retain an expert to evaluate and discuss Gay's Posttraumatic Stress Disorder, depression, and childhood trauma.

V.    Counsel's failure to investigate and present mitigating evidence prejudiced Gay at sentencing.

Claim 1-2: Counsel unreasonably failed to hire and present expert testimony to explain the extensive mental-health evidence found in Gay's prison records.

Claim 1-3: Counsel was ineffective for failing to investigate evidence of Gay's head injuries and possible brain damage.

Claim 1-4: Counsel was ineffective for submitting Gay's entire prison records to the jury and, in effect, failing to present evidence of rehabilitation and good behavior in prison.

**Aggravating Circumstances**

Claim 1-5: Counsel unreasonably failed to challenge or investigate Gay's prior second-degree murder convictions.

Claim 1-6: Counsel was ineffective in his presentation of the unsolved murder of Scotty Garner.

**Witnesses**

Claim 1-7: Counsel was ineffective for failing to object to excessive victim impact testimony.

**Claim 2**:  Trial counsel rendered constitutionally ineffective assistance in the pretrial period.

**Jury Selection**

Claim 2-1: Counsel unreasonably failed to strike jurors who heavily favored the death penalty.

Claim 2-2: Counsel failed to conduct an adequate *voir dire* to ensure that any jurors could consider mitigating evidence.

Claim 2-3: Counsel failed to object or move to disqualify jurors who stated they would not consider intoxication as a mitigating factor.

Claim 2-4: Counsel failed to adequately rehabilitate potential jurors who expressed reservations about imposing the death penalty.

**Venue**

Claim 2-5: Counsel was ineffective for failing to pursue a change of venue.

**Claim 3**: Trial counsel rendered constitutionally ineffective assistance at the guilt phase of Gay's trial.

Claim 3-1: Counsel failed to object to the state's improper guilt phase closing argument.

Claim 3-2: Counsel failed to investigate and pursue a theory of imperfect self-defense or proffer a self-defense instruction.

**Claim 4**: Gay's Fifth, Sixth, and Fourteenth Amendment rights to a fair and impartial jury were violated by the trial court's preclusion of case-specific mitigation questions during *voir dire*.

**Claim 5**: The trial court's inconsistent treatment of rehabilitative questions during *voir dire* resulted in the improper removal of jurors for cause and denied Gay his right to a fair and impartial jury under the Sixth Amendment.

**Claim 6**: Gay was wrongly denied his Sixth Amendment right to the counsel of his choice.

**Claim 7**: There was insufficient evidence of Gay's intent to commit capital murder.

**Claim 8**: The State used improper and unconstitutional "victim impact" testimony.

**Claim 9**: Prosecutorial misconduct during the guilt- and penalty-phase closing arguments violated due process.

**Claim 10**: Form 3 of the jury instructions precluded the jury from exercising mercy.

**Claim 11**: In violation of the Eighth Amendment, the trial court erred in refusing to allow as a mitigating circumstance that Gay had a calming influence on others while in custody.

**Claim 12**: Gay received ineffective assistance on appeal.

**Claim 13**: Evolving standards of decency render the death penalty unconstitutional.

**Claim 14**: Gay is entitled to relief because of the cumulative prejudicial effect of the errors described herein.

### III. STANDARD OF REVIEW

In the interests of finality and federalism, a federal habeas court is constrained by statue to exercise only a "limited and deferential review of underlying state-court decisions." *Whitehead v. Dormire,* 340 F.3d 532, 536 (8th Cir. 2003). The Antiterrorism and Effective Death Penalty Acts ("AEDPA") erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. *Burt v. Titlow,* 571 U.S. 12, 15-16 (2013). While the barriers are formidable, "if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino v. Thaler,* 569 U.S. 413, 421 (2013).

The doctrines of exhaustion and procedural default, as well as the standards for ineffective assistance of counsel are at issue in this case. The Court will first set forth the substance of these doctrines as well as the *Strickland*[6] standard for determining ineffective assistance of counsel.

### A.  Exhaustion

The first issue the Court must address is whether Gay exhausted his state law remedies prior to filing the Petition. "Multiple procedural doctrines and filing rules 'promote federal-state comity' by heavily 'circumscrib[ing]' the availability of federal habeas review." *Rick v. Harpstead,* 110 F.4th 1055, 1059 (8th Cir. 2024) (quoting *Shinn v. Ramirez,* 596 U.S. 366, 378

---

[6] *Strickland v. Washington,* 466 U.S. 668 (1984).

(2022)).

One such doctrine is the statutory limitation of relief to only those petitioners who have "exhausted the remedies available in the courts of the State" or have shown "there is an absence of available State corrective process" or where "circumstances exist that render such process ineffective to protect the rights of [the petitioner]." 28 U.S.C. § 2254(b)(1)(A)-(B). The statute further provides that a petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. 2254(c).

The Supreme Court has explained the exhaustion doctrine as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999).

"Generally, if a federal habeas petitioner's claim makes factual or legal arguments that were not present in petitioner's state claims, the claim is not exhausted." *Simpson v. Jeffrys,* No. 8:23-cv-260, 2024 WL 4349498, *3 (D. Neb. Sept. 30, 2024) (citing *Kenley v. Armontrout,* 937 F.2d 1298, 1302 (8th Cir. 1991)). "The petitioner has the burden to show that all available state remedies have been exhausted with respect to every claim in his habeas petition or that exceptional circumstances exist, such as state remedies are inadequate or fail to afford a full and fair adjudication of federal claims, or . . . exhaustion in state court would be futile." *Jones v. Payne,* No. 6:22-cv-06110, 2023 WL 2186439, *5 (W.D. Ark. Feb. 23, 2023) (Hickey C.J.) (internal quotation marks and citation omitted). If state remedies have not been exhausted, a petition

should be dismissed without prejudice to allow for exhaustion of the claims. *Hampton v. Miller,* 972 F.2d 429, 430-31 (8th Cir. 1991). In a mixed petition, where part of the claims have been exhausted, while others have not, the Court may stay and hold in abeyance a timely filed petition. *Rhines v. Weber,* 544 U.S. 269 (2005).

> A claim is considered exhausted when the petitioner has afforded the highest state court a fair opportunity to rule on the factual and theoretical substance of his claim. It is not enough that all the facts necessary to support a federal claim are before the state court or that the petitioner asserted a similar state-law claim. The petitioner must refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.

*Ashker v. Leapley,* 5 F.3d 1178, 1179 (8th Cir. 1993) (internal quotation marks and citations omitted).

In Arkansas "one complete round" ordinarily means that each claim has been presented to the trial court, on appeal, and in a *postconviction* petition filed pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure.[7] Direct attacks on a criminal judgment, such as those arguing the sufficiency of the evidence, must be made at trial or on direct appeal. *Cotton v. State,* 738 S.W. 2d 90 (Ark. 1987). Rule 37 may not be used to make a direct attack on a criminal judgment. *Id.* A second Rule 37 petition is not allowed unless the original petition was specifically denied without prejudice to the filing of a subsequent petition. *Williams v. State,* 619 S.W. 2d 628, 629 (1981).

A claim of ineffective assistance of counsel may be raised on direct appeal only "when the facts surrounding the claim were fully developed during the trial or during hearings conducted by the trial court [in connection with a motion for new trial]." *Rounsaville v. State,* 288 S.W.3d 213,

---

[7] Ark. R. Crim. Proc. 37.5 applies to persons under sentence of death.

217 (Ark. 2008) (citations omitted).  "Rule 37 of the Arkansas Rules of Criminal Procedure
provides the primary vehicle for postconviction relief due to ineffective assistance of counsel."
*Id.*

### A.  Procedural Default

In addition to the requirement of exhaustion, a federal habeas court must also examine the
state court's resolution of the presented claim.   "It is well established that federal courts will not
review questions of federal law presented in a habeas petition when the state court's decision rests
upon a state-law ground that 'is independent of the federal question and adequate to support the
judgment.'"  *Cone v. Bell,* 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson,* 501 U.S.
722, 731 (1991)).  "The doctrine applies to bar federal habeas when a state court declined to
address a prisoner's federal claims because the prisoner had failed to meet a state procedural
requirement."  *Coleman,* 501 U.S. at 729-30.  A "habeas petitioner who has failed to meet the
State's procedural requirements for presenting his federal claims has deprived the state courts of
the opportunity to address those claims in the first instance."  *Id.* at 732.

A claim can be lost to procedural default at any level of state court review: at trial, on direct
appeal, or during state postconviction proceedings.  *Edwards v. Carpenter,* 529 U.S. 446, 451
(2000); *Kilmartin v. Kemna,* 253 F.3d 1087, 1088 (8th Cir. 2001).   Where "no state court remedy
is available for an unexhausted claim—that is, if resort to the state courts would be futile—then
the exhaustion requirement of § 2254(b) is satisfied, but the failure to exhaust 'provides an
independent and adequate state-law ground for the conviction and sentence, and thus prevents
federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause
and prejudice for the default'" or actual innocence.  *Armstrong v. Iowa,* 418 F.3d 924, 926 (8th

29

Cir. 2005) (quoting *Gray v. Netherland,* 518 U.S. 152, 162 (1996)); *Grass v. Reitz,* 643 F.3d 579, 584 (8th Cir. 2011); *see also Sawyer v. Sawyer,* 505 U.S. 333, 338-39 (1992) (Once a claim is defaulted, the habeas court can only consider the claim if the petitioner can show cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice).

A petitioner can by-pass the cause and prejudice analysis by showing that "the failure to consider his claims would result in a fundamental miscarriage of justice." *McCall v. Benson,* 114 F.3d 754, 758 (8th Cir. 1997) (citing *Coleman*, 501 U.S. at 750). Only a petitioner claiming actual innocence may fall within this exception. *Id.*

"'The requirement of cause . . . is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief.'" *Cornman v. Armontrout,* 959 F.2d 727, 729 (8th Cir. 1992) (quoting *McCleskey v. Zant,* 499 U.S. 467, 496 (1991) (equating cause and prejudice analysis in context of procedural default and abuse of the writ). "[T]he cause standard requires the petitioner to show that some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *McCleskey v. Zant,* 499 U.S. at 493 (internal quotations and citations omitted). Examples of cause include an unavailable factual or legal basis for the claim, or interference by state officials that made complying with the exhaustion requirements impracticable. *Murray v. Carrier,* 477 U.S. 478, 488-89 (1986). In *Coleman*, the Supreme Court stated that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman,* 501 U.S. at 753.

In *Martinez v. Ryan,* however, the Supreme Court created a narrow exception to this rule, providing that "a procedural default will not bar a federal habeas court

30

> from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. 1, 17 (2012). Subsequently in *Trevino v. Taler,* the Supreme Court explained this exception holding that *Martinez* applies "where . . . state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal."

*Marcyniuk v. Payne,* 39 F.4th 988, 995-96 (8th Cir. 2022) (parallel citations omitted).

The Courts have developed three general rules for dealing with the *Martinez* exception. First, petitioner must show that "reasonable jurists could debate whether trial counsel acted ineffectively, creating a substantial likelihood of prejudice to the petitioner." *Shockley v. Crews,* 696 F. Supp.3d 589, 686 (E.D. Mo. 2023) (citations omitted). Second, petitioner must show "that the ineffective-assistance-of-trial-counsel claim plainly presented a stronger case than the claims actually raised by postconviction counsel." *Id.* The first two rules deal with establishing cause. Finally, the third rule deals with prejudice and requires the petitioner to show "actual prejudice, as opposed to merely debatable prejudice, and only then can the petitioner present the merits of the ineffective-assistance-of-trial-counsel claim to a federal habeas court." *Id.*

In applying the *Martinez* exception, "[t]iming matters." *Hartman v. Payne,* 8 F.4th 733, 736 (8th Cir. 2021). "If the default occurs at the initial-review collateral proceeding, then postconviction counsel's ineffectiveness can provide cause. But when default happens later, after 'the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial,' it cannot." *Id.* at 736-37 (internal citations omitted) (quoting *Martinez,* 566 U.S. at 16).

## C. Ineffective Assistance of Counsel

The Court evaluates ineffective assistance of counsel claims brought under § 2254 using the standards set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).

To prevail on his ineffective assistance of counsel claims, Gay must prove, by a preponderance of the evidence, two related but independent issues.   First, Gay must show that counsel's performance was so deficient the performance does not constitute counsel as guaranteed the defendant by the Sixth Amendment.   *Id.* at 687.   Second, Gay must show that counsel's deficient performance materially and adversely prejudiced the outcome of the case.   *United States v. Webb,* 70 F.4th 1038, 1044 (8th Cir. 2023).

With respect to the first prong, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."   *Strickland*, 466 U.S. at 687-88.   The Supreme Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential.   It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.   A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.   Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689.   A reviewing court "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."   *Id.* at 690.   "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."   *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

With respect to the second prong, to prove an error was prejudicial Gay must establish that

"there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. "When the second element of this test can be dispositive of a case, we need not address the reasonableness of the attorney's behavior if the movant cannot prove prejudice." *Webb,* 70 F.4th at 1044 (internal quotation marks and citations omitted).

## IV.   CLAIMS

### A.   Claims Alleged to be Procedurally Defaulted

The State contends Gay has procedurally defaulted on the following claims:

Claim 1-3—Counsel was ineffective for failing to investigate evidence of Gay's head injuries and possible brain damage.

Claim 2-1—Counsel unreasonably failed to strike jurors who heavily favored the death penalty.

Claim 2-3—Counsel failed to object or move to disqualify jurors who stated they would not consider intoxication as a mitigating factor. Procedurally defaulted as to jurors Palmquist, Ritchey, and Holloway.

Claim 2-4—Counsel failed to adequately rehabilitate potential jurors who expressed reservations about imposing the death penalty.

Claim 2-5—Counsel was ineffective for failing to pursue a change of venue.

Claim 4—Gay's Fifth, Sixth, and Fourteenth Amendment rights to a fair and impartial jury were violated by the trial court's preclusion of case-specific mitigation questions during *voir dire*.

33

Claim 5—The trial court's inconsistent treatment of rehabilitative questions during *voir dire* resulted in the improper removal of jurors for cause and denied Gay his right to a fair and impartial jury under the Sixth Amendment.

Claim 6—Gay was wrongfully denied his Sixth Amendment right to the counsel of his choice.

Claim 7—There was insufficient evidence of Gay's intent to commit capital murder.

Claim 8—The State used improper and unconstitutional "victim impact" testimony.

Claim 9—Prosecutorial misconduct during the guilt- and penalty-phase closing arguments violated due process.

Claim 10—Form 3 of the jury instructions precluded the jury from exercising mercy.

Claim 12—Gay received ineffective assistance of counsel on appeal.

Claim 13—Evolving standards of decency render the death penalty unconstitutional.

Claim 14—Gay is entitled to relief because of the cumulative prejudicial effect of the errors described herein.

As is obvious, the State argues procedural default occurred as to many of Gay's claims. The Court turns to an examination of the record and the parties' arguments on the procedural default issue.

### A.    Claim 1-3—Counsel was ineffective for failing to investigate evidence of Gay's head injuries and possible brain damage.

The State first argues Claim 1-3 has been insufficiently pled.   ECF No. 13 at 71.   Second, it argues that Gay has procedurally defaulted on the claim.   *Id.*

Gay concedes that he failed to raise Claim 1-3 in the initial-review collateral proceeding. ECF No. 27 at 22.   Gay argues he has an available state remedy via a motion to recall the mandate. *Id.* at 60.   Moreover, Gay maintains he can establish cause to excuse the procedural default in

34

two separate ways: (1) relying on *Martinez v. Ryan,* 566 U.S. 1, 17 (2012), Gay states that postconviction counsel's ineffectiveness serves as cause to forgive default of each of his ineffective assistance of trial counsel claims; and (2) relying on *Coleman v. Thompson,* 501 U.S. 722, 753-54, Gay argues that the ineffective assistance of trial or appellate counsel can serve as cause    (ECF No. 27 at 22).

### 1.  Sufficiency of the Pleading

The State initially argues that Gay's claim of having suffered head injuries and possible brain damage is not supported by the record and is insufficient to satisfy Rule 2(c) of the Rules Governing Habeas Corpus Cases.   (ECF No. 13 at 72).   At best, the State argues the allegations are vague and conclusory and should be summarily dismissed.   *Id.*

Rule 2(c) of the Rules governing Habeas Corpus Cases, 28 U.S.C. § 2254, requires that a petition:

> (1) specify all the grounds for relief;
> (2) state facts supporting each ground;
> (3) state the relief requested;
> (4) be printed, typewritten, or legibly handwritten; and
> (5) be signed under penalty of perjury by the petitioner or a person authorized to sign it for the petitioner under 28 U.S.C. § 2242.

To the extent they are not inconsistent with any statutory provisions or the Rules Governing Habeas Corpus Cases, the Federal Rules of Civil Procedure are made applicable to habeas corpus actions pursuant to Rule 12 of the Rules Governing Habeas Cases.   Rule 8(a) of the Federal Rules of Civil Procedure requires pleadings in federal court to contain a short and plain statement of the claim showing that the pleader is entitled to relief.   Fed. R. Civ. P. 8(a)(2).

However, in *Mayle,* the Supreme Court concludes that Rule 2(c) is "more demanding" than

35

Rule 8. *Mayle v. Felix,* 545 U.S. 644, 655 (2005).[8]  The Supreme Court pointed out the advisory notes require the petition to state facts pointing to a real possibility of constitutional error.  *Id.; see also Adams v. Armontrout,* 897 F.2d 332, 334 (8th Cir. 1990) (Petitioner "must state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified. These facts must consist of sufficient detail to enable the court to determine, from the face of the petition alone, whether the petition merits further habeas corpus review.").

In his petition, Gay points to two head injuries.  The first injury occurred in 2002 or 2003 when he was employed by BB&B and working on a large construction project.  ECF No. 2 at 3. A large dump truck collided head on with Gay's truck.  *Id.*  Gay suffered face and skull injuries. *Id.*  He was taken to a hospital but refused a CT scan as he lacked health insurance.  *Id.*  The second injury occurred the following year when Gay was operating a bulldozer and was flung forward and struck his head on the top of the bulldozer's protective cage.  *Id.*  Gay lost consciousness was transported to the hospital and received multiple staples to repair a "gash" on the left side of his head.  *Id.*  Gay again left the hospital before a CT scan could be performed because he lacked insurance.  *Id.*  After this injury, Gay suffered headaches for six months and developed a sense of aggravation and annoyance that was not there previously.  *Id.*  He became combative with friends over minor disagreements, demonstrated a negative attitude, and began drinking heavily.  *Id.* at 38.

---

[8] After the *Mayle* decision, the Supreme Court altered the standard for determining the sufficiency of pleading under Rule 8 of the Federal Rules of Civil Procedure in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 562-63 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  The cases continue to hold that Rule 2(c) contains a fact pleading requirement.  *See e.g., Bays v. Warden, Ohio State Penitentiary,* Case No. 3:08-cv-076, 2016 WL 792015, (Mar. 1, 2016).

Gay has stated specific, particularized, facts supporting this ground for relief. Gay has complied with Rule 2(c).

### 2. Procedural Default

The State argues Gay has raised this claim for the first time in his federal habeas petition and has therefore procedurally defaulted on this claim. As noted above, Gay concedes this claim is unexhausted. That is, he did not bring this claim in state court. However, he maintains the claim is not procedurally defaulted because he has an available state remedy.

The question to be determined is "whether state law provides any presently available procedure for determining the merits" of this claim. *Snethen v. Nix,* 736 F.2d 1241, 1245 (8th Cir. 1984). Gay argues a state remedy is available and his petition should be dismissed without prejudice or stayed while the claim is fairly presented to state court. Specifically, Gay argues he can return to the Arkansas courts via a motion to recall the mandate.

"The power of an appellate court to recall its mandate, if the circumstances warrant it, is recognized both in federal courts and state courts across the country." *Robbins v. State,* 114 S.W.3d 217, 221 (Ark. 2003). However, the power is used sparingly. *Id.* The Arkansas Supreme Court stated: "[t]he undeniable fact is this court will recall a mandate and reopen a case in extraordinary circumstances." *Id.* at 222. In *Robbins* the mandate was recalled because the issue raised was "on all fours legally" with the issue in *Willett v. State,* 911 S.W.2d 937 (Ark. 1995), which was found to constitute a fundamental reversable error. *Id.* The Arkansas Supreme Court disagreed with the State's argument that the issuance of a recall of the mandate would open the floodgates to death row inmates. *Robbins,* 114 S.W.3d at 223. It stated it was

> reopening this death case solely because of (1) the alleged comparable verdict form deficiency in the *Willett* case, (2) the federal district court's dismissal of the federal

*habeas corpus* petition in order to give state courts the opportunity to explore this issue, and (3) the enhanced scrutiny that we require in death cases.

*Id.*

Gay, concedes the Court of the Eighth Circuit in *Wooten v. Norris,* 578 F.3d 767 (8th Cir. 2009), rejected the petitioner's argument that in Arkansas, the motion to recall the mandate was a "regularly available means for further, state-court, collateral review."   *Id.* at 783.   While "[r]ecalling the mandate and reopening a case, then is not a completely unique act, as suggested in *Robbins,* but it appears to remain extraordinary rather than routine."   *Id.*

However, Gay suggests that if one fast-forwards to more recent cases it will be clear that the Arkansas Supreme Court has expanded the procedure for recalling a mandate well beyond the narrow circumstances the court articulated in *Robbins,* "such that it now should be considered 'routine' and an ordinary feature of state-court review in Arkansas capital cases."   (ECF No. 27 at 16-17).   Gay points out motions to recall the mandate were granted in *Wooten v. State,* 370 S.W.3d 475, 41 (Ark. 2010), *Williams v. State,* 2011 Ark. 534 at *4 (Ark. 2011), *Roberts v. State,* 426 S.W.3d 372, 378 (Ark. 2013), and *Wertz v. State,* 493 S.W.3d 772, 777 (Ark. 2016).   In support of his argument that "the procedure has expanded well beyond the limitations articulated in *Robbins,*" Gay cites the Court to *Nooner v. State,* 438 S.W.3d 233, 239 (Ark. 2014) where the Arkansas Supreme stated strict compliance with all three *Robbins* factors was not required, and to the prevalence of the procedure as illustrated by *Wertz,*[9] *supra, Ward v. State,* 539 S.W.3d 546

---

[9] Recalling mandate where defendant was charged with two counts of capital murder but only a single set of penalty-phase verdict forms was used.

(Ark. 2018),[10] and *Davis v. State,* 539 S.W.3d 565 (Ark. 2018).[11]

In *Nooner v. State,* 438 S.W.3d 233 (Ark. 2014), the Arkansas Supreme Court acknowledged there had been inconsistencies in its opinions as to whether satisfaction of the three factors in *Robbins* was mandatory, but said it had been consistent in stating "we will reopen a case only to address an 'error in the appellate process,' meaning an error that *this court* made or overlooked while reviewing a case in which the death sentence was imposed." *Id.* at 239 (emphasis in original). It pointed out the error must have been made by it during the course of appellate review of a death-penalty case; distinguished it from an error that should have been raised at trial; and said it could not be considered to fall within one of the so-called *Wicks v. State,* 606 S.W.2d 366 (1980) exceptions; or within their independent review of death penalty cases pursuant to Rule 4-3 of the Arkansas Supreme Court Rules and Rule 10 of the Arkansas Rules of Appellate Procedure—Criminal. *Id.* While it concluded satisfaction of all three *Robbins* factors was not strictly required, it did not back away from the requirement that extraordinary circumstances be shown. Specifically, it said strict compliance with *Robbins* was not required "because this court has the inherent authority to recall its mandate in extraordinary circumstances." *Id.* at 240.

In *Wertz v. State,* 493 S.W.3d 772 (Ark. 2016), the Arkansas Supreme Court stated that recall of the mandate was a "narrow remedy, and it is necessary for us to determine whether the

---

[10] Declining to address defendant's arguments where he had raised the same arguments in a prior motion to recall the mandate and finding the doctrine of law of the case forbade such reconsideration unless the evidence was materially different.

[11] Motion to recall the mandate denied where defendant argued he was entitled to access to an independent mental health expert to assist in his defense. Finding he failed to demonstrate a breakdown in the appellate process. Recognizing the factors set forth in *Robbins* need not be strictly applied but stating the factors were an important guide "because recalling the mandate is discretionary and applying the factors serves as 'some means of an internal check on that discretion' to ensure against its arbitrary application." *Davis,* 539 S.W.3d at 569.

fact that this error was not addressed by this court on direct appeal constitutes a defect or breakdown in the appellate process sufficient to warrant recall of the mandate." *Id.* at 776.   In *Ward v. State,* 455 S.W.3d 303 (Ark. 2015) ("*Ward V"*), the Arkansas Supreme Court stated, "the recall of a mandate of this court is an extremely narrow remedy, it will be granted in only extraordinary circumstances as a last resort to a miscarriage of justice or to protect the integrity of the judicial process." *Id.* at 310-11 (quotation marks and citations omitted).   In *Key v. States,* 575 S.W.3d 554, 557 (Ark. 2019), the Court again stated it would "recall the mandate only in the most extraordinary circumstances."   Additionally, in *Ward*, the Court noted that "[w]e do not entertain a claim for recalling the mandate based solely on allegations of ineffective assistance of postconviction counsel."   *Ward,* 455 S.W.3d at 835.

Gay has shown that capital defendants appear to be filing motions to recall the mandate more frequently; however, this does nothing to establish that it has become part of Arkansas' ordinary and routine *postconviction* relief mechanism.   Rather, it remains an extraordinary remedy.

Gay has completed one full round in the Arkansas courts.   He is not entitled to a stay or dismissal of this petition to allow him to file a motion to recall the mandate with the Arkansas Supreme Court.

### 3.   Cause and Prejudice

This Court may only consider the merits of a procedurally defaulted claim if Gay can show (1) cause for the default and actual prejudice, or (2) that the default will result in a fundamental miscarriage of justice.   *Sawyer v. Whitley,* 505 U.S. 333, 338-39 (1992); *Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991).   Here, Gay maintains he can show both cause and prejudice thus

allowing this Court to review the defaulted claim.

Gay asserts the procedural default can be excused under *Martinez* due to the ineffective assistance of Rule 37 counsel.  *Martinez v. Ryan,* 566 U.S. 1 (2012), ruling extended by, *Trevino v. Thaler,* 569 U.S. 413 (2013).  As previously discussed, *Martinez* applies where: (1) the state did not appoint counsel for the initial-review collateral proceeding for a claim of ineffective assistance of trial counsel; or (2) appointed counsel in the initial collateral review proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668 (1984).  *Martinez,* 566 U.S. at 14.  "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say the prisoner must demonstrate that the claim has some merit." *Martinez,* 566 U.S. at 14.  *See also Dorsey v. Vandergriff,* 30 F.4th 752, 756 (8th Cir. 2022) (equating the terms "is substantial" and "has some merit" to mean a reasonable jurist could believe that trial counsel was ineffective or find the issue debatable among jurists).

The *Strickland* test has two well-known components: (1) that counsel's performance was deficient, resulting in errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense, depriving the defendant of a fair trial.  *Strickland,* 466 U.S. at 687-88.  The deficient-performance component requires that a defendant show counsel's performance fell below an objective standard of reasonableness.  *Id.*  The prejudice-component requires that a defendant establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.

Gay states that both trial counsel and postconviction counsel had evidence of his head

41

injuries in the form of Patsy Howard's FBI interview.[12]  ECF No. 27 at 60.  Either could have

followed up or corroborated evidence of the head injuries by seeking out available witnesses or

records.  *Id.*  Gay maintains "evidence of brain damage is highly impactful in mitigation.

Injuries or damage to the brain is particularly effective because it explains how a person's criminal

conduct is beyond their control."  *Id.* at 61.

Here, Gay has not shown that the Rule 37 counsel was ineffective in failing to raise the

issue of Gay's possible brain injury.  According to the Petition, Gay was taken to the hospital on

each occasion and released without being admitted.  ECF No. 2 at 37.  In fact, the Petition

mentions no treatment at all following the head on collision with the dump truck and only the need

for staples for the second injury where he suffered a laceration on the left side of his head.  *Id.*

To get "through the *Martinez* gateway," the "key question is whether postconviction

counsel was ineffective.  If not, there is no excuse for the failure to raise trial counsel's

ineffectiveness during state postconviction proceedings."  *Deck v. Jennings,* 978 F.3d 578, 582

(8th Cir. 2020) (citing *Martinez,* 566 U.S. at 14).  Thus, "[f]ocusing on the narrow question of

postconviction counsel's performance, as *Martinez* instructs us to do, we must determine whether

the ineffective-assistance-of-trial-counsel claim was 'substantial enough' that the failure to raise

---

[12] The State informs the Court that Patsy Howard's statement is not part of the state court record. ECF No. 13 at 71.  The State indicates the statement it was referenced during the expert testimony given by Dr. Roache at the Rule 37.5 hearing.  ECF No. 14-20, p. 70.  Gay's reply brief fails to cite the Court to any portion of the state court record on this point.  ECF No. 27 at 59-61.

Dr. Roache was retained as a consultant regarding the neurocognitive effects of alcohol and chronic alcohol abuse on the brain.  His report is limited to Gay's alcoholism and makes no mention of any possible brain injury.  ECF No. 14-32, pp. 153-55.  The only mention of Patsy Howard's FBI interview is when Dr. Roache lists the FBI interviews and/or testimony he reviewed. ECF No. 14-20, p. 69.

it on postconviction review was itself ineffective." *Id.* For postconviction counsel to have been ineffective for not presenting a claim, the claim must be plainly stronger than the claims that were presented. *Deck,* 978 F.3d at 584 (citing *Davila v. Davis,* 582 U.S. 521, 532 (2017)). In this case, as in *Deck,* "[p]ostconviction counsel raised a number of other claims, including that trial counsel should have presented more mitigating evidence." *Id.* This claim is not plainly stronger than the claims postconviction counsel brought. The *Martinez* exception is inapplicable, and procedural default is not excused with respect to this claim.

### B. Claim 2-1—Counsel unreasonably failed to strike jurors who heavily favored the death penalty.

Gay argues that his trial counsel permitted the seating of four especially death-prone jurors, Julia Holloway, Frank Palmquist, Brenda Frye, and Natasha Richardson. ECF No. 2 at 98. The State asserts that this claim was raised in Rule 37 proceedings but not on appeal to the Arkansas Supreme Court. ECF No. 13 at 100. As such, the State maintains this claim is procedurally defaulted. *Id.*

Gay concedes this claim was abandoned on appeal. ECF No. 27 at 79. However, Gay argues the Court can still reach the merits of this claim via the miscarriage of justice exception. *Id.*

#### 1. Miscarriage of Justice

To assert the fundamental miscarriage of justice exception, a petitioner must "present new evidence that affirmatively demonstrates that he is innocent of the crime for which he was convicted." *Murphy v. King,* 652 F.3d 845, 850 (8th Cir. 2011); *see also Calderon v. Thompson,* 523 U.S. 538, 559 (1998) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.") (citation omitted) (alteration in original)). "'To be credible,' a

claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon,* 523 U.S. at 559 (quoting *Schlup v. Delo,* 513 U.S. 298, 324 (1995)).

> Although demanding in all cases, the precise scope of the miscarriage of justice exception depends on the nature of the challenge brought by the habeas petitioner. If the petitioner asserts his actual innocence of the underlying crime, he must show it is more likely than not that no reasonable juror would have convicted him in light of new evidence presented in his habeas petition. If, on the other hand a capital petitioner challenges his death sentence in particular, he must show by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty in light of the new evidence.

*Calderon,* 523 U.S. at 559-560 (internal quotation marks and citations omitted).

### 2. Innocent of the Offense of Capital Murder

In this case, Gay seeks to establish that he was innocent of the offense because he was "unable to act with [the] premeditation and deliberation" necessary to commit the offense of capital murder. ECF No. 27 at 27. Gay argues that mental disease or defect is admissible to show incapacity to form the requisite *mens rea.* ECF No. 27 at 27. Gay asserts his PTSD and decades of alcohol abuse inhibited his ability to engage in premeditation or deliberation. *Id.*

Under Ark. Code Ann. § 5-2-301(6), lack of criminal responsibility exists if, "due to a mental disease or defect a defendant lacked the capacity at the time of the alleged offense to either: (A) Appreciate the criminality of his or her conduct; or (B) conform his or her conduct to the requirements of the law."

In *Schlup v. Delo,* 513 U.S. 298 (1995), the Supreme Court stated that "[t]o be credible, [an actual innocence] claim requires petitioner to support his allegations of constitutional error with **new** reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324 (emphasis added). The *Schlup* Court stated the applicable standard required the court to consider

the:

> probative force of relevant evidence that was either excluded or unavailable at trial. . . . The habeas court must make its determination concerning the petitioner's innocence in light of all relevant evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after the trial.

*Id.* at 327-28 (internal quotation marks and citations omitted).  Gay meets this threshold requirement only if he "persuades" the Court "that, in the light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329.

As illustrated by the following, there was substantial evidence during Gay's trial about his excessive use and abuse of alcohol.

(1) James Westlake testified he had known Gay to drink but had never seen him incapacitated.  ECF No. 14-28, p. 291.  Westlake also testified Gay had been drinking, had a few drinks and was "just feeling good," the day he shot Snow.  *Id.*  On cross examination, Westlake testified most of the time he saw Gay in the afternoons he was drinking a beer.  *Id.,* p. 311.

(2) Doris Blees, who owned Blees Grocery on the outskirts of Mountain Pine, testified Gay would purchase beer, whatever brand was on sale, from the store.  ECF No. 14-28, pp. 389-90.  She testified he sometimes just bought six packs and sometimes thirty packs.  *Id.,* p. 390.  Blees referred to Gay as a functional alcoholic.  *Id.,* p. 391.

(3) Special Agent Scott Falls testified that when he interviewed Gay that he described himself as having a "big time alcohol problem" and reported experiencing black outs or passing out while drinking.  ECF No. 14-28, p. 439.  Gay reported having bought a thirty pack of beer on May 10th and a bottle of whiskey and spending the day at Larry Nevels' house.  *Id.,* p. 440.  Gay stated he had been drinking and could not recall having shot Snow and/or he had been at Nevels' house the whole afternoon.  *Id.,* p. 443.

(4) Vera Nevels testified she had known Gay for approximately two years when the Snow murder occurred.  ECF No. 14-29, p. 100.  She indicated Gay and her husband would go fishing. *Id.*  Her sister, Latonya, also dated him for about six months.  *Id.,* pp. 101-02. Vera testified that she had observed Gay have a black out from drinking.  *Id.*, p. 111.

(5) Janice Cochran, an ex-wife of Gay's, testified both Glen and Gay had drinking problems often drinking to excess. ECF No. 14-29, p. 354. Gay confined himself to beer unless Glen was around when Gay would drink whiskey. *Id.* Cochran testified when Gay was drinking whiskey, he would become angry "and every little thing would set him off." *Id.,* pp. 354-55. When Gay was drinking beer, he was functional. *Id.,* p. 355. After Gay woke up in the morning, he would have a cup of coffee and then start drinking. *Id.* Cochran testified she had never seen Gay black out from drinking. *Id.,* p. 373.

(6) John Ward testified he owned Ward Country Store and employed Gay for various things including sweeping the parking lot. ECF No. 14-29, pp. 379-81. Ward indicated he eventually had to tell Gay not to come around the store anymore because he was drinking too much. *Id.*, p. 382. After that, Gay called Ward threatening to kill him. *Id.,* p. 383. Gay was tried and convicted of terroristic threatening. *Id.,* pp. 383-84.

(7) Gloria Lindsay testified that she is Gay's older sister. ECF No. 14-29, p. 418. Lindsay testified that while they were in a children's home, Gay, who was six, was being sexually abused. *Id.,* p. 429. Later, Gay is believed to have witnessed an altercation between Glen, Lindsay, and her boyfriend where Glen first put the boyfriend in a choke hold and then went and got a shot gun and stood in the road with it pointed at Lindsay and her boyfriend. *Id.*, pp. 436-37. Lindsay testified Glen could be harsh and verbally abusive to Gay even when alcohol was not involved. *Id.,* p. 439. Lindsay believed Gay had a problem drinking and considered him to be a functional alcoholic. *Id.,* p. 444. After Gay was paroled for the second time, Lindsay testified she became concerned Gay was drinking to excess. *Id.,* p. 449. After Gay's divorce from Deborah, he gave up on a "lot of things and life" and began drinking "heavily." *Id.,* p. 453. Prior to Glen's death, Gay had a hard time keeping a job because Glen would encourage him to go fishing or hunting or just hang out rather than work and they would both drink. *Id.* Lindsay testified Gay was present when their first cousin Scotty Garner was killed. *Id.*, p. 462.

While there was no testimony about his diagnosis of PTSD, as illustrated above, there was testimony about the violence, sexual assault, and abuse Gay was exposed to and involved in. Further, the ADC pen pack[13] which included, among other things an MMPI evaluation, evidence Gay reported being sexually assaulted while at the ADC, and evidence he reported suffering from

---

[13] Much of the pen pack as it appears in the State record is virtually illegible.

recurrent black outs.   ECF No. 14-12, p. 757-58 (MMPI); ECF No. 14-14 at 129 (sexual assault); ECF No. 14-14 at 110 (recurrent blackouts).

During the Rule 37 hearing, Gay argued that trial counsel failed to introduce powerful mitigation evidence contained in a prisoner medical treatment report for Gay.   ECF No. 14-19, p. 75.   Trial counsel had obtained the report.   *Id.*   This report, among other things, discussed Gay's alcohol dependence disorder; his history of mental health issues; mentioned Gay having reported that the day of Snow's homicide he drank a pint of whiskey and 12-20 beers; mentioned Gay reported he drank 12 beers a day for twenty-five years; included Gay's description of the symptoms of PTSD; indicated the reason for the mental health referral was Gay was symptomatic of PTSD; contained a memo noting Glen had been physically and verbally abusive, a heavy drinker, and had sexually abused Gay; contained an admission psychological evaluation record noting there was evidence Gay suffered from PTSD and had regularly used alcohol since age 15; and mentioned that Gay had limited judgment and was impaired in his ability to make life decisions.   *Id.,* pp. 75-76.

In *Kidd v. Norman,* 651 F.3d 947 (8th Cir. 2011), the Eighth Circuit was faced with a *Schlup* "gateway" claim of actual innocence, as is this, Court.   In *Kidd*, the Eighth Circuit held that it was bound by its decision in *Amrine v. Boxwersox,* 283 F.3d 1023, 1029 (8th Cir. 2010), which held "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence."   The Eighth Circuit held *Armine* required "Kidd to come forward not only with new reliable evidence, which was not presented at trial, but to come forward with new reliable evidence which was not available at trial through the exercise of due diligence."   *Kidd,* 651 F.3d at 953.   Gay concedes the Eighth Circuit's interpretation but argues

"numerous outside circuits have held 'new' to mean evidence that was not considered by the fact finder in the original proceeding.   ECF No. 27 at 130 (citing among others *Fontenot v. Crow,* 4 F.4th 982, 1031-33 (10th Cir. 2021); *Gomez v. Jaimet,* 350 F.3d 673, 679-80 (7th Cir. 2003)).

This Court is not free to ignore the rulings of the Eighth Circuit.   The evidence presented by Gay was not only available at the time of his trial but was in the possession of his defense counsel.   Gay cannot meet *Schlup's* actual innocence gateway on his argument that he lacked the *mens rea* for capital murder.

### 3.  Innocent of the Sentence of Death

Gay first notes that the Supreme Court in *Sawyer v. Whitley,* 505 U.S. 333, 345 (1992) held "[s]ensible meaning is given to the term 'innocent of the death penalty' by allowing a showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met."   (ECF No. 27 at 28). He admits this exception requires him to make a showing by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty under applicable state law in light of new evidence.   *Id.*

Gay, relying on *Ford v. Lockhart,* 861 F. Supp. 1447, 1453-54 (E.D. Ark. 1994), *aff'd on other grounds sub nom., Ford v. Norris,* 67 F.3d 162 (8th Cir. 1995), asks the Court to consider the omission of mitigating evidence that should have come before the jury because of the particular nature of the Arkansas sentencing statute which requires the jurors to first decide if the aggravating circumstances outweigh mitigating factors before it can make the ultimate determination of whether the aggravating circumstances justify a sentence of death.   ECF No. 27 at 28-29.   Gay admits that the Eighth Circuit in *Wooten,* 578 F.3d at 781 stated that "in applying the actual-

48

innocence exception in the death-penalty context, courts may not consider the jury's penalty-phase balancing function." *Id.*

Gay cannot escape the fact that *Wooten* involved an Arkansas death row inmate sentenced under the same statutory provisions. *Wooten,* 578 F.3d at 769. Moreover, as *Ford* was decided more than a decade before *Wooten,* the district court in *Ford* did not have the benefit of the Eighth Circuit ruling on the issue. In *Wooten,* the petitioner argued that his counsel was constitutionally ineffective for failing to present in the guilt phase arguments that mental health issues prevented him from formulating the necessary *mens rea,* and for failing to present mitigating evidence during the penalty phase. *Id.* at 769. Wooten specifically argued the evidence would have swayed the jury as to the balancing of mitigating and aggravating factors. *Id.* at 770. The Eighth Circuit, relying on *Sawyer v. Whitley,* 505 U.S. 333, 347 (1992), rejected Wooten's arguments and held that "in applying the actual-innocence exception in the death-penalty context, courts may not consider the jury's penalty-phase balancing function, and actual innocence refers only to the underlying finding of guilt and the jury's finding of death-qualifying aggravators." *Wooten,* 578 F.3d at 781.[14]

Despite Gay's invitation to do so, this Court is not free to adopt a different standard than that established by the Eighth Circuit in *Wooten.* Consequently, Gay has not shown by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty. Gay has procedurally defaulted on Claim 2-1.[15]

---

[14] The Eighth Circuit in *Wooten* also rejected the argument that a breakdown in the attorney-client relationship constituted cause. *But see Maples v. Thomas,* 565 U.S. 266, 280 (2012) (attorney's abandonment of client without notice severed the attorney-client relationship and constitutes cause for excusing procedural default).

[15] Gay also argues they are entitled to a hearing on the issue of cause and prejudice. However, as

### C.   Claim 2-3—Counsel failed to object or move to disqualify jurors who stated they would not consider intoxication as a mitigating factor.

Although Gay raised this issue in his Rule 37 petition, the State maintains Gay failed to name the jurors he believed should have been struck.   ECF No. 13 at 115-16.   On appeal, the State indicates Gay only argued that counsel was ineffective for allowing jurors Frye and Stacy to be seated.   *Id.* at 116.   Thus, to the extent this claim relates to jurors Palmquist, Ritchey, and Holloway, the State argues Gay has procedurally defaulted.   *Id.* at 116 & 118.

First, Gay maintains that the argument that he was denied a fair and impartial jury because jurors Frye and Stacy said they would not consider intoxication as a defense, was presented to the Arkansas Supreme Court but was not addressed.   ECF No. 27 at 94.   Because there was no merits adjudication, Gay says this Court is free to review the claim *de novo.   Id.*   Second, Gay argues the inclusion of three previously unnamed jurors does not fundamentally alter the claim that counsel unreasonably failed to strike jurors who stated that intoxication did not mitigate a defendant's criminal actions.   *Id.* at 94-95.   As his Rule 37 claim is sufficiently similar to the claim now presented, he asserts his claim is neither unexhausted nor defaulted.   *Id.* at 95.

In *Vasquez v. Hillery,* 474 U.S. 254 (1986), the Supreme Court was asked to "abandon the rule requiring reversal of the conviction of any defendant indicted by a grand jury from which members of his own race were systematically excluded."   *Id.* at 255.   A threshold argument was

---

this Court ruled in connection with Gay's request to expand the record, *Shinn v. Ramirez,* 596 U.S. 366 (2022), requires a petitioner to meet the standards set forth in 28 U.S.C. § 2254(e)(2) (the claim relies on a "new rule of constitutional law" made retroactive or "a factual predicate that could not have been previously discovered through the exercise of due diligence" or "the facts underlying the claim would establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   Gay made no argument he could meet these standards.   ECF No. 48.

whether Hillery had "circumvented his obligation to exhaust state remedies before seeking collateral relief in court." *Id.* at 257. The question arose because the district judge had saw a need to "'supplement and clarify' the state-court record presented for review." *Id.* Specifically, the State was directed to provide more figures showing the portion of the Black population that were eligible for grand jury service. *Id.* He also had the parties submit their views on the application of statistical probability analysis. *Id.* The State argued that the submissions "drastically" altered the "claim and rendered it unsuitable for federal habeas review without prior consideration by the state courts." *Id.* The Supreme Court noted it had "never held that presentation of additional facts to the district court, pursuant to the court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts." *Id.* at 258. The Court stated that "[f]orm would indeed triumph over substance were we to allow the question of exhaustion to turn on whether a federal judge has relied on educated conjecture or has sought out a more sophisticated interpretative aid to accomplish the same objective." *Id.* at 260. It held that "the supplemental evidence presented by [Hillery] did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that [Hillery] be remitted to state court for consideration of that evidence." *Id.* According to Gay, this is precisely the case here.

The Court agrees with Gay. The addition of the three jurors does not alter the substance of his claim that counsel failed to object or move to disqualify jurors who stated they would not consider intoxication as a defense. The claim is not procedurally defaulted as to jurors Palmquist, Ritchey, and Holloway.

### D. Claim 2-4—Counsel failed to adequately rehabilitate potential jurors who expressed reservations about imposing the death penalty.

The State argues this claim is procedurally defaulted because Gay failed to raise it on appeal from the Rule 37 petition.   ECF No. 13 at 121.   Further, the State argues *Martinez* is not available to excuse the default.   *Id.*

Gay concedes this claim is procedurally defaulted.   (ECF No. 27 at 98).   However, Gay argues the Court may still consider the claim by way of the miscarriage of justice exception.   *Id.*

As discussed in detail with respect to claim 2-1, Gay cannot meet the miscarriage of justice exception.   First, he has presented no new reliable evidence which was not available at trial through the exercise of due diligence.   Second, he has not shown by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty.   This claim is procedurally defaulted.

### E.  Claim 2-5—Counsel was ineffective for failing to pursue a change of venue.

The State argues this claim was not raised in state court.   ECF No. 13 at 123.   The State maintains there is no presently available state procedure for determining the merits of the claim. *Id.*   It points out Gay is precluded from filing a successive Rule 37 petition; a state habeas petition is not appropriate; and the claim does not fall under the delineated grounds for error coram nobis relief. [16]   *Id.*   As a result, the State maintains this claim is procedurally defaulted.   *Id.* Moreover, the State argues Gay has not attempted to assert, much less demonstrate, cause and prejudice to excuse his default.   *Id.* at 124.

Gay argues his counsel's failure to seek a change of venue harmed Gay by depriving him

---

[16] The writ of error coram nobis is available to address "errors in one of four categories:  (1) insanity at the time of trial, (2) a coerced guilty plea, (3) material evidence withheld by the prosecutor, or (4) a third-party confession to the crime during the time between conviction and appeal."   *Wells v. State,* 632 S.W.3d 738, 740 (Ark. 2021).

of a trial untainted by pretrial publicity and decided by an impartial jury.   ECF No. 27 at 99.   Gay concedes the claim is unexhausted; however, he maintains it is not defaulted as he has an available state remedy by way of a motion to recall the mandate.   *Id.*   Gay asks that the case be stayed and held in abeyance while he returns to state court to litigate this claim.   *Id.*   If the Court determines that state remedies are unavailable to Gay, he argues the Court may use the *Martinez* exception to excuse the default as this claim presents a substantial claim of ineffective assistance of trial counsel that was defaulted in initial-review collateral proceedings.   *Id.*

### 1.  Recall of the Mandate

As discussed in connection with Claim 1-3, the Arkansas Supreme Court has limited recall of the mandate to extraordinary circumstances.   The Eighth Circuit in *Wooten v. Norris,* 578 F.3d 767 (8th Cir. 2009), rejected the petitioner's argument that in Arkansas, the motion to recall the mandate was a "regularly available means for further, state-court, collateral review."   *Id.* at 783.   While Gay contends the filing of a motion to recall of the mandate is now a part of the regular review process, the Court disagrees.   As previously discussed, in *Nooner v. State,* 438 S.W.3d 233 (Ark. 2014), the Arkansas Supreme Court said it had been consistent in stating "we will reopen a case only to address an 'error in the appellate process,' meaning an error that *this court* made or overlooked while reviewing a case in which the death sentence was imposed."   *Id.* at 239 (emphasis in original).   Gay has pointed to no error on the part of the Arkansas Supreme Court.

### 2. *Martinez* Exception

Next, Gay relies on the *Martinez* exception to establish cause for the procedural default. ECF No. 27 at 99.   While Fraiser summarily asked for a ruling on all the motions Tapp had filed, which included a motion for change of venue, Gay asserts Fraiser unreasonably did not file a motion for change of venue despite the mistrial and continued public exposure.   *Id.*   Asking for a ruling on all previously filed motions, Gay contends was insufficient to renew a motion for change of venue.   *Id.* at 99-100.   In seeking a change of venue, Gay points out that Ark. Code Ann. § 16-88-204 requires the defendant to "set[] forth the facts on account of which removal is requested" and to support the facts with at least two affidavits of residents of the county from which removal is sought.   *Id.* at 100.   While Tapp complied with the statute, Gay asserts Fraiser did not.   *Id.*

With respect to the prejudice inquiry, Gay cites to *Rideau v. Louisiana,* 373 U.S. 723, 726 (1963), where the Supreme Court recognized that pretrial publicity and community sentiment against a defendant may be so severe that prejudice should be presumed, "without pausing to examine a particular transcript of the *voir dire*."   In his case, Gay argues the media discussed the facts of Snow's murder; referred to him as a "twice convicted murderer;" stated he had "killed his own father;" mentioned he was released on parole; and reported he was now awaiting trial for "his third murder."   *Id.* at 101.   Gay maintains these broadcasts crossed the line between "factual publicity" and "that which is invidious or inflammatory."   *United States v. Faul,* 748 F.2d 1204, 1212 (8th Cir. 1984).

Had Fraiser properly raised a motion for change of venue, Gay argues it would likely have been granted.   ECF No. 27 at 101.   By the time of the second trial, despite a gag order, Gay's

case and the details of his proposed plea agreement were being disseminated. *Id.* at 102. Gay maintains it is reasonably probable that a motion for change of venue would be granted given the extensive publicity, televised details of his prior convictions, his reputation in Garland County, the circumstances surrounding the mistrial, and the leaking of privileged details about the plea deal. *Id.* at 103.

No claim regarding a change of venue was made on direct appeal or in the Rule 37 petition. ECF No. 14-12, p. 13 (direct appeal); ECF No. 14-19, p. 36 (Rule 37 petition). The Rule 37 petition was, of course, the first opportunity for Gay to raise the issue of ineffectiveness of trial counsel. *Sasser v. Hobbs,* 735 F.3d 833, 852-53 (8th Cir. 2013) (the first opportunity to raise meaningful ineffective assistance of counsel claims in Arkansas is on postconviction review). Cause exists under *Martinez* to set aside the procedural default if Gay shows: "(1) the claim of ineffective assistance of trial was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the 'initial' review proceeding with respect to the ineffective assistance of trial counsel claim." *Dansby v. Hobbs,* 766 F.3d 809, 834 (8th Cir. 2014). "A substantial ineffective-assistance claim is one that has some merit." *Id.* By contrast, an insubstantial claim "does not have any merit or . . . is wholly without factual support." *Martinez,* 566 U.S. at 15-16. As Gay notes, in the context of a trial counsel's alleged error in failing to file a motion for change of venue, the courts have held the petitioner must prove that there is a reasonable probability that the trial court would have granted a motion for change of venue if defense had made such a motion.

The extent of the pretrial publicity in this case was first addressed by Tapp in his motion

for change of venue which was supported by affidavits.  ECF No. 14-2, pp. 153-155, 214-229. A hearing was held on Tapp's motion for change of venue at which he called five witnesses.  ECF No. 14-3, p. 151-178.  After *voir dire* started, Tapp again addressed the change of venue issue. ECF No. 14-3, pp. 921-22.  Fraiser renewed all previously filed motions at the beginning of the second trial.  ECF No. 14-5, p. 26.  However, he did not specifically mention the motion for change of venue.  *Id.*  The subject of pretrial publicity and knowledge of Gay's prior convictions was addressed in *voir dire*; several jurors were excused for cause based on their prior knowledge regarding Gay's prior convictions.  *Id.,* pp. 46-954.  Clearly, the pretrial publicity and the community's knowledge regarding Gay's prior convictions was a concern.  However, the trial court, in ruling on Tapp's motion for change of venue, indicated the *voir dire* process would provide an appropriate means of addressing these issues.  ECF No. 14-2, p. 234.

Gay cannot show that a motion for change of venue would have been successful.  In fact, the record supports the opposite conclusion.  Under Arkansas law, a criminal case may be removed to another county when the "minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had in that county."  Ark. Code Ann. § 16-88-201.  "There can be no error in the denial of a change of venue if an examination of the jury selection shows that an impartial jury was selected and that each juror stated he or she could give the defendant a fair trial and follow the instructions of the court." *Rankin v. State,* 948 S.W.2d 397, 406 (1997).

At the beginning of the second trial, each juror was individually asked if he or she had any personal knowledge about the facts of the case.  *See e.g.,* ECF No. 14-5, pp. 90-91.  Each juror was asked if he or she remembered reading about it or seeing anything about it on television or

heard anything about it on the radio.  *Id.*  Each juror was asked if they had overheard anyone talking about it.  *Id.*  Each juror was asked if he or she knew Gay.  *Id.*  Each juror was asked if Gay would be starting with a clean slate.  *Id.*  Only when these questions were answered in a manner showing no prejudice to Gay, was the juror allowed to proceed to regular *voir dire*.  *Id.* When a juror expressed a belief Gay committed the murder, the juror was excused.  ECF No. 14-5, p. 105.  When a juror expressed knowledge of Gay's prior convictions, the juror was excused. *See e.g.,* ECF No. 14-5, pp. 99-105, 680-81.  When a juror expressed having knowledge about the case, the juror was excused.  *See e.g.,*  ECF No. 14-5, p. 642.  Many jurors expressed having absolutely no knowledge about the case or of Gay.  *See e.g.,* ECF No. 14-5, pp. 94-95, 99-100, 107-110, 657-59, 661-664, 666-668.  As these examples show, Gay cannot demonstrate a reasonable probability that he would have been granted a change of venue even if his trial counsel had pursued the request.  *Martinez* does not excuse Gay's procedural default of this issue.

**F. Claim 4—Gay's Fifth, Sixth, and Fourteenth Amendment rights to a fair and impartial jury were violated by the trial court's preclusion of case-specific mitigation questions during *voir dire*.**

While Gay raised this issue on his direct appeal, the State points out the Arkansas Supreme Court held Gay failed to preserve the issue for review by not contemporaneously objecting to the *voir dire* or proffering questions he sought to ask potential jurors.  ECF No. 13 at 143.  The State maintains the failure to comply with the state's contemporaneous-objection rule results in a procedural default of this claim.

Further, the State argues this claim has been expanded factually from the claim presented to the Arkansas Supreme Court.  ECF No. 13 at 143.  Gay's claim before the state court was predicated entirely on the *voir dire* of prospective juror McLernon.  *Id.*  Now, Gay has raised

57

facts related to the *voir dire* of three additional venirepersons. *Id.* The State cites to, among others, *Stranghoener v. Black,* 720 F.2d 1005 (8th Cir. 1983), for the proposition that "a federal claim is not 'fairly presented' to state courts when factual allegations significantly affecting the determination of that claim are raised for the first time in federal court." *Id.* at 1007. The State argues Gay's effort to present new facts is designed to provide a stronger evidentiary posture to his claim. ECF No. 13 at 145. It is the State's view that "[t]his creates an entirely new evidentiary basis—one the state courts obviously could not apply when addressing the merits of Gay's claim." *Id.* at 145. The State concludes the expanded claim is unexhausted; because no further state remedy is available, the State maintains the expanded claim is procedurally defaulted. *Id.*

Finally, the State argues Gay cannot demonstrate cause for the procedural default. ECF No. 13 at 146-147. "While Gay has consistently raised a myriad of ineffective-assistance claims, none has argued his trial counsel was ineffective for failing to object to the *voir dire* of McLernon—the only potential juror he identified on appeal—or for failing to proffer denied *voir dire* questions." *Id.* at 147.

Gay alleges the claim was wrongfully denied on direct appeal based on remarks that Gay only presented conclusory statements, presented no citations to authority or convincing arguments, and because he did not preserve the issue for appeal. ECF No. 27 at 87 (citing *Gay I,* 2016 Ark. 433 at 8). Gay maintains he provided ample support for his argument and additionally referred the state court to *Morgan v. Illinois,* 504 U.S. 719 (1992). *Id.* Next, Gay states the claim was raised in the Rule 37 petition when he "argued he was denied a fair and impartial jury, in large part because '[n]one of the potential jurors were asked if they could consider any mitigation evidence

*particular* to Gay's case.'"   *Id.* at 87 (citing ECF No. 14-44, p. 759).

Gay asserts that "the addition of jurors, other than McLernon, does not 'fundamentally alter' the federal claim presented in the habeas petition from the one present in Rule 37."   ECF No. 27 at 87.   Rather, Gay states the "central point" of his claim is that "the trial court blocked critical and relevant mitigation-related questions throughout *voir dire*." *Id*. at 88.   Gay argues the trial court's "repeated objection to 'fact-qualification' as a global matter was a violation of *Morgan*."   *Id.* Gay points out the Arkansas Supreme Court wrongfully stated Gay had "present[ed] no citation to authority."   *Id.* at 88.   Relying on *Cruz v. Arizona,* 598 U.S. 17 (2023), Gay maintains that "denying review for failure to cite to authority or support from the record, when the defendant heavily cited both authority and the record, is an 'unforeseeable' and 'unsupported' state-court decision."   *Id.* at 89.

Review of the opinion on direct appeal sheds some light on this issue.   *Gay v. State,* 506 S.W.3d 851 (Ark. 2016) (*Gay I*). The State court noted that the issue regarded the *voir dire* examination of potential jurors, set forth the appropriate standard of review, reviewed Rule 32(a) & (b) of the Arkansas Rules of Criminal Procedure, and discussed Gay's arguments including setting forth the colloquy between his counsel with McLernon.   *Id.* at 856-57.   The court then stated:

> Here, Gay asserts that he was unable to adequately explore Juror McLernon's view;
> but makes conclusory statements and does not develop his argument.   However,
> based on the record discussed above, the record does not support Gay's argument.
> Further, we "do not consider an argument when the appellant presents no citation
> to authority or convincing argument in its support, and it is not apparent without
> further research that the argument is well taken.   *Decay v. State,* 2009 Ark. 566, at
> 3-4, 352 S.W.3d 319, 324.

*Id.* at 857.   It is only after it concluded the record did not support Gay's claim that the Arkansas

Supreme Court mentioned trial counsel failed to adhere to the contemporaneous objection rule, *i.e.,* Gay did not contemporaneously object to the *voir dire* or proffer questions he sought to ask the potential jurors." *Id.* Thus, it appears the Arkansas Supreme Court did address the merits of Gay's claim but found it lacking in evidentiary support. Furthermore, the Court agrees with Gay that the record is clear he supported his argument on direct appeal.

Gay has not procedurally defaulted on this issue. Therefore, there is no reason for the Court to address the issue of whether cause exists to excuse the procedural default. The Court also agrees that Gay has not impermissibly expanded the claim. As the Arkansas Supreme Court noted, the colloquy with McLernon was just "one instance" allegedly supporting Gay's argument.

### G. Claim 5—The trial court's inconsistent treatment of rehabilitative questions during *voir dire* resulted in the improper removal of jurors for cause and denied Gay his right to a fair and impartial jury under the Sixth Amendment.

The State maintains that this argument is procedurally defaulted based on the failure of Gay's counsel to object to the trial court's questioning or treatment of the four potential jurors. ECF No. 13 at 150. The State points out the Arkansas Supreme Court did not consider Gay's claim for failure to contemporaneously object. *Id.* at 151; *see also Gay I,* 506 S.W.3d at 858.

The State argues the only possible cause to excuse the procedural default that Gay can offer is ineffective assistance of his trial counsel for failure to properly preserve the issue. ECF No. 151. However, the State maintains a claim of ineffective assistance of counsel must generally be presented to the state court; here, "[w]hile Gay raised a myriad of ineffective assistance of counsel claims, none of the claims argued that his trial counsel was ineffective for failing to object to the questioning of Barker, Young, Wetthington, and Brown or for failing to object to the striking of Brown for cause." *Id.* Therefore, the State concludes Gay is procedurally barred from bringing

60

this claim.  *Id.*

Gay maintains the trial court engaged in disparate treatment between jurors who favored, versus jurors who had qualms about, the death penalty.  ECF No. 27 at 114.  Gay admits the argument was raised on direct appeal and rejected on state procedural grounds.  *Id.*

According to Gay, "[w]hile it is true that [Gay] never raised a related ineffectiveness claim, that does not preclude him from using trial counsel's ineffectiveness as cause to excuse this claim." ECF No. 27 at 115.  Pursuant to *Martinez,* Gay maintains "a defaulted ineffectiveness claim, asserted as cause to forgive a separate defaulted claim, may itself be excused from default."  *Id.*

Gay points out the trial court denied several of defense's motions to strike on the basis that the court had rehabilitated each pro-death penalty juror by getting them to state that they understood and could follow the law.  ECF No. 27 at 115 (citing ECF No. 14-5, pp. 570, 575-576).  In contrast, when confronted with a juror who moderately supported and had concerns about a death sentence, the court granted the state's motion to strike despite the juror also stating she could follow the court's instructions.  *Id.*  (citing ECF No. 14-5, pp. 570, 575-576).

*Martinez* excuses procedural default due to ineffective assistance of postconviction counsel of a substantial claim of ineffective assistance of trial counsel.  *Martinez,* 566 U.S. at 14.  "A substantial ineffective-assistance claim is one that has some merit."  *Dansby,* 766 F.3d at 834.  In considering whether an ineffective assistance of counsel claim is substantial, the Court uses the standard set forth in *Strickland,* 466 U.S. at 687-88, 691-92.  Gay must show his trial counsel's conduct (1) fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's unreasonable conduct prejudiced the defense.  To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's

61

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

To make this determination the Court must examine the state court record with respect to the jurors at issue. After the individualized *voir dire* about their knowledge of the facts of the case, exposure to media, and knowledge of Gay and his prior convictions, the trial court called three jurors at a time. Gay maintains the trial court wrongfully denied challenges for cause for three potential jurors, Barker, Young, and Wetthington, who indicated a strong proclivity for the death penalty and presented as an automatic death vote. ECF No. 2 at 117. After his challenges for cause were rejected, Gay used peremptory strikes on jurors Barker, Young, and Wetthington. *Gay I,* 506 S.W.3d at 858; *see also* ECF No. 14-5, pp. 479-481 (Barker); 482-483 (Young); 719 (Wetthington). Finally, Gay maintains Brown was wrongfully stricken for cause. *See* ECF No. 14-5, pp. 557-576.

When questioned about the death penalty by the State, Barker indicated it would be difficult for her to consider any sentence of life without parole if they convicted Gay of capital murder. ECF No. 14-5, p. 433. She believed in a "life for a life." *Id.,* p. 434. She indicated she would have to be convinced to sentence to life without parole. *Id.* Barker expressed reservations about having to be part of the sentencing phase of a capital murder case. *Id.*, pp. 435-436, 461-462.

Under questioning by Fraiser, Barker indicated she strongly supported the death penalty. ECF No. 14-5, p. 456. She stated: "If I feel like if you've murdered someone you should be punished that way for it. I do." *Id.* If she were picked for the jury and the state had proven a premeditated murder, Barker testified she would vote for the death penalty. *Id.,* p. 457. When Fraiser reiterated that the presumed sentence is life without parole, Brown stated: "I guess I would

look at all the evidence and see what--." *Id.*   However, she stated she would start out the sentencing phase with the idea that she had to be convinced why Gay should not be sentenced to death. *Id.,* p. 458.   In her questionnaire, Brown indicated she did not believe the death penalty was used enough and wrote:   "Take a life, lose your life." *Id.*   Under questioning, she testified several times that she felt that if someone intentionally murdered someone they should be sentenced to death. *Id.*, pp. 458-461 ("I think they should be put to death and not let out again to kill again."); *Id.,* p. 463 ("I strongly believe [in] the death penalty;" I start out with them getting the death penalty).

The Court again instructed Barker that the default sentence was life.   ECF No. 14-5, p. 475.   The Court explained that the jury needed to make three findings before it determined the circumstances justified the death penalty. *Id.,* pp. 475-476.   When asked if she was telling the Judge she could not follow his instructions, Barker stated:   "I could follow the instructions, and I do believe in the death penalty, but I have a hard time thinking that I'm going to be a part of putting someone to death.   I do." *Id.*, p. 476.   Fraiser asked that Barker be stricken for cause and his request was denied. *Id.,* pp. 479-480.

When questioned by the State, Young said she would have "no problem" envisioning a situation where she would consider imposing the death penalty.   ECF No. 14-5, p. 431.   Young did state she understood as a member of the jury she would have to consider the full range of punishment. *Id.,* p. 432.

On her juror questionnaire, Young indicated she strongly supported the death penalty. ECF No. 14-5, pp. 466-467.   When asked to explain, she stated "Anyone who takes an innocent should lose their life." *Id.*, p. 467.   Young indicated her religious teachings were "an eye for an

eye." *Id.,* p. 468.   In other words, if you take a life, you lose a life.   *Id.*   Young testified this rule applied in cases involving premeditation.   *Id.,* pp. 469-470.   When asked if the court instructed her that was not the law in Arkansas, if she would be able to follow it, Young responded: "It would be hard but I would follow it because that's the law.   You follow the law, regardless of the situation.   And the law says that if you commit premeditated murder, and it's proven, then you forfeit your life.   But if there's not proof, if there's doubt, then you cannot sentence that person to death." *Id.,* p. 471.

Fraiser then asked her to assume they had found defendant guilty of premeditated murder and asked her if she would start out with the idea that life without parole was the punishment.   *Id.,* p. 472.   He asked Young if that were how she would approach it or would she require defendant to prove he should not be sentenced to death.   *Id.*   Young responded she would require "him to prove to me why he shouldn't." *Id.*   She added:   "Why should I keep him up, as a taxpayer, for the rest of his life when he's proven that he doesn't deserve it?" *Id.*   She voiced her concern that people in prison were "the dregs of society" and why should "we as taxpayers have to keep them up." *Id.,* p. 473.   She stated she believe the death penalty should be applied more often.   *Id.* She indicated her belief that the death penalty should be an option even in cases not involving premeditation.   *Id.*   She stated these were firmly held beliefs.   *Id.,* p. 475.

The court explained he would instruct her that there were three findings necessary before the death penalty could be imposed.   ECF No. 14-5, p. 476.   He asked Young if she was telling him she could not follow his instructions.   *Id.*   Young responded she would follow his instructions.   *Id.,* p. 477.

Fraiser challenged Young for cause making similar arguments to those he raised regarding

Barker.  ECF No. 14-5, p. 482.  His challenge added the aspect of her religious dogma arguing she would start out with the idea the death penalty was appropriate and require the defendant to convince her otherwise.  *Id.*  His motion to strike Young for cause was denied.  *Id.*, p. 483.

Under questioning by the State, Wetthington indicated there were some circumstances in a capital murder case where she could envision life without parole would be an appropriate punishment.  ECF No. 14-5, p. 698.  Crawford conducted the questioning for the defense.  *Id.,* p. 700.  On her questionnaire, Wetthington indicated she believed life without parole was not a serious consequence for the crime of murder; she testified she still felt that way.  *Id.,* pp. 709-710. Wetthington indicated if Gay were found guilty of capital murder, she believed the death penalty was the only just outcome.  *Id.,* p. 710.  When asked if she were instructed to consider all alternatives if she would strongly consider life without parole, Wetthington replied she would not if he were convicted of capital murder.  *Id.*, p. 711.  She indicated she had a strong preference for the death penalty.  *Id.,* p. 712.  When asked by the State if they failed to prove aggravating factors if she could vote for life without parole, Wetthington indicated she could.  *Id.,* pp. 714-715.  She indicated she would apply the law the judge gave her.  *Id.,* at 715.  Despite this, Wetthington indicated she would expect some kind of evidence to convince her the death penalty was not appropriate it.  *Id.*, p. 716.

When asked for clarification by the judge, Wetthington stated the State would have to prove Gay was guilty and the death penalty was appropriate.  ECF No. 14-5, p. 717.  She further stated she understood the defendant did not have to do anything.  *Id.*

Crawford moved to strike Wetthington for cause.  ECF No. 14-5, p. 719.  His request was denied.  *Id.*

During *voir dire*, Brown initially indicated she would not be able to consider the death penalty as an appropriate penalty.   ECF No. 14-5, p. 559.   Brown stated she would not be able to sign her name to a verdict sentencing someone to death regardless of the proof.   *Id.,* p. 560.   When asked if she would vote for some lesser included charge so she wouldn't have to consider whether Gay should be sentenced to death, she responded perhaps.   *Id.,* p. 535.   The next question was: "So the thought of death penalty and having to decide that would prevent or substantially impair your ability to really decide the guilt or innocence, wouldn't it?"   Brown responded: "Yes, sir."   *Id.,* 535-536.

On the juror questionnaire, Brown indicated she moderately supported the death penalty. ECF No. 14-5, p. 567.   She explained she only moderately supported it "because some convicted felons have been found innocent after his or her execution."   *Id.*   On further questioning, Brown stated she was leaning towards being against the death penalty.   *Id.,* p. 558.   When asked whether it would be fair to say that as a "general proposition, you agree with the death penalty but if you're the one who must make the decision you don't want to be the one making that decision, would that be fair?   *Id.,* p. 559.   She responded: "Yes, sir."   *Id.*   If she was on a jury that convicted the person prior to making the sentence, Brown was asked whether that would change her opinion of the death sentence, Brown indicated it "possibly" could change her opinion because she was the one who found the evidence.   *Id.,* p. 567.   If given an instruction to consider both life in prison without the possibility of parole and the death penalty, Brown answered she would do so.   *Id.*, p. 570.   Brown said she did not want to be on the jury.   *Id.,* p. 574.[17]   In her words: "I'm too soft

---

[17] In Gay's reply brief, he cites the Court to ECF No. 14-5, p. 571.   However, that page deals exclusively with the questioning of Juror Joan Jones, who is not at issue here.

for this stuff." *Id.*

The State challenged Brown for cause. *Id.* The challenge was based on Brown's having stated "early on that because she might have to consider death as an option in this case, that would affect her decision on making a decision of proof beyond a reasonable doubt during the case in chief as to the Defendant's guilt or innocence either of the capital murder charge or a lesser included charge." ECF No. 14-5, pp. 575-576. Gay argued Brown had later clarified that she would follow the "Court's instructions. No matter what the instruction is, she would follow it." *Id.*, p. 576. The Court excused Brown for cause. *Id.* The trial court did not engage in its own rehabilitative questions. ECF No. 2 at 119.

When the twelfth juror was selected, Fraiser made a record as to the jury selection process. ECF No. 14-5, pp. 901-904. Fraiser indicated they disagreed with the Court's ruling on at least two previous jurors where they had moved for the juror to be excused for cause and their motion was denied. *Id.*, p. 902. Fraiser acknowledged there was existing case law "that says that you must exhaust all peremptory challenges to preserve any argument on appeal with respect to cause challenges or disagreements with the Court over whether cause should have been granted or not.[18]" *Id.*, pp. 902-903. Gay still had three peremptory strikes left. *Id.*, p. 902. Unless the law changed, Fraiser acknowledged they "may be waiving or probably are waiving, based on the case

---

[18] It has long been the law in Arkansas that "such error in overruling a challenge for cause is available as a ground for reversal, if the objecting party does exhaust his peremptory challenges before impaneling of the jury is complete. . .. It is, of course, no ground of complaint if the accused has not exhausted his peremptory challenges before the panel of the jury is completed, as the accused might correct the error by peremptory challenge." *Caldwell v. States,* 63 S.W. 59 (Ark. 1901) (internal quotation marks and citations omitted); *see also Trotter v. State,* 377 S.W.2d 14, 22 (Ark. 1964) ("At the outset, let it be stated that we are definitely of the opinion that, under our rules of procedure, appellants are not in a position to complain that they were not tried by an impartial jury, i.e., they did not exhaust their peremptory challenges.").

law, the right, assuming this ends in a conviction much less a death sentence, to raise that at some other point." *Id.,* p. 903.   Fraiser indicated Gay had been part of the selection process and that if "we're making a mistake . . . we're using our best judgment at this time."   *Id.*   Gay acknowledged that he had approved all twelve of the jurors that have been selected.   *Id.,* p. 904.

No substantial claim of ineffectiveness of trial counsel is made with respect to this claim. "The Sixth Amendment guarantees a defendant the right to trial 'by an impartial jury.'"   *United States v. Nosley,* 62 F.4th 1120, 1126 (8th Cir. 2023).   The focus of the Sixth Amendment is on the impartiality of the jurors who sat on the jury and found Gay guilty.   *Id.* at 1127.   "[A] defendant is not deprived of his rights when he uses peremptory challenges to strike a juror that the district court should have removed for cause."   *Id.*   None of the jurors in question sat on Gay's jury.   Whether excluded by peremptory challenge or for cause, Gay cannot show prejudice to the degree that he was denied a fair trial on this claim. Gay had peremptory challenges left when the jury was fully seated.   The *Martinez* exception does not excuse the procedural default on this claim.

### H. Claim 6—Gay was wrongfully denied his Sixth Amendment right to counsel of his choice.

The State says this claim is premised on Gay's argument he should have been allowed to proceed with his retained counsel, Tapp.   ECF No. 13 at 153.   The State points out Tapp's license had been suspended and there were pending disbarment proceedings.   *Id.*   The State argues this claim is procedurally defaulted because Gay did not present the claim on direct review or in postconviction proceedings.   *Id.* at 154.   The State maintains there are no presently available state court remedies.   *Id.* at 154-55.   The only possible cause Gay could show to excuse the default is ineffective assistance of trial counsel.   *Id.* at 155.   While Gay has raised a myriad of such claims,

the State maintains none have argued his trial counsel was ineffective for failing to object to Tapp's preclusion from representation. *Id.*

Gay admits he has not fairly presented this claim to the state courts. ECF No. 27 at 117. However, Gay argues the claim is merely unexhausted and not defaulted. *Id.* Gay maintains he should be allowed to return to the state court to file a motion to recall the mandate or a coram nobis petition. *Id.* The Court has already rejected this argument in connection with analyzing procedural default on claim 1-3. The same analysis applies here.

Next, Gay argues even if the Court concludes the claim is defaulted, "ineffective assistance of trial counsel provides cause to excuse the default." ECF No. 27 at 118. At the time Gay sought to have Tapp remain his attorney, Gay asserts Tapp was serving a provisional suspension while the authorities worked out whether he should permanently lose his license. *Id.* at 118-19. The Arkansas Supreme Court denied the request, which was supported by Gay's affidavit as well as an affidavit of the trial judge, for Tapp to continue to represent Gay. *Id.* at 119. Gay asserts this denial deprived him of "his Sixth Amendment right to counsel of choice." *Id.* Gay argues the Arkansas Supreme Court had the discretion to allow Tapp to continue to represent him but summarily denied the request "without measured and adequate reason." *Id.*

Gay makes no claim that Fraiser was ineffective in failing to raise this Sixth Amendment issue. Instead, he merely argues the Arkansas Supreme Court wrongfully deprived him of his right to counsel of his choice which is considered a structural error under *United States v. Gonzales-Lopez,* 548 U.S. 140 (2006). The issue before the Supreme Court was "whether a trial court's erroneous deprivation of a criminal defendant's choice of counsel entitled him to a reversal of his conviction." *Id.* at 142. Gonzales-Lopez was charged in the Eastern District of Missouri.

69

His family hired John Fahle to represent him.   Later Gonzales-Lopez asked a California attorney, Joseph Low, to represent him.   *Id.*   At a hearing, a magistrate judge accepted Low's provisional entry of appearance on the condition he immediately file a motion for admission *pro hac vice*.   *Id.* During the hearing, the magistrate judge "revoked the provisional acceptance on the ground that, by passing notes to Fahle, Low had violated a court rule restricting the cross-examination of a witness to one counsel."   *Id.*

The next week, Gonzales-Lopez advised Fahle that he wanted Low to be his only attorney. *Gonzales-Lopez,* 548 U.S. at 142.   Low filed an application for admission *pro hac vice*.   *Id.*   The district court denied his application.   *Id.*   Low filed a second application which was also denied. *Id.*   Low filed an application of writ of mandamus with the Eighth Circuit but it was dismissed. *Id.*   Fahle filed a motion to withdraw as counsel and a request for sanctions against Low.   *Id.* "Fahle asserted that, by contracting with respondent while respondent was represented by Fahle, Low violated Mo. Rule of Professional Conduct 4-4.2 (2003), which prohibits a lawyer '[i]n representing a client' from 'communicat[ing] about the subject of the representation with a party ... . represented by another lawyer' without that lawyer's consent."   *Id.* at 142-43.   Low filed a motion to strike.   *Id.*   The district court granted the motion to withdraw and a continuance so Gonzales-Lopez could find a new attorney.   *Id.* at 143.   He retained Karl Dickhaus.   *Id.*   The district court then explained it had denied the application for admission *pro hac vice* "primarily because, in a separate case before it, Low had violated Rule 4-4.2 by communicating with a represented party."   *Id.*

The case went to trial.   *Gonzales-Lopez,* 548 U.S. at 143.   Low again moved for admission. *Id.*   Dickhaus also requested to have Low at counsel table with him.   *Id.*   Both

requests were denied and Low was ordered to "sit in the audience and to have no contact with Dickhaus during the proceedings." *Id.* Gonzalez-Lopez was prevented from meeting with Low except once late at night on the last night of trial. *Id.* Gonzalez-Lopez was found guilty; Fahle's motion for sanctions was granted; and read the rule to "forbid Low's contact with respondent without Fahle's permission." *Id.* On appeal, the Eighth Circuit held that the district court erred in interpreting Rule 4-4.2 "to prohibit Low's conduct both in this case and in the separate matter on which the District Court based its denials of his admission motions." *Id.* It found the denials had been erroneous and violated respondent's Sixth Amendment right to paid counsel of his choosing. *Id.* at 143-144.

The Government did not dispute the Eighth Circuit's conclusion that the district court had erroneously deprived Gonzalez-Lopez of his right to counsel of his choice. *Gonzalez-Lopez,* 548 U.S. at 144. Instead, it argued the Sixth Amendment violation was not "'complete unless the defendant can show that substitute counsels' performance was deficient and the defendant was prejudiced by it" or alternatively that "counsel of choice would have pursued a different strategy that would have created 'a reasonable probability that . . . the result of the proceedings would have been different.'" *Id.* at 144-45. "[I]n other words, that he was prejudiced within the meaning of *Strickland* by the denial of his counsel of choice even if substitute counsel's performance was not constitutionally deficient." *Id.* at 145. The Supreme Court rejected this argument stating "the right at stake here is the right to counsel of choice, not the right to a fair trial; and that right was violated because the deprivation of counsel was erroneous. No additional showing of prejudice is required to make the violation 'complete.'" *Id.* at 146. It concluded that deprivation of counsel of choice "unquestionably qualifies as 'structural error.'" *Id.* at 150.

71

The Supreme Court stated "[n]othing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right of counsel of choice and recognize the authority of trial courts to establish criteria for admitting lawyers before them." *Gonzalez-Lopez,* 548 U.S. at 151.  It recognized "[t]he court has, moreover, an 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 152.

As a careful examination of *Gonzalez-Lopez* has shown, it does not support Gay's argument that he was entitled to be represented by counsel who had been conditionally suspended from the practice of law because of violation of applicable ethical rules.  Tapp's request to be allowed to continue to represent Gay was denied by the Arkansas Supreme Court.  Gay has shown no error on the part of the trial court, which supported Tapp's request.  The Sixth Amendment does not extend to the right to be represented by counsel who is suspended from the practice of law.  *See e.g., United States v. Bender,* 539 F.3d 449, 455 (7th Cir. 2008) ("Although a denial of the Sixth Amendment right to counsel of choice is a structural error not susceptible to analysis for its prejudicial effect on the outcome of trial, there can be no violation of the right if the defendant's 'counsel' of choice is not licensed to practice law.").

No action of the trial court deprived Gay of his right to counsel of his choice.  This claim is procedurally defaulted.

## I.  Claim 7—There was insufficient evidence of Gay's intent to commit capital murder.

The State points out that Gay did not present this claim at any point to the state courts. ECF No. 13 at 158.  Further, it maintains there are no state court remedies available to Gay.  *Id.* "The only possible cause Gay could identify would . . . be the ineffectiveness of his trial counsel

for failing to properly preserve the issue or ineffective assistance of appellate counsel for failing to raise the issue on direct appeal." *Id.* at 159.   While the current habeas petition raises claims of ineffective assistance of trial counsel, the State asserts Gay never presented the claim to the state courts. *Id.*   "Consequently, Gay can show no cause to excuse his procedural default and his claim should be denied." *Id.*

Gay indicates Fraiser moved for a directed verdict arguing the elements of capital murder did not exist because Gay did not have the time to premediate or produce a motive to kill Snow. ECF No. 27 at 121.   He further indicated the fact that Gay killed Snow in front of witnesses showed a lack of intent. *Id.*   On direct appeal, appellate counsel did not challenge the sufficiency of the evidence. *Id.*   Gay argues this Court may still reach the merits of this issue "via the fundamental miscarriage of justice exception." *Id.*   In this regard, Gay contends he "can show he is innocent because he was unable to act with premeditation and deliberation, as required for a capital murder conviction." *Id.* at 27.   He contends his PTSD and decades of alcohol abuse inhibited his ability to engage in premeditation or deliberation, the required elements of capital murder. *Id.*

In connection with the discussion of Claim 2-1, the Court discussed in detail Gay's claim that he was innocent of the crime of capital murder or innocent of the death sentence.   The Court rejected both arguments.   Gay has presented nothing in connection with this claim that alters the Court's conclusion that Gay cannot meet the requirements imposed by the courts.   Gay has procedurally defaulted on this claim.

### J. Claim 8—The State used improper and unconstitutional "victim impact" testimony.

The State maintains this claim is procedurally defaulted because Gay failed to raise it on direct appeal.   ECF No. 13 at 163.   The State maintains Gay has no presently available state

procedure for determining the merits of the claim.  *Id.* at 163-64.  As a result, the State maintains

this claim is procedurally defaulted.  *Id.* at 164.

"The only possible cause Gay could identify would . . . be the ineffective assistance of his

trial counsel for failing to properly preserve the issue or ineffective assistance of appellate counsel

for failing to raise the issue on direct appeal."  ECF No. 13 at 165.  The State cites the Court to

*Coleman*, 501 U.S. at 755, where the Supreme Court said: "counsel's ineffectiveness will

constitute cause only if it is an independent violation."  *Id.*

In this claim, Gay argues the victim-impact testimony of Mary Beth Landsdell

("Landsdell"), Snow's daughter, admitted at trial was unconstitutional.  ECF No. 2 at 124.

Specifically, Gay points to Landsdell's reading of a statement in front of the jury where she

commented on the offense calling it ruthless and characterizing him as remorseless.  *Id.*  The

statement referred to provides as follows: "Due to the actions of one man, who had no remorse,

which resulted in taking our mother's life so ruthlessly."  ECF No. 14-6, p. 641.

This issue was not raised on direct appeal.  *Gay I,* 506 S.W.3d at 854.  However, Gay

points out that the issue of trial counsel's ineffectiveness in failing to object to Landsdell's

testimony was raised in the Rule 37 petition.  ECF No. 27 at 74.  The Arkansas Supreme Court

denied relief on two bases.  First, it held admission of the testimony was not "so unduly

prejudicial" as to render the trial "fundamentally unfair."  *Gay III,* 2022 Ark. at 16.  Second, it

held that counsel's decision not to object to Landsdell testimony was reasonable trial strategy.

*Id.; see also, Gay III,* at 17.  Gay argues that "[b]ecause Claim 1-7 is a substantial ineffective

assistance of counsel claim, and because it has been exhausted in state courts, that claim can be

used as cause to excuse the default of [Gay's] related trial error claim."  *Id.* at 78.

The Court disagrees.   *Martinez* provides that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez,* 566 U.S. at 17.   Here, Gay seeks to extend the *Martinez* exception to claims of ineffective assistance of appellate counsel and claims of error at trial.   In *Dansby v. Hobbs,* 766 F.3d 809 (8th Cir. 2014), the Eighth Circuit specifically declined to extend *Martinez* to either type of claim.   *Id.* at 833-34.   *Martinez* cannot be used to excuse the procedural default on a claim of trial court error.   This claim should have been brought on direct appeal.   *See e.g., Ortega v. State,* 533 S.W.3d 68, 71 (Ark. 2017) ("Assertions of trial-court error, even those of constitutional dimension, must be raised at trial and on direct appeal.").   *Martinez* simply does not apply to excuse this procedurally defaulted claim.

### K.  Claim 9—Prosecutorial misconduct during the guilt and penalty-phase closing arguments violated due process.

The States contends Gay's claim that there was prosecutorial misconduct during closing arguments is procedurally defaulted.   ECF No. 13 at 168.   The State points out that Gay did not present this argument at any time to the state courts.   *Id.*   As there is no presently available means of state law review, the State maintains this claim is procedurally defaulted.   *Id.* at 168-69.

According to the State, the only possible cause Gay could identify would be the ineffectiveness of his trial counsel for failing to properly preserve the issue or ineffectiveness of appellate counsel for failing to raise the issue on appeal.   ECF No. 13 at 169.   Further, the State argues that Gay's claim is factually expanded from what he argues in his related ineffective-assistance claim.   *Id.* a n. 25.

Gay argues that regardless of trial counsel's failure to object to the prosecutor's closing

argument it violated Due Process.   ECF No. 27 at 107.   Gay maintains ineffectiveness of counsel "can serve as cause to excuse the default of this claim because the related [ineffective assistance of counsel] claim, 3-1, has been exhausted in state court and is not meritless."   *Id.*   Although this claim does address additional misconduct from that raised in Claim 3-1, Gay suggests the legal and factual basis are "not so altered such that trial counsel's ineffectiveness cannot be used to excuse the default of objections other than to the State's improper comments about 'chunking' Snow's body."   *Id.*   Gay maintains the injection of inflammatory language and lack of remorse into the closing arguments render the trial fundamentally unfair and violated his rights under the Fourteenth and Eighth Amendments.

For the reasons discussed above in connection with Claim 8, *Martinez* does not apply to excuse the default of claims, even those of constitutional dimension, that were required to be raised on direct appeal by appellate counsel.   This claim is procedurally defaulted.

### L.  Claim 10—Form 3 of the jury instructions precluded the jury from exercising mercy.

In this claim, Gay contends the jury was precluded from exercising mercy in violation of the Fifth, Eighth, and Fourteenth Amendments, based on the language of Form 3 in the jury instructions.   ECF No. 2 at 128.   "Form 3 provided that if the jury determined that (1) the state proved beyond a reasonable doubt one or more aggravating circumstances; (2) the aggravating circumstances outweighed beyond a reasonable doubt any mitigation evidence; and (3) the aggravating circumstances justify beyond a reasonable doubt a sentence of death, 'then sentence Randy William Gay to death.'"   *Id.*

The State points out this claim was denied when it was raised for the first time in Gay's Rule 37 petition because it should have been raised on direct appeal and was not cognizable in a

Rule 37 petition. *Gay III,* 2022 Ark. 23, at 28. Specifically, the Arkansas Supreme Court said, "unless an error is so fundamental as to render the judgment of conviction void and subject to collateral attack, a petition under Rule 37 does not provide a remedy when an issue could have been raised at trial or argued on appeal." *Id.* As Gay did not argue the error was structural or fundamental in nature, the issue did "not constitute grounds for relief under Rule 37." *Id.* Moreover, the court noted that in *Kemp v. State,* 919 S.W.2d 943 (Ark. 1996), it had specially held that "'Form Three, Section (C) permits the jury to show mercy, as it allows the jury to find that the aggravating circumstances do not justify a sentence of death.'" *Gay III,* at 29 (quoting *Kemp,* 919 S.W.2d at 957).

Moreover, the State maintains "a claim of ineffective assistance generally must be presented to the state courts as an independent claim before it can be used to establish cause for a procedural default." ECF No. 13 at 178. The State argues that while Gay has raised a myriad of ineffective assistance of counsel claims, he did not raise this claim. *Id.* As such, the State contends the claim is procedurally defaulted. *Id.*

In opposition, Gay, citing *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000), argues that trial counsel's ineffectiveness in failing to properly preserve a claim for review may suffice as cause to excuse a defaulted claim. ECF No. 27 at 122. "Because trial counsel was ineffective in failing to preserve this issue at trial, and because post-conviction counsel's ineffectiveness may excuse default of trial [ineffective assistance of counsel] claim, counsel's ineffectiveness may be used to excuse default of Claim 10." *Id.*

The fault in Gay's analysis is that trial counsel did preserve this issue. Fraiser argued the format of Form 3 seemingly made the death penalty mandatory if the jury checked paragraphs A,

B, and C on the form.   ECF No. 14-7, p. 57.   He acknowledged existing case law approving the form but suggested that the word "then" be changed to "may."   *Id.*   The request was denied.   *Id.* Thus, the default occurred when appellate counsel failed to raise the issue on direct appeal. *Martinez* does not apply and this claim is procedurally defaulted.

### M. Claim 12—Gay received ineffective assistance of counsel on appeal.

The State argues Gay failed to present this claim to the state courts.   ECF No. 13 at 183. As there are currently no available state law remedies, the State argues the claim is procedurally defaulted.   *Id.* at 183-84.   While Gay could have challenged the performance of his appellate counsel in his Rule 37 petition, he did not.   *Id.* at 184.   The State argues that "claims of ineffective postconviction counsel can only constitute cause to excuse the default of a claim of ineffective *trial* counsel, not defaulted claims of ineffective appellate counsel."   *Id.* at 185.

Gay maintains his appellate counsel was ineffective for not contesting the sufficiency of the evidence, not challenging the State's use of excessive victim impact testimony and not challenging the prosecutor's improper closing arguments.   ECF No. 27 at 126.   Even though Gay agrees this claim is defaulted, he maintains the Court can still reach the merits via the miscarriage of justice exception.   *Id.*   Gay refers the Court to the arguments he raised with respect to Claim 7 (insufficient evidence of capital murder), Claim 8 (the State used improper victim impact testimony), and Claim 9 (prosecutorial misconduct during the guilty and penalty-phase closing arguments.).   *Id.*

As previously discussed, to assert the fundamental miscarriage of justice exception, a petitioner must "present new evidence that affirmatively demonstrates that he is innocent of the crime for which he was convicted."   *Murphy v. King,* 652 F.3d 845, 850 (8th Cir. 2011); *see also*

78

*Calderon v. Thompson,* 523 U.S. 538, 559 (1998) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.") (citation omitted) (alteration in original)). The claim must be based on new evidence sufficient to persuade the Court that "no juror, acting reasonably, would have voted to find [Gay] guilty beyond a reasonable doubt." *McQuiggin,* 569 U.S. at 386 (citation omitted).   Evidence is only new if it "was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Nash v. Russell,* 807 F.3d 892, 899 (8th Cir. 2015) (citation omitted).   "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup,* 513 U.S. at 316.   Gay has procedurally defaulted on this claim.

### N. Claim 13—Evolving standards of decency render the death penalty unconstitutional.

The State argues: (1) while Gay presented this argument in a pretrial motion, he did not appeal the denial; (2) there are currently no available state law remedies; and (3) Gay can show no cause to excuse his procedural default.   ECF No. 13 at 187.   The only possible cause would be ineffectiveness of appellate counsel and Gay raised no claim of ineffective assistance of appellate counsel.   *Id.*

Gay maintains that national standards of decency have evolved to the point that the death penalty is categorically unconstitutional.   ECF No. 2 at 132.   Gay asserts many, including prominent elected officials, now are opposed to the death penalty and believe it to be morally wrong.   *Id.* at 137.   Gay points out that since he was sentenced five states have abolished the death penalty.   *Id.* at 135.   Gay points to pharmaceutical companies' decisions not to participate in executions, execution decline due in part to prolonged and costly litigation, and cases resulting

79

in death sentences being outliers among capital sentencings.  ECF No. 27 at 127-28.   Gay maintains these developments constitute new facts to bring this claim within the novel exception to procedural default.   *Id.* at 128.   According to Gay, under this exception, default is excused if the claim is "so novel that its legal basis is not reasonably available to counsel" in state court.   *Id.* (quoting *Reed v. Ross,* 468 U.S. 1, 16 (1984)).

In *Reed,* the Supreme Court noted it had "uniformly acknowledged that federal courts are empowered under 28 U.S.C. § 2254 to look beyond a state procedural forfeiture and entertain a state prisoner's contention that his constitutional rights have been violated."   *Reed,* 468 U.S. at 9. It characterized the issue before it as being what standards "should govern the exercise of the habeas court's equitable discretion in the use of this power?"   *Id.*   The Supreme Court held that "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met.   If counsel had no reasonable basis upon which to formulate a constitutional question, . . . it is safe to assume that he is sufficiently unaware of the question's latent existence that we cannot attribute to him strategic motives of any sort."   *Id.* at 14-15.   It noted in those circumstances; it was reasonable to assume competent counsel would fail to "perceive the possibility of raising such a claim" and "reasonable to assume a court will similarly fail to appreciate the claim."   *Id.*

Here, not only was the question of the constitutionality of the death penalty perceived by trial counsel, but it was also considered and rejected by the state court.   Clearly, the "novel law" exception to the rules of procedural bar does not apply under the circumstances in this case.   The claim is procedurally barred.

### O. Claim 14—Gay is entitled to relief because of the cumulative prejudicial effect of the errors described herein.

The State first argues this claim is not cognizable.   ECF No. 13 at 193.   It contends errors that are not unconstitutional individually cannot be added together to create a constitutional violation.   *Id.*   *Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation. Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief.").   Next, the State argues, assuming the claim is cognizable, it is procedurally defaulted as Gay did not raise it on direct appeal or in his postconviction proceeding.   ECF No. 13 at 193.   The State maintains the factual or legal basis of the claim was reasonably available and no claim of ineffective assistance of counsel has been raised as to this claim.   *Id.* at 194.   As there is no currently available state court remedy, the State maintains the claim is procedurally defaulted.   *Id.*

Gay concedes there is Eighth Circuit precedent that the Court may not assess cumulative error.   ECF No. 27 at 129.   However, Gay points out the Eighth Circuit stands apart from most circuit courts on this issue.   *Id.*   As to prejudice from counsel, Gay argues *Strickland* itself permits, if not requires, consideration of aggregate prejudice.   *Id.* (citing *Strickland,* 466 U.S. at 694) (requiring a petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").   *Id.*   Gay argues that "[w]hile Eighth Circuit precedent disallows a "cumulative inquiry of counsel's performance," *Shelton v. Mapes,* 821 F.3d 941, 951 (8th Cir. 2016), that is different from holding that prejudice should not be analyzed cumulatively if it is determined that counsel acted unreasonably in multiple ways." *Id.* at 130.   Gay cites Ruth A. Moyer, *To Err is Human; to Cumulate, Judicious,* 61 Drake

81

L. Rev. 447, 451 (2013) for the proposition that only the "'Sixth and Eighth Circuits have rejected the cumulation of *Strickland* errors to determine the existence of prejudice on § 2254 review.'" *Id.*  Finally, Gay argues that even if he cannot demonstrate fault, the merits of the claim may be addressed via the miscarriage of justice exception.  *Id.*

Unfortunately for Gay, this Court is not allowed to ignore Eighth Circuit precedent.   Nor does this Court have the power to change Eighth Circuit precedent.   This claim is not cognizable under binding Eighth Circuit precedent.   Nor can Gay rely on the miscarriage of justice exception. The miscarriage of justice exception allows the Court to consider an otherwise barred claim if there is new evidence.   However, it does not apply to reach a claim that is not cognizable.

### V. CONCLUSION

For the reasons stated, the Court finds as follows:

- Gay has procedurally defaulted on the following claims:   1-3, 2-1, 2-4, 2-5, 5-10, and 12-13.

- Gay has not procedurally defaulted on the following claims:   2-3 and 4.

- Gay's claim 14 is not cognizable under binding Eighth Circuit precent.

IT IS SO ORDERED this 23rd day of September 2025.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge