IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

RANDY WILLIAM GAY                                                                    PETITIONER

v.                                              Civil No. 6:23-cv-06011

DEXTER PAYNE, DIRECTOR,
ARKANSAS DIVISION OF CORRECTION                                     RESPONDENT

## OPINION AND ORDER

In March 2015, the Petitioner, Randy W. Gay ("Gay"), was convicted of the capital murder

of Connie Snow by a jury in the 18th Judicial District-East located in Garland County, Arkansas,

with Circuit Judge John Homer Wright presiding.  The jury imposed the death penalty.  After

exhausting his remedies at the state level, Gay seeks habeas relief on multiple separate grounds,

each of which will be addressed below.[1]

The matter comes before the Court on a Habeas Corpus Petition filed pursuant to 28 U.S.C.

§ 2254.  ECF No. 2.  Respondent (hereinafter "the State") filed a Response and the state record.

ECF Nos. 13-14 & 18.  Gay filed a reply brief.  ECF No. 27.

## I.  FACTUAL BACKGROUND

On direct appeal, the Arkansas Supreme Court succinctly set forth the facts regarding the

murder of Connie Snow.  *Gay v. State,* 506 S.W.3d 851 (Ark. 2016) (*Gay I*).  The Arkansas

Supreme Court stated:

> James Westlake testified he and his family operated a timber business in Garland
> County in 2011.  James testified that he paid Gay "a few hundred dollars each
> week" to "keep an eye" on their equipment overnight.  On May 10, 2011, James,
> Jim Westlake, and Rickey Stewart were attempting to repair machinery at their
> logging business in a wooded area of Garland County.  Around 5 p.m. that day,
> Gay arrived in a pickup truck, and Snow was in the passenger seat.  James testified

---

[1] In a separate opinion, this Court has found Gay procedurally defaulted on several claims.  ECF
No. 58.

that Gay exited the truck and ordered Snow out of the truck; Snow did not comply, and Gay went back to his truck and retrieved a shot gun and ordered Snow out of the truck.  As Snow was attempting to exit the truck; Gay shot Snow in the right side of her face.  The testimony demonstrates that James and Stewart both witnessed the shooting.  James testified that Gay loaded Snow's body into the back of his truck and exited the property.  Snow's body was recovered four days later in a shallow creek, and Gay was charged with capital murder.

*Id.* at 854-55.

Prior to the charges at issue here, Gay had been convicted of (1) murdering his father-in-law, James Kelly ("Kelly"), on August 12, 1978; (2) murdering his father, Glen Gay ("Glen"), on May 4, 1991; and (3) terroristic threatening.  These are the aggravating factors the State relied on. ECF No. 14-8, pp. 99-102 (Kelly); ECF No. 14-8, pp. 104-106 (Glen); ECF No. 14-8, pp. 108-109 (terroristic threatening). [2]

## II.   PROCEDURAL HISTORY

On March 19, 2015, Gay was convicted by a Garland County Circuit Court jury of one count of capital felony murder in the 2011 death of Connie Snow and sentenced to death by lethal injection.[3]  Gay appealed the conviction to the Arkansas Supreme Court, which affirmed the conviction in *Gay v. State,* 506 S.W.3d 851 (Ark. 2016) (*Gay I*).  Gay sought post-conviction relief through Arkansas Rule of Criminal Procedure Rule 37.5.  His petition was denied by the Circuit Court, remanded by the Arkansas Supreme Court for additional factual findings, and subsequently denied.  *Gay v. State,* 2021 Ark. 3 (2021) (*Gay II*); *Gay v. State,* 2022 Ark. 23 (2022) (*Gay III*).[4]

---

[2] ECF No. 14 contains the corresponding Bates numbers of the exhibit pages; it lists the first and last page (beginning with RWG000001 and ending with RWG015948) contained in each document numbered ECF No. 14-1 through ECF No. 14-56.

[3] Gay's first trial ended in a mistrial.  Details regarding the first trial may be found in the Court's opinion on the issue of procedural default, ECF No. 58, or in the record.

[4] These opinions are not reported in the Southwest Reporter.

Gay was represented during his second trial by court appointed public defenders Mark Fraiser, Brian Johnson, and Brandon Crawford.   Ashley Hornibrook was retained as a mitigation expert.   ECF No. 14-4, pp. 804-05.

On March 11, 2015, jury selection began.   ECF No. 14-5, p. 24.   By March 13, 2015, twelve jurors and two alternates had been selected.   ECF No. 14-5, p. 955.

The evidentiary portion of the trial began March 16, 2015.   ECF No. 14-5, p. 957.   The jury was sworn in and instructed by the Court.   ECF No. 14-5, 968-973.   After calling eighteen witnesses and recalling one, the State rested.   ECF No. 14-6, p. 463.   Fraiser moved for a directed verdict on the charge of capital murder, arguing the State had not shown Gay formed the necessary intent and had proved only first-degree murder.   ECF No. 14-6, pp. 464-466.   The Court denied the motion holding it was for the jury to determine if Gay had acted with premeditation and deliberation.   ECF No. 14-6, p. 466.   Fraiser renewed his objection to the procedure the Court utilized in selecting the alternate jurors.   *Id*.   He also renewed his objection to the Court's overruling of his requests for jurors to be stricken for cause.   *Id.*   These objections were noted for the record.   *Id.*   Fraiser advised the Court the defense would rest without calling any witnesses. ECF No. 14-6, p. 468.   This completed the guilt phase of the trial.

On March 17, 2015, the jurors began their deliberations at 2:54 p.m.   ECF No. 14-6, p. 533.   At 3:32 p.m., the jurors returned from deliberations.   ECF No. 14-6, p. 534.   The jury found Gay guilty of capital murder and of employing a firearm as a means of committing the homicide.   ECF No. 14-6, p. 535.   The Court polled the jury, and all 12 jurors indicated the verdict was their own.   ECF No. 14-6, pp. 535-36.   *See also* ECF No. 14-3, pp. 62-63, 80-81 (verdict forms).

On March 18, 2015, prior to the beginning of the penalty phase, Fraiser renewed all motions

made at the close of the State's case.   ECF No. 14-6, p. 538.   Fraiser raised the issue of whether

certain facts he deemed as non-disclosed aggravating circumstances could be utilized by the State.

ECF No. 14-6, pp. 538-39.   The court granted Fraiser's motion and limited the testimony "from

anyone relative to the aggravators that have been disclosed . . . [to] those . . . immediately

surrounding the act that [Gay] was convicted of."   ECF No. 14-6, pp. 544-45.

The State called eight witnesses, and the defense called six witnesses.   ECF No. 14-6, p.

553 to ECF No. 14-7, p. 31.   Both sides rested.   ECF No. 14-7, p. 38.   The defense rested without

Gay testifying.   *Id.*   The State offered no rebuttal testimony.   *Id.*   Court was adjourned for the

day.   ECF No. 14-7, p. 34, 38.   After discussions with counsel regarding jury instructions and

verdict forms, the trial resumed on March 19, 2015.   ECF No. 14-7, p. 65.   The court read the

jury instructions.   ECF No. 14-7, pp. 65-78.   The State gave its closing argument.   ECF No. 14-

7, pp. 78-93.   The defense gave its closing argument.   ECF No. 14-7, pp. 94-121.   The State

gave rebuttal.   ECF No. 14-7, pp. 122-36.

The jury retired to deliberate at 11:41 a.m. and at 12:21 p.m. asked for a lunch break.   ECF

No. 14-7, p. 139.   Deliberations were resumed at 1:47 p.m.   ECF No. 14-7, p. 140.   At 4:08 p.m.,

the jury returned its verdict deciding Gay should be sentenced to death.   *Id*.   In accordance with

the jury verdict, the Court sentenced Gay to death by lethal injection.   ECF No. 14-7, p. 147.

### III.   SCOPE OF REVIEW

"In general, if a convicted state criminal defendant can show a federal habeas court that his

conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas

corpus that requires a new trial, a new sentence, or release."   *Trevnio v. Thaler,* 569 U.S. 413, 421

(2013).   "Because of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

codified in 28 U.S.C. § 2254, we give great deference to the factual findings made by the state

court." *Roberts v. Payne,* 113 F.4th 801, 807 (8th Cir. 2024).   Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A state court's decision will be viewed as "'contrary to' clearly established federal law if the state court has applied a rule that directly contradicts Supreme Court precedent or has reached a result opposite to a result reached by the Supreme Court on 'materially indistinguishable' facts." *Kinder v. Bowersox,* 272 F.3d 532, 538 (8th Cir. 2001) (citing *Williams v. Taylor,* 529 U.S. 362, 405 (2000) (O'Conner, J., concurring)).   When reviewing a state court's decision for reasonableness, the question is whether the state court's application of "clearly established federal law" was "objectively reasonable"; "an unreasonable application of federal law is different from an incorrect application of federal law."   *Williams,* 529 U.S. at 409-10; *see also Penry v. Johnson,* 532 U.S. 782, 792-93 (2001).   Therefore, a state court's application of federal law might be erroneous, in a reviewing court's independent judgment, yet not objectively unreasonable. *Kinder,* 272 F.3d at 538.

A habeas petitioner may also seek relief if the state court made an unreasonable determination of the facts.   However, the state court's findings are subject to a deferential standard of review.   The state court's findings are presumed correct unless the petitioner can rebut those

findings with "clear and convincing evidence."   28 U.S.C. § 2254(e)(1); *Kinder,* 272 F.3d at 538; *see also Marshall v. Lonberger,* 459 U.S. 422, 432 (1983) (A federal habeas court must do "more than simply disagree with the state court before rejecting its factual determinations.   Instead, it must conclude that the state court's findings lacked even 'fair support' in the record.").   In other words, a state court decision counts as an unreasonable determination of the facts "only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record."   *Ryan v. Clarke,* 387 F.3d 785, 790 (8th Cir. 2004) (citations omitted).   In short, the AEDPA creates a high bar for any claim adjudicated on the merits in state court.

## IV.   GROUNDS FOR HABEAS RELIEF

### A. Claim 1—Trial Counsel rendered constitutionally ineffective assistance at the penalty phase of Gay's trial

Gay argues his counsel failed to conduct a reasonable pretrial investigation into Gay's life history, failed to integrate Gay's prior offenses and prison records into a cohesive narrative, and failed to explore and present multiple avenues of mitigating evidence such as childhood trauma, exposure to violence, and chronic alcohol abuse.   Habeas counsel sets forth a comprehensive narrative regarding Gay's life.   ECF No. 2, pp. 13-38.   According to that narrative, Gay had a traumatic childhood suffering sexual abuse by another child and his father, was frequently exposed to violence, began drinking at an early age, and experienced several failed relationships as a young adult.   Gay was incarcerated at least twice, and he was sexually abused during at least one of these periods of incarceration.

**1. Claim 1-1: Counsel was ineffective for failing to investigate, develop, and present mitigating evidence**

**a. Arguments of the Parties[5]**

Gay argues his counsel failed to fulfill his obligation "to conduct a thorough investigation of the defendant's background" including anything in his life that may militate against imposition of the death penalty. *Wiggins v. Smith,* 539 U.S. 510, 522 (2003). According to Gay,

> [t]he principal question here is not whether [Gay's] trial counsel should have presented a mitigation case but whether "the investigation supporting counsel's decision not to introduce mitigating evidence of [Randy's] background was *itself reasonable." Id.* at 523 (emphasis in original). If counsel limits the scope of their investigation for strategic reasons, then the court must consider the reasonableness of their limited investigation and whether reasonable professional judgment supports their limited investigation.

ECF No. 2, p. 43.

Gay points out his trial counsel had access to his pen pack which "made clear he suffered physical and sexual abuse from his father, was diagnosed with alcohol use disorder, PTSD, and major depression, and suffered multiple major adverse childhood experiences, such as being abandoned by both his mother and father at different times in his life." ECF No. 2, p. 43. Counsel Fraiser did retain Hornibrook, a mitigation expert, to assist in the development of a mitigation case, however, according to Gay, little investigation was done. Instead, defense counsel focused their mitigation efforts on Gay's siblings and hung their mitigation case solely on the testimony of Gloria Lindsay, Gay's sister. *Id.* at 44. At the Rule 37.5 hearing, defense counsel testified they considered Lindsay to be a self-absorbed and extremely difficult witness to

---

[5] This is intended only as a summary of the arguments of the parties.

interview and schedule.   According to Gay, Fraiser had a "multitude of witness with documented knowledge of Randy's social history."   *Id.* at 45.   Gay denies he refused to aid in his mitigation investigation and asserts he had "countless meetings and conversations with Hornibrook in which he provided numerous details of abuse."   *Id.*

In particular, Gay contends trial counsel unreasonably failed to:   (1)   investigate evidence of childhood trauma and abuse; (2) investigate or present evidence of trauma readily apparent from the FBI interviews; (3) investigate or explain Gay's lifelong struggle with alcohol abuse; (4) retain an expert to evaluate and discuss Gay's PTSD, depression, and childhood trauma; and (5) investigate and present mitigating evidence which prejudiced Gay at sentencing.

The State maintains a wealth of powerful mitigation evidence was presented at trial.   ECF No. 13, p. 42.   It notes both Fraiser and Hornibrook testified at the habeas phase that Gay refused to testify or otherwise cooperate in developing mitigating facts thus forcing them to rely on family members to develop that history.   *Id.,* pp. 43-44.   Moreover, the State asserts defense counsel thoroughly investigated the aggravating circumstances.   *Id.*, p. 44.   According to the State, defense counsel's mitigation strategy was to convince the jury to remove Gay from society rather than to forfeit his life.   *Id.*, p. 45.

Further, the State maintains evidence of the trauma Gay suffered was introduced.   First, evidence regarding Gay's sexual abuse was introduced through the testimony of Lindsay.   ECF No. 13, p. 43.   Second, Gay's exposure to violence was introduced through evidence Gay was present when Glen murdered Scotty Garner, Gay's cousin.[6]   *Id.*, p. 44.   Third, Gay's alcohol abuse was a consistent theme at his trial.   *Id.,* p. 47.   Fourth, the ADC pen pack contained

---

[6] Testimony at the Rule 37.5 hearing suggests the actual murder was done by an individual other than Glen.

evidence of Gay's sexual abuse in prison and of his diagnoses.  *Id.*, p. 49.

When proper deference is given to the conclusions of the Arkansas Supreme Court, the State maintains it is clear Gay is entitled to no relief on this claim.  ECF No. 13, p. 50.  The State maintains defense counsel made strategic decisions based on the facts of the case not to pursue certain avenues.  *Id.,* p. 51.  "These choices, when made after thorough investigation, are virtually unchallengeable."  *Id.*

### b.  Review of the Record

As relevant to this claim, Gay argued trial counsel failed to effectively prepare for trial and sentencing and failed to reasonably investigate or reasonably determine a particular investigation was unnecessary.  ECF No. 14-19, p. 38.  Included in his overall claim, were the following specific allegations of trial counsel ineffectiveness:

(1) the failure to investigate and present a meaningful theory of mitigation;

(2) the failure to investigate and present as mitigating evidence Gay's medical health history, mental health history, and social history;

(3) the failure to investigate Gay's prior diagnosis of post-traumatic stress disorder (PTSD), and to present evidence of the diagnosis in either the guilt or penalty phases;

(4) the failure to retain an expert in PTSD and present expert testimony in the guilt and penalty phase;

(5) the failure to investigate Gay's chronic alcoholism and present it as evidence of Gay's reduced mental state in the guilt phase or reduced moral culpability in the penalty phase;

(6) the failure to retain an expert in chronic alcoholism to testify to its long-term damage to the brain and consequent Neuro-Cognitive Disorders and to present this evidence as

a reduced mental state in the guilt phase or reduced moral culpability in the penalty phase;

(7) the failure to investigate Gay as the victim of sexual abuse as a child; and

(8) the failure to retain an expert in child sexual abuse and present this evidence in mitigation.

*Id.,* p. 40.

A hearing was held on the Rule 37.5 Petition on December 6-7, 2018. ECF No. 14-20, p. 1. Gay presented the testimony of several expert witnesses, Gay's former counsel Fraiser, and the mitigation expert Hornibrook.

Gay's first witness was Dr. Matthew Mendel, a clinical and forensic psychologist. ECF No. 14-20, pp. 4-5. Dr. Mendel conducted a psychological evaluation on Gay focusing on childhood abuse including sexual abuse. *Id.*, p. 5. He stated:

> Randy Gay was subjected to just a huge range of adverse childhood experiences, risk factors that damaged him; that have caused him lots of problems in lots of areas over the course of his life. Those include several different instances of childhood sexual abuse, but also physical abuse, verbal and emotional abuse, the loss of his mother who stopped being involved early in his life; basically, a further abandonment when he spent time in an orphanage. Witnessing his father threaten violence to others as well as his father's frequent threats of violence to him. And all of these things, among other factors, have had a major damaging impact affecting all aspects, so virtually all aspects of Randy Gay's life.

*Id.,* pp. 9-10. Dr. Mendel believed "there's an enormous amount of mitigating evidence here." *Id.*, p. 10.

To formulate his opinions, Dr. Mendel spent nine hours with Gay on October 24th and 25th, 2018, and reviewed the opinion of the Arkansas Supreme Court, a case synopsis prepared by habeas counsel, Lindsay's trial testimony, interviews conducted by defense counsel of Janice Cochran, Gay's ex-wife; Jeannie Smoke, Gay's former stepmother; Shirley Barron, another of

Gay's sisters; and Lindsay. ECF No. 14-20, p. 15. He also reviewed the FBI interviews of Darrel Garner, Gay's first cousin; Jeannie Smoke; and Shirley Barron. *Id.* Finally, he administered the Detailed Assessment of Posttraumatic Systems (DAPS). *Id.* With individuals facing a death penalty, Dr. Mendel testified he approached the issue of childhood sexual abuse with "some degree of skepticism because of the potential gain that could come from – to someone for if they were to – through alleging sexual abuse." *Id.*, p. 16.

In Gay's case, while Dr. Mendel did not find a paper trail of sexual abuse complaints, he did find a prior history of Gay disclosing the sexual abuse which, Dr. Mendel opined, supports the veracity of Gay's claims. ECF No. 14-20, pp. 17-18. In fact, Gay disclosed the abuse long before the capital murder trial. *Id.* Dr. Mendel testified sexual abuse by a family member is seen "as a huge betrayal, so there's issues of – of trust. Often you get people who – who just don't trust other people, who expect that people are out to harm them, hurt them." *Id.*, p. 21. In males, in particular, Dr. Mendel testified hypermasculinization often occurs. *Id.,* p. 22.

> You have with males, in particular, the term I use is hypermasculinization. So you get these males who were abused and experienced the abuse as a fundamental challenge to their sense of themselves as male, as masculine, as strong, as capable, competent, powerful, and they will take on these compensatory strategies where they will become aggressive. They will become even violent. They will fight at the drop of a hat. They'll be reactive or over-reactive.

*Id.*

Dr. Mendel noted the rate of alcoholism and substance abuse is generally "very high" in individuals who have been a "victim of child sexual abuse . . . particularly by a family member." ECF No. 14-20, p. 22-23. Dr. Mendel stated Gay's pulling back from relationships and interactions was "much more severe with him being really isolated and living in the – in the woods, literally." *Id.,* p. 25.

In his report, Dr. Mendel listed fourteen risk factors pertinent to Gay, and recounted these in his testimony:   (1) Gay's mother left him and his sisters when Gay was about five years old; (2) his father, Glen, placed Gay and his sisters in a "children's home" for about a year; (3) Gay was sexually abused by an older child at that home; (4) Glen was a severe alcoholic; (5) Glen subjected Gay's mother and stepmother to frequent and severe physical abuse in view of Gay and his siblings; (6) Glen raped Gay when Gay was approximately eight years old, and Glen attempted to sexually assault Gay on two other occasions the following year; (7) Glen sexually abused Gay's half-sister, Candy, for many years, a fact that was known within the family; (8) Glen frequently threatened Gay with physical violence including holding a gun to his head and threatening to kill him; (9) Gay witnessed Glen threaten multiple other individuals with physical harm or death; (10) Glen raped a female peer of Gay's in the backseat of a vehicle while Gay drove the vehicle; (11) Glen made sexual overtures to Gay's first wife; (12) Gay was subjected to an attempted violent rape while in prison at the age of twenty; (13) Glen attempted to rape Gay's second wife; (14) Gay witnessed Terry Camp murder Garner with Glen's assistance, and Glen prevented Gay from getting help for Garner.   *Id.*, pp. 27-28.

Dr. Mendel described Glen's relationship with Gay as "one of the most messed up relationships I have ever come across."   ECF No. 14-20, p. 29.   Dr. Mendel believed Gay was "unable to leave" the relationship despite the years of severe abuse and severe conflict.   *Id.*, p. 30. Dr. Mendel referred to the relationship as an "enmeshed conflictual relationship."   *Id.*   While he could understand it clinically, Dr. Mendel testified the relationship was "pretty far out there."   *Id.*, p. 32.   In fact, Dr. Mendel said he did not "think I've ever come across a relationship that – that captures that enmeshed conflictual dynamic more intensely than that between" Gay and his father, Glen.   *Id.*   Dr. Mendel referred to Glen as being "sadistic, violent – probably a psychopath . . .

with no concern for anyone other than himself in getting what he wanted when he wanted it." *Id.*, p. 33.

Dr. Mendel testified the more adverse childhood a person experiences, the more likely that person is to "be alcoholic or substance abusing." ECF No. 14-20, p. 41. There is also a genetic linking to alcoholism. *Id.* The modeling and messaging Gay received from Glen is that men deal with stress through drinking and violence. *Id.*

With respect to the deaths of Kelly and Glen, Dr. Mendel said in both events "Randy felt tremendously threatened and in danger himself." ECF No. 14-20, p. 45. As recounted by Gay, Gay struck or punched his first wife, who was Kelly's daughter. *Id.*, p. 46. When Kelly found out, Kelly smashed Gay's head on the hood of a car and said if Gay ever did that again he would "come and shoot [his] brains out." *Id.* In a second incident, Gay claimed he had not abused his wife, nevertheless, Kelly believed Gay had struck her. *Id.* Gay was told by his friends that Kelly was looking for him, with one friend adding that Kelly was planning to kill Gay. *Id.* Kelly then pulled up in a car. *Id.* When Kelly reached in his car, Gay assumed Kelly was reaching for a gun, so Gay responded to the perceived threat by shooting Kelly first. *Id.* According to Dr. Mendel, in "Gay's world, in which people are pulling guns on each other a lot and threatening each other a lot, that was his – his response, his belief, his reaction." *Id.*

On the day Gay shot Glen, the two had been arguing as they carried a table up a hill. Glen pushed the table causing Gay and the table to tumble downhill. ECF No. 14-20, p. 48. At that point, Glen began striking Janice (Gay's wife) and picked up a tent stake and threatened her with it. *Id.* Gay approached where a shotgun was laying on the ground. *Id.* Glen stated, "You better get that shotgun – you better get to that before I do, boy." *Id.* Gay picked up the shotgun and pointed it at his father. Glen responded by pulling his pistol and pointing it at Gay. *Id.* Gay

then shot and killed Glen. *Id*. Dr. Mendel testified that these two cases – Gay's killing of Kelly and Glen – demonstrated the level of fear and reactivity Gay experienced. *Id.*, p. 49.

After assessment, Dr. Mendel concluded Gay had PTSD. ECF No. 14-20, p. 49. Dr. Mendel explained one consequence of PTSD is hypervigilance or extreme vigilance which Dr. Mendel described as "extreme watchfulness, guardedness. Basically, being constantly vigilant, looking around us and expecting, suspecting danger and challenges and threats and always being on guard against them." *Id.*, p. 51. Another symptom is having an exaggerated startle response. *Id.*, pp. 51-52.

Dr. Mendel also diagnosed Gay with alcohol dependence and depression. ECF No. 14-20, pp. 52-53. Dr. Mendel concluded Gay "went through a more—a more severe, more wide-ranging pervasive set of damaging childhood events and childhood traumas, more than the vast majority of—of capital murder defendants that I've seen." *Id.*, p. 54. Dr. Mendel testified Gay was:

> likely to feel threatened much more easily, readily, and more intensely than most of us would have . . . or that almost anyone would if they hadn't had the circumstances that he's had. And when he's in those situations, he has learned from early on in his life to do react to them with violence and aggression, and he reacts suddenly, quickly, and extremely.

*Id.*, pp. 54-55.

Gay's second witness was Dr. John Roache a professor in the departments of psychiatry and pharmacology, at the University of Texas Health Science Center. ECF No. 14-20, pp. 62-63. Dr. Roache diagnosed Gay with alcohol abuse disorder (AUD) and concluded Gay's chronic alcoholism and its effects on his brain resulted in "a tendency to react emotionally and violently and impulsively." *Id.*, p. 64. Dr. Roache testified AUD causes neurochemical changes to the brain. *Id.*, pp. 83-84.

14

Dr. Roache testified Gay had severe AUD at the time of Gay's arrest for Snow's murder. ECF No. 14-20, p. 76.   AUD is the result of a combination of genetic and environmental factors. *Id*.   The greatest genetic risk comes from the father being an alcoholic.  *Id*.   Environmental risk factors include "peer influences, the environment in which you're raised, you know, the commonality [of] substance use and drinking behaviors in your environment around you, and role modeling."  *Id*.   In Gay's case, "[t]he physical, sexual, and emotional abuse that Randy [Gay] suffered makes—conveys particular risks of excessive drinking in a pattern that many would describe as self-medicating, self-medication, using alcohol."  *Id.*, p. 77.

Dr. Roache found two significant environmental factors predisposed Gay to AUD.  *Id.*, p. 79.   The first was "the role modeling of his father drinking heavily."  *Id.*   The second was "the physical, sexual, and emotional abuse that Randy suffered that produced, you know, self-doubt, the hyperarousal, the emotional distress, the fear and anxiety, and all of those things are highly likely, most likely, most probably gonna lead to heavy drinking."  *Id.*, pp. 79-80.   Dr. Roache indicated he was not referencing voluntary intoxication, which is not a defense to a criminal act, but rather a diagnosable mental health disorder.  *Id.*, p. 81.

Dr. Roache testified AUD causes neurochemical changes to the brain.   ECF No. 14-20, pp. 83-84.   The prefrontal cortex is the part of the brain where logical reasoning processes.  *Id*, p. 84.   Dr. Roache explained there is an impulse to react, but logical decision-making can inhibit that reaction.  *Id*.   The chronic and excessive daily use of alcohol inhibits or damages the prefrontal cortex, the area of the brain used for making rational decisions in life.  *Id.*, p. 85.   Dr. Roache explained "if there were a sudden noise that one associated with danger or risk of having occurred in the past, it would activate the amygdala, make the amygdala hyperreactive aroused sending fear signals, warning signals, danger signals, and then it should be the higher cortical parts

15

of like the prefrontal cortex that say, Wait.   Stop.   No, it's okay.   Don't react that way."   *Id.,* p. 86.   The "amygdala's also been responsible for aggression, aggressive acts and -- and behaviors."   *Id.*

Dr. Roache testified "with years of exposure of alcohol," the white matter of the brain is decreased resulting in "decreased prefrontal activity and increased lower emotional activity in the amygdala and other lower centers."   *Id.,* p. 89.   Dr. Roache also testified "alcohol intoxication itself reduces what is called cognitive flexibility . . . [t]hat cognitive flexibility of being able to think and weigh and consider alternatives is diminished under the influence of alcohol."   *Id.*   Dr. Roache believed Gay had learned to act with hostility and aggression and the decreased cognitive flexibility reduced "his options to consider alternative paths and courses of action."   *Id.,* p. 90.

Dr. Roache agreed with Dr. Mendel's conclusion that Gay had PTSD.   ECF No. 14-20, p. 92.   Dr. Roache referred to Gay's having both AUD and PTSD as being the "a perfect storm of— of these two thing[s]—events or causes that make one impulsive, aggressive, and reactive."   *Id.,* p. 95.   Dr. Roache testified these diagnoses would be an important factor, neurologically speaking, to explain why Gay acted in the manner he did when he killed Snow.   *Id.,* pp. 95-96.

Gay's third witness was Professor J. Thomas Sullivan, University of Arkansas at Little Rock, Bowen School of Law.   ECF No. 14-20, pp. 99-100.   Professor Sullivan testified regarding the standard of care for capital counsel in Arkansas during 2015 when the case was tried.   *Id.,* pp. 103-04.   Professor Sullivan explained the standard of care is determined by decisions of the United States Supreme Court and the Arkansas Supreme Court which articulate performance standards.   *Id.,* pp. 104-05.   Additionally, the American Bar Association (ABA) has set criminal justice standards relating to the performance of capital counsel.   *Id.*, p. 105.   These standards are routinely cited as guidelines.   *Id.*

Professor Sullivan testified a defense counsel should question prospective jurors to determine whether the juror will consider mitigating circumstances. ECF No. 14-20, p. 118. While defense counsel cannot ask the juror to commit to deciding a specific issue or to considering specific evidence, defense counsel can ask whether the juror would meaningfully consider specific mitigators such as intoxication or child abuse. *Id.,* pp. 122-125. Voluntary intoxication cannot be a defense to a crime or reduction of culpability, however, "impairment as a result of intoxication may be a mitigating factor in sentencing in a death penalty case." *Id.,* p. 126. In Professor Sullivan's opinion, it would not be fact-qualifying to ask a juror whether he or she could "give meaningful consideration and effect to intoxication as a factor mitigating against the death penalty?" *Id.*, p. 128. If a juror could not, he or she would be considered mitigation impaired and not qualified to serve on the jury. *Id.*, p. 129.

In Gay's case, the State asked the jurors if they believed intoxication could excuse a person's conduct and whether the potential consequences should be less. ECF No. 14-20, pp. 135-36. In Professor Sullivan's opinion, the State's questions effectively resulted in mitigation impaired jurors. *Id.*, pp. 136-37

In Professor Sullivan's review of the record, defense counsel never asked any of the jurors if they could give meaningful consideration and effect to any mitigating circumstance. ECF No. 14-20, p. 130. Even if defense counsel thought the court would not allow such questioning, a proffer should have been made because of the adverse and potentially prejudicial consequences of such a ruling. *Id*. Defense counsel wants the jury to be life-qualified not death-qualified. *Id.,* p. 131. In Professor Sullivan's opinion, the failure to make such a proffer falls below the standard of care. *Id.*

Turning to the sentencing phase of the trial, Professor Sullivan indicated the pen pack,

17

introduced by the Defense, contained damaging evidence that did not support a mitigation case in Gay's favor. ECF No. 14-20, p. 146. For example, the pen pack contained a letter Glen wrote to the parole board seeking Gay's release on a prior incarceration. *Id*. The State emphasized this letter to the jury during closing argument and asked them to review it. *Id*. The pen pack also contained the results of an MMPI which the State used in characterizing Gay essentially as a cold-blooded killer. *Id.,* pp. 149-50. Parole records were in the pen pack and contained references to Gay's threatening to blow up someone's house, being arrested for battery, carrying a shotgun, engaging in domestic violence, being arrested for being a felon in possession of a firearm, and having his parole revoked. *Id.,* pp. 151-52.

In Professor Sullivan's opinion, the defense counsel's admitting of the pen pack fell below the standard of care and provided the State with evidence damaging to Gay. *Id.,* pp. 151-54. Further, these records did not support any mitigating circumstances that they were admitted for; instead showing a history of violence, threats, and illegally carrying a gun. *Id.*, pp. 152-53. The records "contained information contrary to the mitigation theory in the case" and "invited error." *Id.*, pp. 153-54.

Professor Sullivan's testimony then moved to defense counsel's eliciting of the testimony from Lindsay about the shooting death of Garner and the fact that no one was ever charged with the murder. ECF No. 14-20, pp. 157-59. Professor Sullivan opined that with no clear explanation "for why the Scotty Garner killing would've been mitigating for" Gay it "left the door open to jurors to consider the possibility that [Gay was] the killer and maybe Glen was covering up for [Gay], then you've added more aggravation" by opening the door to the "ambiguous crime." *Id.,* p. 159. Professor Sullivan identified one of the themes of the State's close was Gay had "somehow escaped full liability for the two prior murders for which he been convicted." *Id.,* pp.

18

160-61.  Had the testimony regarding Garner's death been more fully developed it would have shown Gay as a more responsible and caring individual and would have resulted in "substantial mitigation."  *Id.*, p. 161.  Professor Sullivan concluded defense counsel's failure to investigate and develop the facts more, fell below the standard of care.  *Id.,* p. 163.

In Professor Sullivan's judgment, when the evidence of prior sexual abuse, violence in the home, being exposed to Garner's death, and having been diagnosed with PTSD is considered, competent counsel should have consulted a mental health expert in connection with the mitigation evidence.  ECF No. 14-20, pp. 162-63.

Regarding defense counsel's motion for a directed verdict, Professor Sullivan noted the defense essentially conceded all the elements of first-degree murder had been proved.  *Id.,* p. 164-65.  In fact, during defense counsel's close, counsel conceded to the jury that Gay was guilty of first-degree or second-degree murder.  *Id.*, p. 165.

At trial, a photo of a knife found in the passenger compartment of the vehicle was introduced.  ECF No. 14-20, p. 166.  Defense counsel testified that he did not know whether Snow had grabbed the knife.  *Id.*  In Gay's medical records, Gay stated during a psychological examination that a woman tried to stab him and he shot her.  *Id.,* p. 167.  Despite this photo and the statement Gay made during his psychological examination, defense counsel did not seek a self-defense instruction.  *Id.*  According to Professor Sullivan if Gay recklessly formed the belief he was under attack there might not have been enough to request a self-defense instruction, but there may have been a basis to request a lesser-included offense instruction under an imperfect self-defense theory.  *Id.,* p. 169.  Professor Sullivan testified in his opinion a manslaughter instruction should have been requested, but he was not certain the failure was sufficient to reverse the case because Gay did not testify.  *Id.*  In Professor Sullivan's estimation, defense counsel should have

investigated the question of whether a lesser-included instruction was appropriate considering the evidence of the knife and Gay's statement to the psychological examiner.   *Id* at 170.

In reviewing the case, Professor Sullivan had examined Gay's medical records and the FBI 302's or witness summaries.   ECF No. 14-20, p. 173.   Gay's medical and mental health records included the diagnosis of alcohol dependence disorder and indicated Gay's family was dysfunctional.   *Id.,* p. 175.   Glen was noted to be an alcoholic and an abusive person.   *Id.*   Notes were made in the records Gay had been physically and sexually abused by his father; his father had been sexually inappropriate with Gay's wives and girlfriends and had sexually abused Gay's sister; and described Gay as suffering from the symptoms of PTSD and major depressive disorder. *Id.,* pp. 176-77.   Professor Sullivan testified all this evidence suggested an avenue regarding mental health issues on Gay's part that should have been pursued by defense counsel.   *Id.,* p. 182.

Under all these circumstances, in Professor Sullivan's opinion, it was "absolutely" a failure of defense counsel to meet the standard of care not to consult with a mental health expert.   *Id.,* p. 185.   He stated: "there was no objectively reasonable strategic decision for not investigating and having this evidence available in the event you wanted to make the decision to offer it at trial." *Id.,* p. 186.   In Professor Sullivan's estimation, this material should have been presented in the guilt phase to support the lesser-included offense of first-degree murder or manslaughter and in the mitigation phase to present a meaningful theory of mitigation.   *Id.,* 186-87.

As to defense counsel's duty to investigate the aggravating factors, Professor Sullivan indicated the State met its burden of showing the existence of the aggravating circumstances in Gay's case by merely showing the existence of the prior convictions.   ECF No. 14-20, p. 189-190.   In Professor Sullivan's view, it was then up to defense counsel to investigate the aggravators to see whether the circumstances themselves were egregious or not to assist the jury in determining

whether the aggravators warranted the imposition of a death sentence. *Id.*

The State submitted Gay's murder of Kelly to the jury as an aggravator. Professor Sullivan testified the prosecutor's file contained statements and evidence that defense counsel should have introduced to lessen the impact of the Kelly murder aggravator. Such statements and evidence included (1) Gay, who was nineteen when he killed Kelly, had been drinking and was upset leading up to his murder of Kelly, (2) according to one witness interview in the file, Gay had been talking about killing himself, (3) Kelly threatened "he was going to beat [Gay's] brains in" if Gay laid another hand on Sherry, who was Kelly's daughter and Gay's wife, (4) Gay stated he just wanted Kelly to drive away and did not mean to shoot him, and (5) Sherry submitted a letter stating the sentence Gay received was fair and just. ECF No. 14-20, pp. 192-93. Sherry testified at the penalty phase of this trial, however defense counsel did not cross-examine Sherry regarding her statement that Gay had received a fair and just sentence for murdering Kelly. *Id.,* p. 196. Based on his review of the record, Professor Sullivan testified defense counsel introduced none of this evidence from the prosecutor's file in an attempt to lessen the aggravating weight of Gay having murdered Kelly. *Id.,* p. 194.

With respect to Gay's murder of Glen, there were statements in the record that: Gay reported Glen had pulled a gun on him and he had no choice but to shoot; Patty Gay, one of Gay's sisters, said Gay and Glen had been arguing lately and guns had been pulled; a citizen informant told the Sheriff that Gay shot Glen in self-defense; Glen's arrest history showed he had been arrested for aggravated assault and endangering the welfare of a minor and convicted of two counts of maiming an animal; Janice Cochran, Gay's wife at the time, said she tried to calm Glen down and thought he was going to first hit her with a sharp tent pole and then Gay; Janice Cochran also stated that Glen hollered he would get Gay's "ass" and something like, "You better get to it before

21

I do;" after the shooting Gay was crying and saying, "Dad, I didn't want it this way."   ECF No. 14-20, pp. 197-01.   Professor Sullivan testified that with this information, defense counsel could have argued to the jury to give less weight to the aggravating factor of Gay's conviction of murdering Glen.   *Id.,* p. 201.

On cross-examination, Professor Sullivan acknowledged he did not speak with defense counsel or the mitigation specialist assigned to assist them.   ECF No. 14-20, p. 204.   Nor did Professor Sullivan know what investigation had been performed other than there being a list of mitigating circumstances present in a file created by the mitigation specialist.   *Id.,* pp. 204-05.   However, Professor Sullivan emphasized the trial record is clear that the mitigation evidence was not produced.   *Id.*, p. 205.   Professor Sullivan also stressed there was no evidence in the file that a mental health expert had been consulted.   *Id.*, p. 206.   In line with his earlier testimony, Professor Sullivan noted the pen pack contained some valid mitigating evidence including that Gay was not a problem prisoner.   *Id.*, p. 207.

Professor Sullivan conceded witness statement's taken from the prosecution files would not be independently admissible unless there was an exception to the hearsay rule.   ECF No. 14-20, p. 214.   However, with respect to mitigation evidence, Professor Sullivan noted the defense is not bound by stricter rules regarding admissibility of the evidence.   *Id.,* pp. 218-19.   Professor Sullivan agreed that admitting Sherry Gay's testimony concerning the sentence Gay received for murdering her father would have opened the door to previously excluded testimony about Gay having beaten her the night before he murdered Kelly.   *Id.,* pp. 217-18.   Professor Sullivan also acknowledged that in Gay's polygraph examination Gay stated Glen did not have a gun at the time of the shooting.   *Id.*, p. 218.   However, in Professor Sullivan's view, the statements provided investigative leads.   *Id.,* p. 215.

Gay's fourth and final witness was Ashley Hornibrook who served as the mitigation specialist for his trial team.   ECF No. 14-20, p. 220.   Hornibrook testified she made the rough notes listing mitigation factors including that Gay had been sexually abused by Glen.   *Id.*, pp. 221-22.   Hornibrook could not recall if her note about the sexual abuse was a result of her reviewing the prison records or a conversation she had with Gay.   *Id.,* p. 225.   Hornibrook testified she made multiple visits to the prison to speak with Gay and attempted to speak with him at court hearings.   *Id.*   While Hornibrook testified she and defense counsel took additional steps to investigate these mitigating factors, she indicated there would have been notes in her file referencing an expert consultation if she had been present for such consultation.   *Id.,* pp. 226-27. She could not independently recall consulting any experts and believed it would have been reflected in her notes.   *Id.,* p. 229.   Hornibrook was aware Sky Tapp, a private attorney first retained by Gay to represent him, had advised Gay not to cooperate with the psychologist ordered to evaluate him.   *Id.,* pp. 229-30.   Had they consulted with an expert in child sexual trauma, Hornibrook testified she did not believe Gay would have cooperated with the expert.   *Id.,* p. 230. In fact, Hornibrook testified Gay "did not want us to proceed with any of that, any of those angles." *Id.,* p. 231.   Hornibrook testified Gay would not even talk to her about it as a mitigation specialist. *Id.,* p. 233.

The State's first witness was the primary defense counsel, Fraiser.   ECF No. 14-20, p. 239. During *voir dire*, Fraiser testified he did everything he could to get any jurors expressing a pro-death penalty stance excused for cause.   *Id.,* p. 242.   The defense team's goal was to get as many jurors as possible that were "bordering on being excluded because they couldn't consider the death penalty."   *Id*.   For those hesitant jurors, Frasier attempted to get them to say they would consider the death penalty.   *Id.,* p. 243.

Fraiser testified the decision was made to introduce the pen pack as evidence of mitigating circumstances. ECF No. 14-20, p. 245. In deciding whether to introduce the pen pack, the fact that Gay had been incarcerated most of his adult life and otherwise lived an isolated type of lifestyle were considered. *Id.,* p. 247. These facts limited the "people that could come forward and testify about Randy, the positive things about Randy." *Id.* By the time the decision was made, the jury had already heard Gay had been convicted of two other homicides through the use of guns, and as a result, the introduction of the pen pack "seemed to [the defense team] to be minor." *Id.* Fraiser testified it was a strategic move which in his opinion worked because the jury did find the existence of mitigating circumstances. *Id.,* p. 248.

Fraiser testified the defense team attempted to convince Gay to testify at least in the sentencing phase but he refused. ECF No. 14-20, p. 250. In fact, Fraiser testified he "implored [Gay] to do it, 'Get on the witness stand and try to save your life.'" *Id.*

Fraiser testified Gay was not "very forthcoming about his past and wanting to—or being able to help us." ECF No. 14-20, p. 260. While Gay was always respectful and polite, he did not help them despite being repeatedly asked to do so. *Id.*

With respect to the childhood abuse, Fraiser emphasized the only sponsoring witness they had to support this was Gay's sister, Lindsay. ECF No. 14-20, p. 268. In connection with the alleged failure to investigate and present mitigating evidence regarding Gay's medical health history, mental health history, and social history, Fraiser testified he would defer to Hornibrook on the medical and social history. *Id.* He knew Hornibrook had obtained Gay's school records because they had a teacher testify. *Id.* As far as Gay's mental health history, Fraiser indicated he knew Gay had undergone a forensic examination and been found fit and competent. *Id.* Fraiser knew Gay would refuse to cooperate and, based on his prior dealings with Gay, knew he

24

was "founded in reality as to time and place." *Id*. Fraiser "didn't see where—where there was anything to go forward on the mental health part of it." *Id*. Fraiser was aware of the diagnosis of PTSD because it was brought up in the pen pack. *Id., pp.* 268-69. Fraiser deferred to Hornibrook as to any steps taken to follow up on that diagnosis. *Id.*, p. 269.

Fraiser explained he would need the executive director's approval to retain an expert, and he did not believe simply having a diagnosis of PTSD an adequate basis to obtain approval. ECF No. 14-20, pp. 269-70. Further, Fraiser noted such approval would likely be more difficult to obtain due to Gay's refusal to cooperate. *Id*. With respect to retaining an expert in alcoholism, Fraiser testified Gay did not want to talk about his past and there was plenty of evidence introduced regarding his drinking. *Id*. On the issue of childhood sexual abuse, Fraiser pointed out Gay was not cooperating so the only evidence they had was Lindsay's testimony, and he could not tell from the mitigating factors whether the jury believed her. *Id.,* p. 271.

Fraiser was next asked about the alleged failure to investigate the circumstances of the two prior murder convictions. ECF No. 14-20, p. 271. He indicated he had reviewed the prosecutor's file on the Kelly murder and had some discovery on the Glen murder. *Id.,* pp. 271-72. Fraiser was unaware of any way to combat the aggravating circumstances regarding the convictions or to argue a murder conviction was not a felony involving violence. *Id.,* pp. 272-73. He pointed out the State even put on evidence to support the convictions. *Id.*

Fraiser testified he had a discussion with Gay about testifying in the guilt phase of the trial and advised him there were certain things Gay would have to explain if he took the stand. ECF No. 14-20, p. 275. Fraiser advised Gay not to take the stand during the guilt phase but to testify during the sentencing phase. *Id*. Gay took his advice not to testify during the guilt phase but then refused to testify in the sentencing phase. *Id.,* p. 276.

25

Fraiser admitted no one asked the jurors if they could give meaningful consideration and effect to any specific mitigators in the case.   ECF No. 14-20, p. 291.   However, Fraiser testified this was because they did not know at that point whether Gay would testify as a sponsoring witness "to a lot of stuff."   *Id*.   When asked if he developed the mitigators before trial, Fraiser responded it was a work in progress and some mitigators were obvious prior to trial but as "other stuff came up" during the trial additional mitigators were submitted.   *Id.*   Defense counsel knew intoxication would be an issue throughout the trial as well as Gay's history of it.   *Id*.   Fraiser did not ask about intoxication as a mitigator during *voir dire* because absent Gay's testimony there would be no evidence Gay had been drinking prior to killing Snow.   *Id.,* p. 292.   From the State's questioning, Fraiser could also tell the State was anticipating if Gay took the stand, he was going to say he had been drinking or was drunk at the time.   *Id.,* p. 293.   Fraiser had no specific recollection of reading Gay's medical or mental health records but thought he had read the entire file.   *Id.,* p. 294.

Fraiser stated he would have "possibly" followed up with at least a consultation with an expert had he known Gay had been diagnosed with PTSD and chronic alcohol abuse.   ECF No. 14-20, p. 296.   Fraiser testified that if Gay had disclosed he had been sexually assaulted, Fraiser believes he would have sought an expert to determine if that would help Gay's case.   *Id.,* p. 297. Fraiser conceded Gay had signed releases for his medical, employment, and psychological records prior to trial; subpoenas were issued but the subpoenas he was shown did not indicate if they were for records.   *Id.,* pp. 300-01.

The State's second witness was Hornibrook.   ECF No. 14-20, p. 309.   Hornibrook testified the subpoenas shown to Fraiser were trial subpoenas.   *Id.,* p. 310.   The medical and mental health records had previously been obtained from these individuals.   *Id*.

When asked how many times she attempted to persuade Gay to give her some information

on his background and what happened to him, Hornibrook answered: "Probably more times than I could count."  ECF No. 14-20, p. 313.   Gay would not participate in the conversations.  *Id., p.* 314.    With respect to Lindsay, Hornibrook testified she attempted to meet with Lindsay when Lindsay visited Gay, but Lindsay refused to meet with Hornibrook.   ECF No. 14-20, p. 314. Most of the time, Lindsay would not take her calls.  *Id.*   At one point, Lindsay told Hornibrook she would not cooperate with her.  *Id.*   Hornibrook offered to drive to Tennessee or to pay for Lindsay to come to Arkansas.  *Id.*   At this point, Lindsay made it difficult by demanding they transport her animals and to find a hotel that would take them that "it became almost an impossible task" for Hornibrook.  *Id.,* p. 315.   Any information Hornibrook obtained from Lindsay was piecemeal.  *Id.,* p. 317.   Lindsay finally told the defense about the sexual abuse just before trial. *Id.*   Defense counsel and Hornibrook did not inform Gay of the specific questions they planned to ask Lindsay because defense counsel believed, and Hornibrook still believed, Gay would not have wanted the information to come out.  *Id.*, p. 318.

Hornibrook believed she had done everything she could to investigate potential mitigation circumstances.   ECF No. 14-20, p. 318.   On cross-examination Hornibrook stated she was aware of the contents of Gay's records and did not consult with any experts.  *Id.,* p. 319.   Hornibrook did not believe Gay would have cooperated with an expert.  *Id.,* p. 321.

### c.  The *Strickland* Standard

The Sixth Amendment guarantees a criminal defendant "the right . . . to have the Assistance of Counsel for his defense."   U.S. Const. amend. VI. "It has long been recognized that the [Sixth Amendment] right to counsel is the right to the effective assistance of counsel."  *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970).

Ineffective assistance of counsel claims are analyzed under the standards set forth by the

Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on his ineffective assistance of counsel claims, Gay must prove, by a preponderance of the evidence, two related but independent issues. First, Gay must show counsel's performance was so deficient the performance does not constitute counsel as guaranteed the defendant by the Sixth Amendment. *Id.* at 687. Second, Gay must show counsel's deficient performance materially and adversely prejudiced the outcome of the case. *United States v. Webb,* 70 F.4th 1038, 1044 (8th Cir. 2023).

With respect to the first prong, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The Supreme Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689. A reviewing court "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

With respect to the second prong, to prove an error was prejudicial Gay must establish

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. "When the second element of this test can be dispositive of a case, we need not address the reasonableness of the attorney's behavior if the movant cannot prove prejudice." *Webb,* 70 F.4th at 1044 (internal quotation marks and citations omitted).

"A federal habeas court's review of a state court's application of *Strickland* is doubly deferential because it requires a highly deferential look at counsel's performance through the deferential lens of AEDPA. In other words, the doubly deferential standard gives both the state court and the defense attorney the benefit of the doubt." *Roberts,* 113 F.4th at 814 (internal quotations, alterations, and citations omitted).

### d. Discussion

Gay's ineffective-assistance-of-counsel claim was addressed on the merits by the Arkansas Supreme Court upon review of the denial of Gay's Rule 37.5 petition. *Gay v. State,* 2022 Ark. 23 (2022) (*Gay III*). After reviewing the evidence presented at trial and during the Rule 37.5 hearing, the Arkansas Supreme Court concluded:

> Here, the jury heard an abundance of evidence about Gay's childhood, such as abuse by his father, sexual abuse by other children in the children's home, and his chronic alcohol abuse; however, it found that most of this evidence did not rise to the level of a mitigating circumstance. Despite this, the jury found that "the aggravating circumstances outweigh beyond a reasonable doubt any mitigating

circumstance found by any jury to exist." Thus, Gay has failed to demonstrate that there is a reasonable probability that, but for counsel's failure to present testimony from the doctors, the jury would have reached a different result, namely a sentence of life imprisonment without parole. Therefore, we affirm the denial of relief on this point.

*Id.,* at 25.

While it is true that there was testimony about Gay's childhood abuse, his father's violent, controlling, and manipulative behavior, and Gay's alcohol use, there was no testimony about how these factors could have adversely impacted Gay's decision making and his actions at the time he killed Snow or at the time he killed Glen or Kelly. It is one thing that the jury heard certain facts occurred, but it is quite another to hear expert testimony on how the cumulative effect of these occurrences impacted Gay's general conduct and, more significantly, his conduct at the time he murdered Kelly, Glen, and Snow. "Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Cagle v. Norris,* 474 F.3d 1090, 1097 (8th Cir. 2007) (internal quotation marks and citation omitted); *see also Wiggins v. Smith,* 539 U.S. 510 (2003) (counsel's failure to expand the investigation fell below professional standards and prejudiced the defendant). The presentation of expert testimony regarding how Gay's abusive life experiences combined with his own alcohol abuse impacted Gay's behaviors would have enhanced the jury's decision making on the mitigating factors as well as their balancing of whether the aggravating factors outweighed the mitigating factors. In this case, the aggravating factors regarding the prior murder convictions were particularly weighty making it even more important for the jury to have the benefit of compelling expert testimony establishing a causal link between Gay's conduct and his mental health diagnoses.

Supreme Court cases "firmly establish[]" that "sentencing juries must be able to give

meaningful consideration and effect to all mitigating evidence that might be a basis for refusing imposition of the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246 (2007). With respect to expert testimony, the Supreme Court has said that "[d]etermining whether a defense expert's report or testimony would have created a reasonable probability of a different result if it had been offered at trial necessarily requires an evaluation of the strength of that report or testimony." *Thornell v. Jones,* 602 U.S. 154, 164 (2024).[7]

In *Sears v. Upton,* 561 U.S. 945, 956 (2010), the Court noted it had "never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Id.*, at 956. In *Williams v. Taylor,* 529 U.S. 362 (2000), the Court reiterated the proper standard in making the prejudice determination in the context of a mitigation investigation was "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Id.*, at 397-98; *see also Porter v. McCollum,* 558 U.S. 30, 41 (2009) (proper standard for determining whether a defendant would have received a different sentence was the totality of the evidence).

This Court believes Gay has established it was unreasonable for the Arkansas Supreme Court to have concluded: (1) Gay had not overcome the strong presumption of competence; and (2) Gay had failed to undermine confidence in the jury's sentence of death. *Cullen v. Pinholster,*

---

[7] In *Thornell*, the petitioner had murdered three members of the same family in heinous ways, including a 7-year-old child who he dragged from under a bed, beat her, and ultimately asphyxiated her, to obtain a $2000 gun collection which he sold to finance a trip to Las Vegas. The Supreme Court held that in such a case "where the aggravating factors greatly outweigh the mitigating evidence, there may be no 'reasonable probability' of a different result." *Thornell,* 602 U.S. at 165.

31

563 U.S. 170, 189 (2011).   Multiple considerations underlie this Court's determination.

First, from Fraiser's own testimony, he admitted if he had known Gay had been diagnosed with PTSD and chronic alcohol abuse, he would have "possibly" consulted an expert.   Further, had Gay disclosed the prior sexual assaults, Frasier believed they would have consulted an expert.   *See* ECF No. 14-20, p. 297.   The record available to defense counsel, much of which was obtained by defense counsel, contained these diagnoses, the information about the sexual abuse, and more.   Hornibrook's notes clearly reflect her knowledge regarding the sexual assaults.   Hornibrook testified that some of the records such as the records from the children's home Gay and his sisters resided in were no longer available, however other records, such as the ADC pen pack, were available and indicated Gay had disclosed the sexual assaults.   Neither Fraiser's concerns about the need to justify the expenditure of funds on experts nor his belief Gay might not participate in an expert evaluation, should have precluded—at a minimum—a consultation with an expert to determine the effectiveness of such testimony in Gay's case.   Considering what counsel knew, or had in their possession, the decision to limit their investigation and not consult an expert was unreasonable.   As the Supreme Court stated in *Strickland,*

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation.   In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

466 U.S. at 690-91; *see also Wiggins,* 539 U.S. at 525 ("The scope of their investigation was also unreasonable in light of what counsel actually discovered in the . . . records.").   There is, of course, no specific requirement that counsel in all cases consult with an expert.   Nevertheless, the Court cannot say the defense team's decision not to do so in this case was an informed or reasonable

strategic decision.  *See Nooner v. Norris,* 402 F.3d 801, 808 (8th Cir. 2005) ("A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").   Here, Fraiser's own testimony establishes he did not make a strategic decision not to consult an expert in connection with Gay's mental health diagnoses.  *See Johnson v. United States,* 860 F. Supp. 2d 663 (N.D. Iowa 2012) (The strength of the general presumption that counsel engaged in sound trial strategy turns on adequacy of counsel's investigation).

Second, from Hornibrook's testimony and her notes it is clear she knew of Gay's various diagnoses.   Further, her notes suggest Gay was at least cooperating to a certain extent.   He signed releases for his medical records; Hornibrook's notes indicate either Gay was cooperating by providing information about his past sexual abuse, childhood trauma, and his chronic use of alcohol or she obtained this knowledge from his records.   There are no notations in her notes indicating Gay was refusing to cooperate or that she made any effort to consult with, let alone retain an expert, or even considered how expert testimony could be used in either phase of the trial.

Third, the evidence provided by the experts at the Rule 37.5 hearing was compelling and established a clear link between Gay's conduct during the murders he committed in the past and the one he stood accused of.   The Court recognizes its obligation is not to rely on hindsight to assess an attorney's performance.   In this instance, however, there was ample evidence known to the defense team that should have at least compelled consultation with an expert.   The evidence would have been relevant both during the guilt phase and the penalty phase.   The testimony of the experts at the Rule 37.5 hearing demonstrates just how compelling the evidence would have been in explaining to the jurors (1) the adverse effects Gay's childhood trauma and exposure to violence had on how he responded to stressful situations, (2) the adverse effects of his mental illness on his

behavior, and (3) the impact Gay's severe alcohol abuse had to the prefrontal cortex of his brain which inhibited Gay's logical decision making.  *Cf. Thornell,* 602 U.S. at 167 ("Because none of Jones's experts provided a real link between Jones's disorders and the murders, their testimony would have done him little good in the Arizona courts."  Citing Arizona cases holding that evidence of causation was necessary before mental impairment can be considered a significant mitigating factor.).  Although deference must be given to strategic choices made by counsel, this is true only after a thorough investigation of the law and facts relevant to plausible options has been made.  *Strickland,* 466 U.S. at 690 (strategic choices made after thorough investigation are virtually unchallengeable as ineffective assistance of counsel); *see also Williams v. Taylor,* 529 U.S. 362, (2000) (Williams had a constitutionally protected right to provide mitigating evidence that his trial counsel either failed to discover or failed to offer).

Fourth, while Gay had previously refused to cooperate with an expert, his refusal concerned a mental competency examination and was the result of following the advice of his then counsel, Sky Tapp.  Neither Fraiser nor Hornibrook testified they had directly asked Gay whether he would cooperate with an expert.  Instead, they operated on an assumption based on Gay's prior refusal and his reluctance to speak about his past sexual abuse and his alcohol use.  Additionally, there was no testimony Gay was advised of the possible relevance of expert testimony on the evidence introduced by the State as aggravators as well as the mitigating evidence they sought to introduce through other witnesses, including Lindsay.

Fifth, this is not a case where counsel could utilize cross-examination to effectively diminish the damaging evidence submitted by the State, with respect to the aggravating factors and with respect to Snow's death.  *Wiggins v. Smith,* 539 U.S. 510, 522-23 (2003) (counsel's failure to make a reasonable investigation of a defendant's history and present this evidence at

mitigation can constitute ineffective assistance of counsel).   Nor did the mere testimony of witnesses about the circumstances of Gay's upbringing and his alcohol use provide the depth of knowledge expert opinion would have provided.   As exhibited by the testimony at the Rule 37.5 hearing, the cohesive narrative established by the experts would have explained to the jurors why Gay reacted the way he did with respect to Snow's murder and the murders used as aggravating factors and provide meaningful mitigation evidence.[8]   *See Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir. 1991) (counsel deficient in failing to present lay and expert mitigating evidence which would have put defendant's behavior in a more sympathetic light in the context of his family and medical background). In other words, the testimony was essential for the jurors to consider when determining Gay's moral culpability.

Sixth, this is not the type of case where Dr. Mendel's and Dr. Roache's testimony could be considered to be cumulative.   No expert testimony was introduced regarding Gay's diagnosis of PTSD or alcohol abuse disorder.   *Cf. Reynolds v. Bagley,* 498 F.3d 549 (6th Cir. 2007) (counsel not ineffective for failing to retain expert where a psychologist testified regarding chronic alcoholism, state of drunkenness at the time of the offense, and antisocial personality).   No testimony was offered that analyzed the impact of prior traumas on Gay's conduct or the way PTSD and alcohol use altered the way Gay thought and reacted to stressful situations.   Instead,

---

[8] The need for further investigation and expert testimony is perhaps no better underscored than by reference to the jurors' findings with respect to the mitigating factors.   *See e.g.,* ECF No. 14-3, p. 36-44 (#10—No member of the jury finds Gay had difficulties in efficiently taking in, processing, and weighing information; #21—No member of the jury finds Gay's chronic alcohol use is an illness; #23—No member of the jury finds Gay's capacity to conform his conduct to the requirements of the law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge; #24—No member of the jury finds Gay's intellectual and executive functioning abilities have been worsened by alcohol abuse; #48—No member of the jury finds Gay was sexually abused as a child).

the testimony of the various lay witnesses underscored Gay's inability to conform his conduct to societal expectations.

Finally, to establish prejudice, Gay must show there was "a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster,* 565 U.S. 170, 189 (2011) (internal quotation marks and citations omitted). In other words, "[w]hen a capital defendant claims that he was prejudiced at sentencing because counsel failed to present available mitigating evidence, a court must decide whether it is reasonably likely that the additional evidence would have avoided a death sentence." *Thornell,* 602 U.S. at 171. After a thorough review of the record, the Court concludes there is a reasonable probability that admission of the mitigating evidence, particularly the testimony of experts, would have resulted in Gay avoiding the death penalty. For the reasons stated, the ultimate conclusion of the Arkansas Supreme Court was unreasonable in this case. *Zornes v. Bolin,* 37 F.4th 1411, 1415 (8th Cir. 2022) (The Court evaluates "the reasonableness of the state court's ultimate conclusion, not necessarily the reasoning used to justify the decision.").

Having concluded Gay is entitled to relief on this claim, the Court need not address the remaining sub-parts of Claim One.

### B.    Claim 2—Trial counsel rendered ineffective assistance in the pretrial period.

Gay maintains during the pretrial period, counsel provided ineffective assistance by mishandling multiple aspects of *voir dire* and jury selection. He maintains his Sixth and

Fourteenth Amendment rights were violated by his counsel's deficient performance.    ECF No. 2, p. 97.[9]

### 1. Claim 2-2:   Counsel failed to conduct an adequate *voir dire* to ensure that any jurors could consider mitigating evidence

#### a.    Arguments of the Parties

According to Gay, life qualification requires trial counsel to explain to potential jurors the concept and application of mitigating evidence.   ECF No. 2, p. 101.   Following this, counsel must verify potential juror's views on mitigation and whether they can give meaningful consideration to the mitigation offered.   *Id.*   Gay states no potential juror was asked if they could give meaningful consideration to mitigation evidence, such as a history of substance abuse, childhood trauma, and mental-health disorders.   *Id.*   Instead, the venire was "simply asked, in general terms, whether they could consider mitigation evidence at sentencing.   Such broad questioning does not explore jurors' views or understanding of mitigating evidence, and there is a substantial likelihood that one or more mitigation-impaired jurors were seated as a result."   *Id.*   It is pointed out that at sentencing more than 70 potential mitigating factors were submitted without any juror having been questioned about whether they could consider any of these potential circumstances.   *Id.*

The State argues the Arkansas Supreme Court's decision on this point is entitled to deference.   ECF No. 13, p. 106.   The State contends counsel's actions during *voir dire* are presumed to be matters of trial strategy.   *Id.*, p. 107.   Further, jurors are presumed to be impartial, to follow the law as instructed by the trial court, and to comply with their oaths.   *Id.*   The State

---

[9] The Court has previously held that Gay procedurally defaulted on claims 2-1 (unreasonably failed to strike jurors who heavily favored the death penalty), 2-4 (failed to adequately rehabilitate jurors who expressed reservations about imposing the death penalty), and 2-5 (counsel was ineffective for failure to pursue a change of venue).   ECF No. 58.

maintains "Gay has not alleged, much less demonstrated, that the state court's adjudication of this claim was contrary to clearly established federal law or that it applied clearly established law to the facts of his case in an 'objectively unreasonable manner.'"  *Id.,* p. 109.

### b.   Review of the Record

In *Gay III,* the Arkansas Supreme Court rejected Gay's argument that *Morgan v. Illinois,* 504 U.S. 719 (1992), supported Gay's argument concluding *Morgan*'s holding did not "stand for the proposition that Gay should be allowed to question jurors about their views on 'particular' mitigators."   *Gay III,* 2022 Ark. 23, *12.   The court then held:

> Gay has not demonstrated that trial counsel's performance was deficient under *Strickland.*   During the Rule 37 hearing, Fraiser testified the defense team scoured the jury questionnaires and divided them into three stacks:  good, questionable, concerning.  In the "concerned" stack were jurors that indicated they were pro-death penalty.  Fraiser testified that his strategy was to seat as many jurors "as possible who would be bordering on being excluded because they could not consider the death penalty."  Fraiser testified that his goal for these prospective jurors was to get them to say they could consider the death penalty in order to prevent the prosecution from striking them for cause.  At trial, Fraiser asked the jury mitigation specific questions, including, "Do you consider [the possibility of life without parole] a severe punishment for a crime? and "Some people are of the belief, because of religion, the way that they were raised, what they have read, life experience, that if you take a life you should forfeit your life.  Do you believe that?"
>
> Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for finding ineffective assistance of counsel.  *Hartman v. State,* 2017 Ark. 7, 508 S.W.3d 28. When a decision by trial counsel is a matter of trial tactics or strategy and that decision is supported by reasonable professional judgment, then such a decision is not a proper basis for relief under Rule 37.  *Van Winkle v. State,* 2016 Ark. 98, 486 S.W.3d 778.  We agree with the circuit court's determination that Fraiser's voir dire was a matter of trial strategy.  Finally, because Gay cannot demonstrate deficient performance, we need not consider the prejudice prong in *Strickland.*

*Id.,* at *12-13.

### c. Discussion

The Supreme Court has emphasized the "importance of allowing juries to give meaningful effect to any mitigating evidence providing a basis for a sentence of life rather than death." *Abdul-Kabir,* 550 U.S. at 260; *see also Brewer v. Quarterman,* 550 U.S. 286 (2007). As stated in *Abdul-Kabir,* "the jury must be permitted to 'consider fully' such mitigating evidence and . . . such consideration 'would be meaningless' unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir,* 550 U.S. at 260 (citation omitted).

Defense counsel did not ask during *voir dire* whether the jurors could give meaningful consideration to specific mitigating factors, including Gay having had a traumatic childhood; his being subjected to sexual abuse; his frequent exposure to violence; Glen's and Gay's chronic alcohol abuse; and his mental health diagnoses. Additionally, with respect to some individual jurors, defense counsel did not make a general inquiry about whether the juror would give meaningful consideration to mitigating evidence. However, trial counsel submitted seventy-three mitigating factors to the jury. At the beginning and the conclusion of the penalty phase, the jury was instructed by the trial judge that "[a] mitigating circumstance is shown if you believe from the evidence that it probably exists." ECF No. 14-3, p. 25 (beginning); ECF No. 17-7, p. 69 (conclusion).

At the conclusion of the penalty phase, the Court then read each of the seventy-three mitigating factors to the jurors. ECF No. 17-7, pp. 70-77. The mitigating factors were coherently written, did not contain subparts or multiple factors, and permitted the jurors to consider each factor separately. *Cf. Johnson v. United States,* 860 F. Supp. 2nd 663, 873-876 (N.D. Iowa 2012) (relief not granted because the issue was untimely; however, the court discussed the

prejudicial effect of poorly drafted multifaceted, overly complicated mitigating factors for the jury to weigh).   The jurors' completion of the forms indicate the jurors found some of the mitigating factors existed.   ECF No. 14-3, pp. 35-49.

As the Eighth Circuit has noted, ineffective assistance of counsel claims are evaluated using "a freeze frame—when the alleged poor performance occurred." *Deck v. Jennings,* 978 F.3d 578, 583 (8th Cir. 2020).   Fraiser testified it was undecided what mitigating factors would ultimately be submitted to the jury during the penalty phase of the trial at the time voir dire was conducted.   Accordingly, the Court cannot say defense counsel acted deficiently in not questioning potential jurors about certain mitigating factors, some of which had not been determined by *voir dire*.

Furthermore, even if the Court assumes that Gay's trial counsel performed deficiently during *voir dire*, the Court does not believe Gay suffered any prejudice from this deficiency. *Strickland,* 466 U.S. at 691-92.   The prejudice prong of *Strickland* requires Gay to establish the outcome of the proceeding would have been different but for counsel's deficient *voir dire* performance.   No such showing has been made on this claim.   It necessarily follows Gay has not shown the decision of the Arkansas Supreme Court was contrary to, or an unreasonable application of, federal law.   Gay is entitled to no relief on this claim.

2. **Claim 2-3:   Counsel failed to object or move to disqualify jurors who stated they would not consider intoxication as a mitigating factor**

a. **Arguments of the Parties**

Gay argues counsel's ineffective *voir dire* resulted in the seating of five jurors who stated they would not consider intoxication as a mitigating factor.   ECF No. 2, p. 104.   Gay points out that intoxication is a statutory mitigating circumstance.   Ark. Code Ann. § 5-4-605(3).   Gay

maintains that a total of five jurors, Randall Stacy, Brenda Frye, Frank Palmquist, Barbara Ritchey, and Julia Holloway, all agreed a defendant should be held to the same punishment whether they committed the crime while sober or while intoxicated.[10]   Gay maintains Frasier's failure to challenge and seek removal of these mitigation-impaired jurors was unreasonable, particularly because intoxication would be listed as a mitigating factor.   ECF No. 2, p. 104-05.   Had counsel sought to seat a jury who could meaningfully consider intoxication or alcoholism as a mitigating factor, Gay argues there is a reasonable probability the jury would have returned a lesser sentence. Finally, Gay asserts this issue was raised in the appeal to the Arkansas Supreme Court but not addressed.   Thus, Gay maintains the court's review is *de novo.*

The State maintains Gay's argument is at least partially based on a misreading of *Morgan v. Illinois,* 504 U.S. 719 (1992).   ECF No. 13, pp. 116-117.   In the State's view, *Morgan* does not stand for the proposition that jurors must be struck for cause because they decline to give weight to one mitigating factor.   Rather, the State argues a juror's responses during *voir dire* must be considered as a whole.   When reviewed in this manner, the State maintains the jurors agreed they would consider mitigating evidence in reaching a verdict on the appropriate sentence.   Moreover, the State urges the Court to find Gay has failed to demonstrate *Strickland* prejudice—that, but for the seating of the jurors in question, the outcome of his trial would have been different.

### b.   Review of the Record

Jurors Palmquist, Ritchey, and Holloway, were called up in a panel of three.   ECF No. 14-5, p. 288.   When conducting *voir dire* for the State, the prosecutor's first question was: "[W]ith

---

[10] Specially, Gay alleges Stacy and Frye answered "no" when asked whether a defendant's punishment should be less if they committed the crime while intoxicated.   The remaining three jurors agreed a defendant should be held accountable regardless of intoxication the same way as they had committed the act while sober.   Intoxication should not be an excuse.

regard to alcohol use, do either of you ladies or you, sir, feel like somebody who's been drinking, voluntarily gets intoxicated should not be held responsible for their actions?" *Id.*, p. 290. All three jurors shook their heads. He then asked: "If you do something illegal while you're drunk, should you be held accountable for it?" *Id.* All three jurors answered: "Yes." *Id.* The prosecutor then added: "The same way if you had done it sober. Should not be an excuse." *Id.* A short time later, the prosecutor asked the jurors if each could consider both the death penalty and life without parole and decide which was appropriate based solely on the facts heard and the evidence admitted. *Id.,* p. 293. Each said they could. *Id.* All three said they could envision a set of circumstances warranting a sentence of death and one of life without parole. *Id.*, pp. 294-96.

When conducting its *voir dire*, defense counsel asked Palmquist, who indicated on a questionnaire that he strongly supported the death penalty, whether he would consider both aggravating factors and mitigating factors before making his decision. ECF No. 14-5*,* p. 305-06. Ritchey also indicated on the juror questionnaire that she strongly supported the death penalty. *Id.*, p. 310. However, she indicated she thought life without the possibility of parole was a serious sentence. *Id.* No questions were asked regarding whether she could consider mitigating circumstances. Holloway also indicated she strongly supported the death penalty in response to the questionnaire. *Id.*, p. 311. She indicated she could consider life without the possibility of parole. *Id.*, pp. 311-12. No questions were asked regarding mitigating circumstances. The defense did not challenge these three jurors for cause. *Id.*, p. 316.

Jurors Frye and Stacy were called up as part of a panel of three. ECF No. 14-5, p. 484. The prosecutor's first question to the panel was: "[D]oes anybody think someone who's been using alcohol and becomes intoxicated should still be held responsible for their actions? If they violate

42

the law, they still should be held accountable?" *Id.,* p. 487. Frye and Stacy both responded: "Yes." *Id.* His next question was: "Does anybody think that their punishment should be less because they chose to get drunk and do this than somebody who did something while they were sober?" *Id.* Both Frye and Stacy responded: "No." *Id.*

The prosecutor went on to explain to the jurors that this was a bifurcated trial and the case would proceed to the sentencing phase only if the defendant was found guilty of capital murder. ECF No. 14-5, p. 490. He explained the State would present evidence of statutory aggravating factors that might justify the death penalty, while the defense would put on evidence of mitigating factors, or any reason the death penalty should not be imposed. *Id.,* p. 490-91. The jurors were told that only if they found the aggravating factors outweighed the mitigating factors, would they be asked to impose the death penalty. *Id.* Stacy and Frye said they had no problem with having to weigh the aggravators and the mitigators. *Id.,* p. 492. They understood if they found the aggravators outweighed the mitigators their verdict would be death. *Id.,* p. 492. While if they found the opposite way—that the mitigators outweighed the aggravators—the verdict would be life. *Id.,* p. 493. Frye and Stacy each indicated they could envision circumstances under which both penalties would be appropriate. *Id.,* p. 494.

Frye was next asked about her response indicating she moderately supported the death penalty. ECF No. 14-5, p. 495. She indicated it depended on the facts and circumstances of the crime. *Id.* She also indicated she would follow the judge's instructions on the law. *Id.* Next, Stacy was asked about his response that he moderately opposed the death penalty. *Id.,* p. 496. While Stacy did not know if the death penalty was really a deterrent to crime, he stated he did believe in the death penalty. *Id.,* p. 497. He understood the death penalty was an available

punishment. *Id.* He said he could vote for the death penalty or for life imprisonment. *Id.*, p. 498.

When these jurors were being questioned by the defense, Frye was asked about her belief that life imprisonment was not a serious punishment. ECF No. 14-5, p. 506. However, Frye indicated she would not have a problem choosing a sentence of life without the possibility of parole over the death penalty. *Id.* Stacy agreed he would not have a problem choosing a life sentence. *Id.* After Frye indicated she would expect the defense team to prove Gay did not commit the crime, she indicated if the defense rested without presenting witnesses it would not necessarily suggest to her that Gay was guilty. *Id.*, pp. 507-08. Neither juror was asked any questions about mitigating evidence.

On further *voir dire*, the prosecutor clarified with Frye that the defense had no burden of proof on the issue of guilt or innocence. ECF No. 14-5, p. 510. When asked if she would have a problem voting for life if the State had not proven beyond a reasonable doubt that the aggravators outweigh the mitigators, Frye testified she would have no problem. *Id.* No challenges for cause were made with respect to Frye and Stacy. *Id.*, p. 512-14.

At the Rule 37.5 hearing, Professor Sullivan indicated that asking a juror if he or she could give meaningful consideration and effect to intoxication as a mitigating factor was a proper qualifying question rather than a "fact-qualifying" question. ECF No. 14-20, p. 125-128. Professor Sullivan indicated this was a particularly troublesome issue because voluntary intoxication is not a defense to a crime but is a statutory mitigating factor in capital cases. *Id.*, p. 126. He pointed out there are many jurors, like several of the responses made by jurors in the Gay case, who believe if you are intoxicated "you don't deserve any special leniency because you were intoxicated; but moreover, they would never consider that as a possibility for mitigation even

44

if there's considerable evidence produced at trial, because they just think that's not gonna be something that would warrant consideration for leniency." *Id.*

In Professor Sullivan's opinion, any juror who believed he could not consider intoxication as a mitigating factor was "mitigation impaired." ECF No. 14-20, p. 129. To effectively conduct capital *voir dire*, Professor Sullivan believed defense counsel "must ask case-specific mitigator questions; in other words, in this case, 'Can you give meaningful consideration and effect to intoxication as a mitigating factor.'" *Id.* In Professor Sullivan's review of the trial record, defense counsel did not ask any jurors if they could give meaningful consideration and effect to any mitigating circumstance. *Id.* at 130. If defense counsel was prevented from asking these questions, a proffer should have been made. *Id.* The failure to make a record, including a proffer, was in Professor Sullivan's opinion "defective performance on the part of counsel." *Id.*, p. 131.

Professor Sullivan was asked specifically about jurors Frye and Stacy. ECF No. 14-20 at 132. Professor Sullivan noted Frye and Stacy essentially said on the front end, "No, nobody gets a break in the sentencing because they were intoxicated." *Id.*, p. 133. In other words, they had already indicated they will not consider "a life sentence based upon mitigation evidence by intoxication." *Id.*, p. 134. In Professor Sullivan's view, this was an attempt by the State to try to persuade the jury that intoxication was not a mitigating factor. *Id.* As it stood, without further questioning, Professor Sullivan believed "these jurors should not have been allowed to sit" on the jury. *Id.* Professor Sullivan indicated the State had received similar commitments from other jurors. *Id.*, pp. 135-36.

In the Rule 37.5 Petition, Gay asserted an ineffective assistance of counsel claim based on trial counsel's failure to object to, or move to disqualify, at least five jurors who stated, in response

to the State's *voir dire*, they would not consider intoxication as a mitigating factor.  *Id.,* p. 38.  In *Gay III,* in ruling on the ineffective assistance of counsel claims, the Arkansas Supreme Court did not separately address the arguments made with respect to the seating of these five jurors.  *Gay III,* 2022 Ark. 23, *11-13.

### c.  Discussion

The parties disagree over the significance of the decision in *Morgan v. Illinois,* 504 U.S. 719 (1992), on the current issue.  In *Morgan*, the Supreme Court was asked to decide "whether, during *voir dire* for a capital offense, a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant."  *Id.* at 721.  The State asked, in accordance with *Witherspoon v. Illinois,* 391 U.S. 510 (1968), inquiry be made to determine "whether any potential juror would in all instances refuse to impose the death penalty upon conviction of the offense." *Morgan,* 504 U.S. at 722.  Each juror was asked if he or she had any moral or religious principles that would mean the juror could not impose the death penalty regardless of the facts.  *Id.*  The defense asked for the following "life qualifying" or "reverse-*Witherspoon"* question to be asked: "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?"  *Id.* at 723.  The trial court refused on the grounds it had "asked the question in a different vein substantially in that nature."  *Id.*

The Court noted Illinois had set up its capital sentencing scheme so that a jury determined both guilt and whether the death penalty should be imposed on a capital defendant.  *Morgan,* 504 U.S. at 726.  As described, the sentencing scheme is the same as that employed in Arkansas, although *voir dire* in Illinois was carried out by the court.  *Id.* at 722.

The Court found the petitioner entitled to relief under the Due Process Clause of the Fourteenth Amendment. *Morgan,* 504 U.S. at 722. The Court said it has been decided as early as 1807 that "a juror who has formed an opinion cannot be impartial." *Id.* at 727 (internal quotation marks and citations omitted). The Court stated it had decided in *Wainwright v. Witt,* 469 U.S. 412, 424 (1985), "'the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* (citation omitted). The Court reiterated "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729.

> The Court discussed the importance of *voir dire* stating
>
> "[v]oir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion). Hence, "[t]he exercise of [the] trial court's discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States,* 238 U.S. 308, 310 (1931).

*Morgan,* 504 U.S. at 729-30 (parallel citations and footnote omitted).

The issue before the Court centered on the "petitioner's ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt." *Morgan,* 504 U.S. at 733. The Court concluded it was constitutionally required that petitioner be able to "challenge for cause . . . those prospective jurors who would *always* impose death following conviction, [or] his right not to be

tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so." *Id.* at 733-34 (emphasis in original). It stated jurors who would impose the death penalty regardless of mitigating facts "obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty: They not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736.

Here, the State asserts *Morgan* has no application outside its precise holding—that criminal defendants must be allowed to ask jurors if they will consider a life sentence. In short, the State maintains *Morgan* has no applicability to case-specific *voir dire* questions. Whereas Gay argues *Morgan* stands for the broader proposition that any juror who states he or she will not consider a statutory mitigating circumstance is not impartial. From this, Gay argues it necessarily follows that counsel's failure to *voir dire* the jurors on their ability to consider intoxication as a mitigating factor constitutes an inadequate *voir dire* in violation of the Constitution, amounting to the ineffective assistance of counsel.

In *United States v. Johnson,* 366 F. Supp. 2d 822 (N.D. Iowa 2005), a United States District Court for the Northern District of Iowa undertook a thorough review of the case law to determine "what degree of case-specific questioning, if any, is permissible in the course of life- or death-qualifying prospective jurors." *Id.* at 826. The *Johnson* case was before the court at the pretrial stage for determination of the scope of *voir dire* with respect to case-specific questions. The *Johnson* court noted that while *Morgan* did not involve the issue of the "propriety or impropriety of case-specific *voir dire,* the *Morgan* decision is nevertheless instructive on the proper role of *voir dire* in capital cases." *Id.* "Thus, the vexing question left unanswered in *Morgan* is whether any case-specific inquiry is appropriate to determine whether a juror can truly consider both a life

and a death sentence in a particular case—in other words, can a determination be made on a juror's ability to impose either sentence no matter what the facts are, or regardless of the facts and circumstances of conviction, without some inquiry into the juror's response to the facts of the particular case." *Id.* at 831.

After reviewing applicable case law, the *Johnson* court determined there were "five categories of '*Morgan* questions': (1) 'abstract' questions; (2) 'defendants status' questions; (3) 'case-categorization' questions; (4) 'case-specific' questions; and (5) 'stake-out' questions." *Johnson,* 366 F. Supp. 2d at 834-35.   The court noted the cases, including *Ramsey v. Bowersox,* 149 F.3d 749 (8th Cir. 1998), routinely found the "abstract" questions were permissible and satisfied *Morgan's* constitutional standard.   *Johnson,* 366 F. Supp. 2d at 835.

Category four—case-specific questions were defined as "questions that ask whether or not jurors can consider or would vote to impose a life sentence or a death sentence in a case involving stated facts, either mitigating or aggravating, that are or might be actually at issue in the case that the jurors would hear." *Johnson,* 366 F.Supp.2d at 840.   The court acknowledged the "clear majority of courts reject '*Morgan* questions' with any degree of case specificity."   *Id.*   However, it found "a glaring fallacy in most of the decisions excluding any and all 'case-specific' questions, of whatever type identified above, purportedly on the authority of *Morgan:*   These questions simply are not precluded by *Morgan,* because *Morgan* never addressed the propriety of any case-specific questions." *Id.* at 844.   The court believed the correct question was "whether 'case-specific' questions, of any of the types identified above, are *appropriate* under *Morgan*—even though they are not required by *Morgan*—to provide the parties with an adequate opportunity to *voir dire* prospective jurors for the purpose of empaneling a fair and impartial jury." *Id.* at 844-45.   The *Johnson* court decided "while *Morgan* does not require 'case-specific' questioning of

prospective jurors to satisfy constitutional requirements for life- and death-qualifying prospective jurors, 'case-specific' questions [were] nevertheless appropriate—indeed, necessary—to empanel a fair and impartial jury" in the case before it.    *Id.* at 848.

The question here is whether Gay was denied his Sixth Amendment right to counsel when counsel failed to question these five jurors about their willingness to consider intoxication as a mitigating factor in response to their verbal commitment to the State that they did not consider intoxication to be a defense to a criminal act or to lessen the punishment imposed.    There is no constitutional right to ask about each case-specific mitigating circumstance.    However, when the jurors have made a specific commitment to the State not to consider intoxication to lessen the punishment imposed, it was incumbent on counsel to ensure these same jurors were willing to consider intoxication as a mitigating factor.    *Voir dire* is especially crucial in a capital case to identify those jurors who will give meaningful consideration to both aggravating and mitigating factors.    Failing to ask about the jurors' willingness to consider intoxication as a mitigating factor was a serious error in judgment that cannot be categorized as reasonable or within the rubric of being a trial tactic or strategy.    Instead, this error fell below prevailing professional standards for capital counsel at the time.    As the Arkansas Supreme Court noted: "Gay's alcohol abuse was a consistent theme in his trial."    *Gay III,* 2022 Ark. 23, *22.    Gay has demonstrated defense counsel's performance was deficient, meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."    *Strickland,* 466 U.S. at 687.

Next, Gay must demonstrate prejudice.    "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances

did not warrant death." *Strickland,* 466 U.S. at 695.  *Morgan* and its' progeny do not provide any definitive answer as to when case-specific mitigating questions are appropriate.  *Morgan,* however, does serve to underscore the importance of *voir dire* in a capital murder case.   The Court stated "[*v*]*oir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored."  *Morgan,* 504 U.S. at 729.  As is evidenced from the *voir dire* set forth above, the State asked for more than a commitment that the jurors would not consider intoxication as a defense in the guilt phase of the trial, the State's questioning also intruded into the punishment phase of the trial.   *Cf., Martinez v. Dretke,* 426 F. Supp. 2d 403, 462 (W.D. Texas 2006) (no prejudice found from defense counsel's *voir dire* where jury faced "no specific issues regarding the 'mitigating' effect of any evidence of petitioner's youth, intoxication, or difficult childhood until the punishment-phase of trial.").   In this case, when these five jurors had committed to the State not to allow intoxication to lessen the available punishment, Gay was clearly prejudiced by the failure of his defense team to follow-up with questions to ensure the jurors would consider intoxication as a mitigating factor.   This is not a situation where the jurors' general commitment to consider mitigating factors was sufficient.   The State had essentially already obtained their commitment not to consider one statutory mitigator—intoxication.   Gay is entitled to relief on this claim.

### C.  Claim 3—Trial counsel rendered constitutionally ineffective assistance at the guilt phase of Gay's trial

Gay contends he was denied effective legal representation during the guilt phase of his capital trial.   Gay asserts two separate claims.   First, he contends defense counsel failed to object to the state's improper guilt phase closing argument.   Second, he contends his counsel failed to investigate and pursue a theory of imperfect self-defense or proffer a self-defense instruction.

**1. Claim 3-1:   Counsel failed to object to the state's improper guilt phase closing arguments**

**a.   Arguments of the Parties**

Gay asserts the prosecutor repeatedly made inflammatory statements during the closing argument of the guilt phase of the trial and dramatized descriptions of the crime in such a way to prejudice him.   ECF No. 2, p. 111.   Gay maintains the highly sensationalized comments likely had a significant impact on the jury's decision.   *Id.*   Gay identifies the following statements made by the prosecutor: (1) after Gay shot Snow "he picked her up like a dead deer and chunked her . . . into the back of his truck," (2) Gay then drove a mile away and "chunked" her onto an unmarked road where "animals could eat her;" and (3) after Gay shot Snow, he "push[ed] her up on his knee like she's a dead animal" and "chunk[ed] her into the back of his truck."   *Id.*   Gay maintains counsel acted unreasonably in failing to object to the sensationalized account.   First, Gay argues the "statements instilled into the jury's mind the image of a heartless killer handling the victim like a dead animal."   *Id.*   Second, and in Gay's view more importantly, without such comments there was a reasonable likelihood the jury would have returned a lesser verdict.   *Id.* Gay states only one eyewitness, Rickey Stewart, provided evidence Gay acted with premeditation and deliberation.   *Id.*   Gay argues other evidence suggests he may have acted in self-defense or believed he was acting in self-defense.   *Id.*

The State maintains Fraiser made a rational strategic decision not to object to the statements.   ECF No. 13, p. 130.   The State maintains the Court should defer to the decision of the Arkansas Supreme Court.   *Id.*, p. 131.   Even a sustained objection would not, in the State's view, alter the outcome of the trial. *Id.*   Thus, even if Gay could establish the deficient performance prong of *Strickland*, he cannot establish the prejudice prong.   *Id.*

**b.    Review of the Record**

At trial, James Westlake ("Westlake") testified he did not actually witness Gay shoot Snow, but he turned around when he heard a blast and Gay was holding a shotgun and Snow's body was on the ground.  ECF No. 14-6, p. 30.  Gay then walked over and asked Westlake if he had any plastic.  *Id.,* p. 33.  When Westlake stated he did not, Gay turned and walked back to the truck.  *Id.*  When Gay could not get the tailgate open on the truck, he asked Westlake for help.  *Id.*, p. 34.  Westlake walked over and bumped the tailgate with his hand, and it opened.  *Id.*  Westlake turned and went to check on his father.  *Id.*  Westlake testified that next Gay "brings her back – drags her back to the truck and then loads her in the back-end of the truck."  *Id.*, p. 36.  Westlake testified Gay was just dragging Snow "by the back of the neck or back of the head or something. He's just dragging her."  *Id.*  When he got to the back of the truck, Gay "rolled her up on his knees like and then rolled her into the in the back of the truck."  *Id.*, p. 37.  When asked how Gay picked Snow up, Westlake testified Gay "just reached down and grabbed her, I think at the belt loop kinda, and then the back of the head with the hair or something, and lifted her up and put her in the back of the truck."  *Id.*  Gay then turned his pickup around and, on his way back by, gave Westlake a thumbs up.  *Id.,* p. 38.

Ricky Stewart ("Stewart") testified he was working for the Westlakes on May 10, 2011; he was at the equipment site with Westlake.  ECF No. 14-6, p. 87.  Shortly after 5:00 p.m. that day, he and Westlake were attempting to jump start a skidder.  *Id.*, p. 89.  Stewart was sitting in the seat of the skidder approximately six or seven feet off the ground.  *Id.*, p. 91.  Stewart was approximately fifteen to twenty feet from Gay's truck.  *Id.*  When Gay first arrived at the site he came over and was talking to Westlake.  *Id.*, p. 92.  Stewart heard Gay tell Westlake that Snow was going to jail, but she did not know it.  *Id.*, p. 93.  Gay indicated she was associated "with that

bunch over there" and gestured with his head. *Id.* Snow denied she was associated with anyone. *Id.* Gay turned around, hollered "[y]ou got a f-----' problem," returned to the truck, and retrieved a bolt action gun out of the toolbox on the back of the pickup. *Id.*, p. 94. Initially, Gay stuck the gun in the driver's side window and told Snow to get out of the truck. *Id.* Then he walked to the back of the truck and hollered: "I told you to get the f--- outa my truck." *Id.* Gay then leaned on the side of the truck, put his elbow on the bed of the truck, and aimed the gun at Snow. *Id.* at 94-95. Stewart testified "she stepped outa the truck, [with] her back to the inside of the door." She said, 'What are you gonna do, shoot me:'" Stewart heard the safety click off, and Gay "shot her." *Id.*, p. 95. Afterwards, Gay first asked Westlake for plastic and then asked him for help opening the tailgate. *Id.*, pp. 97-98.

Stewart witnessed Gay drag Snow to the back of the truck "[b]y the hair of the head and loops on her pants." ECF No. 14-6, p. 99. After Gay got to the back of the truck, Stewart quit watching. *Id.* Stewart testified Gay was acting "[p]retty much like nothing happened." *Id.*

Special Agent Charles S. Falls ("Falls") testified he interviewed Gay the day he was arrested. ECF No. 14-6, p. 186-87. When Falls questioned Gay regarding Snow, Falls testified Gay "went back and forth between two positions. The first, he said that he had been drinking and he could not remember what he had done. And then he would also then maintain that he spent the whole afternoon in Mountain Pine at Mr. Nevels' place." *Id.*, pp. 195-96.

Falls testified Snow's body was discovered, approximately 1.2 to 1.3 miles from the site of her death, on May 14th—four days after the homicide. ECF No. 14-6, p. 213. It was found on "what was described as a Jeep trail" that wound around a "bit until it crossed a creek." *Id.*, p. 214. Falls testified: "Ms. Snow's body was found lying in the creek on top of some rocks that

rose above the creek. . . . [A]pproximately twenty-three feet or so from the body, we located Ms. Snow's hair and her scalp."  *Id.*

Chief Deputy Prosecuting Attorney Michelle Lawrence gave the closing argument for the State.  ECF No. 14-6, p. 496.  During the closing, she stated:

> We have eye witnesses who saw her fall into a heap.  Blood come out of her head. You have witnesses who tell you that he picked her up like a dead deer and chunked her, after he drug her, and he chunked her into the back of his truck.  Then you hear from witnesses that she was found over a mile away on an unmarked road that the Forest Service doesn't even keep up anymore.  Chunked out there so that she's bleeding, she's sustained a bloodshot – or a gunshot wound to the face, she's bleeding, and she's left there for four days so animals could eat her.

*Id.,* p. 504.  Later, she said:

> You have two eyewitnesses.  He didn't deny it and you have physical evidence. Her blood on his boot.  Her blood at the scene.  Her blood in the back of his truck where he threw her up there like an animal to only dump her in the woods so she would rot.

*Id.*, p. 506.

When she was speaking to the jury regarding premeditation versus a sudden impulse, she said:

> You heard the testimony of the M.E.  She was rendered unconscious immediately. She's sitting there in a pool of blood.  He walks back around the truck, "Hey James you got any plastic?"  Do you have any plastic?  "No, man, I just got the shirt off my back."  "Well I need a little help with this tailgate."  It's like he's just killed a deer and, how fitting, that he uses a shotgun with buckshot to kill her.
>
> So what did he do?  Mr. Westlake goes and hits the back of the truck.  It falls down.  He walks off.  Then you see the Defendant, based upon all of the evidence, go and start dragging her by her hair.  Pulling her, pulling her, pulling her.  Gets her around, then takes a belt loop in her shirt, pushes her up on his knee like she's a dead animal, to which he then picks her up, chunks her into the back of his truck. "See you guys later," turns around and on the way out lights up a cigarette and gives a thumbs up.  He has just blown a woman's brains out.
>
> Step by step, choice by choice, thought by thought. And then what did he do to her afterwards?  He takes her off – he lived in the woods and she lived in the woods –

takes her off in the back woods by a creek with awful roads on a jeep trail and dumps her out like an animal.   Blood.   Like an animal.

And then he gives Mr. Westlake a call.   "We okay, buddy."   "I got it taken care of."   Does that sound like somebody who operated on a sudden impulse?   I submit to you, definitely not.

ECF No. 14-6, pp. 510-11.

In *Gay III,* the Arkansas Supreme Court addressed this claim on the merits.   *Gay III,* 2022 Ark. 23, *17.   "A reversal of a judgment due to remarks made by counsel during closing arguments is rare and requires that counsel make an appeal to the jurors' passions and emotions. Experienced advocates might differ about when, or if, objections are called for since, as a matter of trial strategy, further objections from counsel may result in comments seeming more significant to the jury."   *Id.* (citations omitted).   The Arkansas Supreme Court reviewed the comments Gay argued were overly inflammatory and that he contended established a "reasonable probably that the jury would not have sentenced him to death had counsel objected."   *Id.*, *18.   The Court stated:

> We agree with the circuit court's determination that trial counsel's decision not to object during the State's closing argument was a matter of trial strategy.   At trial, two witnesses testified that Gay shot Snow, he dragged her to the back of his truck by her hair and belt loops, rolled her up on his knee, and put her in the back of his truck.   Additionally, medical examiner Dr. Charles Kokes testified that when Snow's body was recovered, bones and tissue were missing from her face, which could have been caused by animal activity.   We cannot say that the circuit court's findings in this regard were clearly erroneous.

*Id.*

### c.   Discussion

Considering the weight of the evidence, this Court cannot say trial counsel's failure to object to this characterization satisfied the deficient performance prong of *Strickland.*   As the Arkansas Supreme Court noted, there are many reasons for counsel not to interject an objection

during the State's closing argument.   In this case, such an objection likely would have served to underscore the characterization in the jurors' minds.   Reasonable jurists could find Gay's conduct invited the prosecutor's comments.

With respect to the prejudice prong, the Court finds it helpful to review the case law regarding when statements by the prosecutor can result in an unfair trial.   "As a general rule, prosecutorial misconduct does not merit federal habeas relief unless the misconduct infected the trial with enough unfairness to render petitioner's conviction a denial of due process."   *Louisell v. Dir. Of Iowa Dep't. of Corr.,* 178 F.3d 1019, 1023 (8th Cir. 1999) (internal quotation marks, alterations, citation omitted); *see also Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (prosecutor's comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (quotations and citations omitted). To be entitled to relief, Gay "must show that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety the verdict would probably have been different."   *Anderson v. Goeke,* 44 F.3d 675, 679 (8th Cir. 1995).

Three factors are considered to determine whether prosecutorial misconduct rises to the level of a denial of due process: (1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the district court.   *Graves v. Ault,* 614 F.3d 501, 508 (8th Cir. 2010) (citation omitted).

In this matter, the evidence of Gay's guilt was overwhelming.   There were two eyewitnesses who testified consistently regarding Gay's murder of Snow; the gun used to murder Snow was in Gay's possession when located by law enforcement; and Snow's blood was discovered in Gay's pick-up.   Gay cannot establish the prejudice prong of *Strickland*, that is,

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688. A sustained objection would not have altered the outcome of the guilt phase of the trial. The Court finds the decision of the Arkansas Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law.

> **2.    Claim 3-2:   Counsel failed to investigate and pursue a theory of imperfect self-defense or proffer a self-defense instruction**

> **a.   Arguments of the Parties**

Gay notes his counsel moved for a directed verdict on the capital murder charge arguing lack of premeditation and deliberation. ECF No. 2, p. 112. Based on the evidence in counsel's possession, Gay argues there was enough evidence to raise a theory of imperfect self-defense, and his counsel was ineffective for failing to do so.

Gay emphasizes evidence was admitted that there was a knife in the truck's center console when the truck was seized. ECF No. 2, p. 112. Additionally, Gay made multiple statements after the murder that Snow had threatened him with a knife. *Id.* Specifically, Gay points to the following statements: (1) in a November 2011 interview with Tapp, Gay stated, prior to the murder, he caught Snow in his trailer trying to rob him. Later, when they were at the Westlakes' and Gay ordered Snow out of the car, Gay said Snow "spun around with a knife" and he shot her; (2) in an interview with his defense team in October 2014, Gay again claimed Snow had broken into his trailer and he planned to take her in for robbing him. Then at the Westlakes', Gay stated Snow started mouthing off and pulled a knife causing him to shoot her; and (3) in a prisoner medical treatment report, Gay said he had been arrested because "a woman tried to stab him." *Id.*, pp.

112-13.   Based on these statements, Gay contends there was enough evidence to at least present some theory to the jury as to what prompted Gay's actions.   *Id.*, p. 113.

According to Gay, even if his defense team believed there was no way to present the evidence Snow threatened him, there was substantial evidence he acted recklessly and spontaneously.   *Id.*, p. 113.   Specifically, Gay refers the Court to evidence in his prison medical record showing he was diagnosed with PTSD and alcohol dependence.   *Id.*   Gay then asserts that had counsel obtained an expert he would have known these disorders cause hyperactivity, lack of impulse control, and heightened emotional arousal— "'a perfect storm' of emotional, irrational reactions."   *Id.* at p. 114.

The State argues this court should defer to the ruling of the Arkansas Supreme Court.   ECF No. 13, p. 138.   They point out that in Arkansas, a person is justified in using "deadly physical force on another if that person reasonably believes that the other is committing or about to commit a felony involving physical force or violence, using or about to use deadly physical force, or imminently endangering the person's life or imminently about to victimize the person from the continuation of a pattern of domestic abuse."   *Id.*, pp. 138-39 (citing Ark. Code Ann. § 5-2-607(a)(1)-(3) (Supp. 2009)).   When a defendant recklessly or negligently forms the belief that physical force is necessary, the State indicates this is what is referred to as "imperfect self-defense."   *Id.,* p. 139.   If it is unlikely that self-defense will be a successful strategy, the State argues defense counsel is not ineffective for failing to pursue it.   *Id.*   Likewise, if there is no basis to support the giving of an instruction, counsel is not ineffective for failing to request it.   *Id.* While a knife was found in the center console, the State asserts there was no evidence Snow wielded it, attempted to reach for it, or even knew it was there.   *Id.*, p. 140.   Finally, with respect to Gay's claim that he acted "recklessly and spontaneously due to his diagnoses," the "evidence at

trial established Gay act[ed] in a calm and deliberate manner, not hyperactive or impulsive, or emotional." *Id.*, p. 140-41.

### b.   Review of the Record

At the Rule 37 hearing, Fraiser was asked about co-counsel Crawford's introduction of the picture of the interior compartment of Gay's pickup, taken the day after the homicide, that had a knife in the interior compartment. ECF No. 14-20, p. 303. Fraiser indicated he "[v]aguely" recalled this occurring. *Id.* Fraiser was reminded that in his closing argument he said: "There was a knife in the passenger compartment. I don't know whether Connie Snow grabbed for it or not." *Id.* Fraiser stated: "If I'm not mistaken, there was some statement attributed to Randy, something about a knife or some action Ms. Snow took. And, again, I could be totally wrong about that." *Id.*

Fraiser was next asked about whether Crawford was introducing the notion of imperfect self-defense or the idea Gay had recklessly formed the belief that he may have been in danger. Fraiser responded:

> Answer:   Well, obviously I know what the legal requirements are to present a self-defense. But without a – without Randy testifying, I don't see how we would've been able to submit either a self-defense instruction and/or an imperfect self-defense instruction because you have to have evidence that the individual acted in the way that they did because they reasonably believed it was necessary in a very succinct definition.

> \* \* \*

> Question:   Self-defense is not available as a justification when the mental state is recklessness. Right.

> Answer:   Right. Reckless or negligent; that's correct.

> Question: Yeah. And so what I'm actually getting at is offering a manslaughter instruction based on recklessly forming the belief that he was in danger.

Answer:  I don't think – and when we did the instructions, we discussed lesser. And if I'm not mistaken, we were allowed to put in – obviously you get capital.   If you got a premeditated case you automatically – or you should automatically get murder one, and we submitted murder two.   But I don't know how in the world we would've been able to justify submitting a manslaughter instruction.

Question:   Yeah.   And had you known that there was a prior diagnosis of posttraumatic stress disorder, and had you furthered it up with your own expert on PTSD, you're aware that one of the by-products of PTSD is exaggerated startle response –

Answer:  Okay.

Question:   --another's hypervigilant, in other words, being hair triggered.

Answer:  I understand.

Question:   Do you think that could've helped support and build a potential manslaughter instruction?

Answer:  Not without Randy's testimony, no.

Question:   Why would – why would Randy's testimony be necessary?

Answer:  Well, because you can have an expert say that he suffered from PTSD and one of the side – by-products is a hair trigger.   Well, how's that expert gonna say that Randy reacted as the result of a hair trigger on this occasion, without him testifying that he heard a noise and just snapped?   I mean, you've got an expert that's telling you he's got this diagnosis, but where's gonna be the evidence that he acted in conformity with that diagnosis without Randy?   'Cause we had nobody else.

ECF No. 14-20, pp. 303-305.

The Arkansas Supreme Court noted the only evidence in the record was: (1) the fact that a knife had been found in the passenger compartment of Gay's pickup; (2) a picture of the knife was introduced; and (3) Gay's medical treatment report that contained a statement by Gay that "a woman tried to stab him."   *Gay III,* 2022 Ark. 23, * 18.   The Supreme Court concluded that, while counsel had a duty to reasonably investigate or reasonably decide an investigation was not

necessary, counsel's decision to "not investigate what he believed to be a losing defense theory was a tactical decision and not a basis for Rule 37 relief." *Id, *19.

The court concluded:

> Here, other than Gay's own self-serving statement, there is no evidence that Gay acted recklessly or in self-defense when he shot Snow. At trial, there was no evidence presented that Snow had a weapon or acted aggressively toward Gay. The two witnesses testified that Gay exited the truck and ordered Snow out of the truck; Snow did not comply, and Gay went to the back of his truck and retrieved a shotgun and again ordered Snow out of the truck. As Snow was attempting to exit the truck, Gay shot Snow in the right side of her face. Further, during the Rule 37 hearing, Fraiser testified that there was no indication from any witness during the trial that a knife was presented in a threatening manner to Gay when he shot Snow.

> As the justification of self-defense was not available to Gay, his counsel necessarily did not render ineffective assistance of counsel in failing to raise the defense.

*Id.*

### c. Discussion

Review of counsel's decisions under *Strickland* is highly deferential. The totality of the circumstances must be considered in determining whether a habeas petitioner received ineffective assistance of counsel. *Strickland,* 466 U.S. at 688-89. Counsel is required to "exercise reasonable diligence to produce exculpatory evidence and strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir. 1991). In this case, the Court agrees with the State that counsel acted reasonably in not requesting a self-defense or imperfect self-defense instruction. The sole evidence to support Gay came from a single statement he made that was recorded in a prisoner medical treatment form. The fact that there was a knife in the car establishes nothing unless it can be proven Snow wielded the weapon in some manner. Gay elected to exercise his constitutional right not to testify. He cannot be faulted for this. However, this left his defense team with no basis on which to request a self-defense instruction. Counsel was not deficient in

failing to request an instruction not supported by the evidence.   Further, Gay has not shown he was prejudiced by the conduct of his counsel.   Upon careful review, the decision of the Arkansas Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law.

### D. Claim 4—Gay's Fifth, Sixth, and Fourteenth Amendment rights to a fair and impartial jury were violated by the trial court's preclusion of case-specific mitigation questions during *voir dire*

#### a.    Arguments of the Parties

Gay argues that throughout *voir dire* defense counsel was precluded from questioning jurors about mitigating circumstances specific to his case.   ECF No. 2, pp. 114-15.   Gay maintains this resulted in the seating of mitigation-impaired jurors and left jurors generally unable to grasp the concept of weighing factors that could mitigate against the death sentence.   *Id.*, p. 115.   In support, Gay points to the questioning of jurors Misty McLernon, Sandra Barker, Carolyn Wetthington, and Margaret Young.   *Id.*   Essentially, all counsel was able to ask the jurors regarding the weighing of mitigating factors was for their affirmative response that they could follow the law and the court's instructions.   *Id.*   None of the potential jurors were asked if they could consider any mitigating evidence relevant to Gay's case.   *Id.*, p. 116.   In Gay's view, "the duty to conduct an adequate *voir dire* to seek out those jurors who cannot give meaningful consideration to all relevant mitigating evidence has been breached."   *Id.*   Gay argues "[i]n order to adequately test for mitigation-impaired jurors, *voir dire* must explore whether or not a juror will be able to consider a life sentence, weighing those facts specific to the defendant which militate against a death sentence."   *Id.*, p. 117.   In sum, Gay argues the *voir dire* in his case was constitutionally inadequate to guarantee him a fair and impartial jury.   *Id.*

The State maintains the focus of the Court must be on the jurors that sat on the jury.   ECF No. 13, p. 148.   As Gay's claim of "an impartial jury is predicated upon venirepersons who did not actually end up on the jury," the State contends "this alone is grounds for denial."   *Id.*   Moreover, when the record is carefully reviewed, the State contends it does not support Gay's position.   *Id.*, p. 149.   With respect to potential jurors Barker, Wetthington, and Young, while each stated they would automatically impose the death penalty if Gay was convicted, the State argues this does not in any way establish that the circuit court limited Gay's questions on mitigation evidence.   *Id.*, p. 150.

### b.  Review of the Record

McLernon was one of three jurors in a panel.   ECF No. 14-5, p. 223.   Fraiser explained the state had to prove the existence of aggravating circumstances beyond a reasonable doubt and if they did the jurors would be asked to "see if there's any mitigating circumstances.   And a mitigator is anything that you can consider for reasons not to give the death penalty.   Or reasons for life."   *Id.,* pp. 223-24.   Each juror indicated they understood this concept.   *Id.*, p. 224.   Fraiser then explained the jurors were required to decide "do the aggravators outweigh the mitigators and justify a sentence of death.   And if they don't then you impose a sentence of life without parole."   *Id.*   Each juror indicated they understood.   *Id.*

When asked if she would have any difficulty following the procedure, McLernon answered: "I don't know."   ECF No. 14-5, p. 224.   Fraiser then stated: "Also in Arkansas even if a jury makes all of those findings, a juror is allowed to exercise mercy and vote for life without" parole.   *Id.*, p. 225.   McLernon answered that this made sense.   *Id.*

The following colloquy occurred:

64

> Fraiser:  All right.  Taking the last statement, would you be able to look at any circumstances that were presented to you to convince you that the death penalty's not appropriate?
>
> McLernon:  I'm still on the side of the death penalty, so I can't really answer that question.
>
> Fraiser:  And let me just tell you.  We're not allowed to give you examples and say –
>
> McClernon:  Oh, I know.  I know.
>
> Fraiser:  --if this is proven, would you do this.
>
> McLernon:  I understand.
>
> Fraiser:  You know, it's not like a –
>
> McLernon:  I understand.
>
> Fraiser:  --slot machine, where you put it in, pull the handle and get an answer.
>
> McLernon:  I know.
>
> Fraiser:  So that's why we're talking in a vacuum.

ECF No. 14-5, pp. 231-232.

Under questioning by the State, Barker indicated she would have to be convinced to give someone life without parole.  ECF No. 14-5, p. 433-34.  During Frasier's questioning of the panel of three that Barker was placed in, Fraiser explained mitigating circumstances were "[r]easons not to impose the death penalty.  Or reasons to spare his life."  *Id.*, p. 454.  Fraiser continued explaining mitigators could be anything and there was no limit on the number of mitigators that could be considered.  *Id.*  Fraiser added that jurors were entitled to come up with a mitigator on their own.  *Id.*, p. 455.  Fraiser then advised jurors they would come to the stage where they were "required to take the aggravator or aggravators then look at the mitigators, and weigh 'em."  *Id.*  Frasier continued "even if you've made the findings of yes, the mitigators, it's outweighed, do

65

each of you understand that you have the authority as juror to always exercise mercy and vote for life without parole?"  *Id.*   Each of the three jurors being questioned indicated they understood this.  *Id.*, p. 456.

Fraiser turned to asking Barker about her support of the death penalty.   ECF No. 14-5, pp. 456-463.   Barker indicated she strongly supported the death penalty and if a person intentionally murdered someone, that person should get the death penalty.  *Id.*, pp. 456-57.   If the state proved Gay guilty of capital murder, she indicated she would start the sentencing phase with the idea that someone would have to convince her why Gay should not be sentenced to death.  *Id.*, p. 458. Wetthington and Young also similarly testified.  *See e.g.,* pp. 709-712 (Wetthington); pp. 466-475 (Young).

In *Gay III*, the Arkansas Supreme Court addressed this argument first by noting it could have been raised on direct appeal and second by noting the circuit court found "Gay failed to prove prejudice or the likelihood that the outcome of the trial would have been different."  *Gay III,* 2022 Ark. 23, *7.   It noted it had held in *Reams v. State,* 560 S.W.3d 441, 452 (Ark. 2018) that Rule 37 was a postconviction remedy and did not "provide a method for the review of mere error in the conduct of the trial or to serve as a substitute for appeal."  *Id.*   An exception exists "for errors that are so fundamental as to render the judgment of conviction void and subject to collateral attack."  *Id.*   In *Gay III,* the Arkansas Supreme Court noted it was not persuaded by Gay's argument that "his denial of a request . . . to voir dire [jurors] on particular mitigating facts is an issue involving fundamental error."  *Id.*

### c.    Discussion

In connection with Claim 2-3, the Court discussed the importance of *voir dire* in capital murder cases.   The Court will not repeat that discussion.   As the State points out, on this claim, none of the jurors identified by Gay sat on the jury who convicted and sentenced him.

The right to an impartial jury is itself clearly established federal law made applicable to the states by the Fourteenth Amendment.   *See e.g., Morgan,* 504 U.S. 719 (1992); *Turner v. Louisiana,* 379 U.S. 466 (1965).   In *Connors v. United States,* 158 U.S. 408, 413 (1895) the Supreme Court discussed the role of *voir dire* and stated:

> [A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried.   That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.

Nearly a century later, in *Mu'Min v. Virginia,* 500 U.S. 415, 425-26 (1991), a case dealing with pretrial publicity, the Court stated, "[t]o be constitutionally compelled . . . it is not enough that such questions be helpful.   Rather the trial court's failure to ask these questions must render defendant's trial fundamentally unfair."   In *Morgan,* the Court underscored the critical importance of *voir dire* in capital cases.   The underlying requirement is one of fundamental fairness.

Here, while the trial court did not in general allow questioning regarding specific mitigating circumstances, defense counsel had significant latitude in defining mitigating circumstances and ensuring the jurors would commit to considering the mitigating factors.   To rule in Gay's favor would require the Court to go further than *Morgan* or any other Supreme Court case and hold that in all capital murder cases the defense must be allowed to ask case-specific mitigating factors.   This Court declines to do so.   The decision of the Arkansas Supreme Court that Gay

was not denied a fair and impartial trial was not an unreasonable application of clearly established federal law.

> **E.   Claim 11—In violation of the Eighth Amendment, the trial court erred in refusing to allow as a mitigating circumstance that Gay had a calming influence on others while in custody**

### a.  Arguments of the Parties

Defense counsel offered as a mitigating circumstance that "Randy Gay has had a calming influence on others while in custody."   ECF No. 2, p. 129.   The State objected that no evidence had been introduced to support the mitigator.   *Id.*   Defense counsel maintained "the jury could reasonably infer that Randy had a calming influence 'just based on the absence of disciplinary infraction in his correctional record.'"   *Id.*   The Court struck the proposed mitigator.

Gay maintains there was ample evidence from which the jury could find he was a well-behaved and well-adjusted inmate.   ECF No. 2, p. 130.   Gay argues this evidence supports a conclusion that he had a positive influence and calming effect on others in custody.   *Id.*

The State maintains the fact that Gay had "no disciplinary infractions while he was incarcerated does not provide any evidence that he had a 'calming influence' on others—it merely means he had not violated any prisoner guideline or regulation."   ECF No. 13, p. 182.   The State argues a "prisoner could be utterly terrifying to those around him and not have any disciplinary infractions."   *Id.*   The State asks that due deference be given to the state court.

### b.  Review of the Record

Gay raised this point on direct appeal.   The Arkansas Supreme Court stated:

Arkansas Code Annotated §5-4-602(4), "[m]itigation evidence must be relevant to the issue of punishment."   We have observed that Ark. Code Ann. § 5-4-602 does not totally open the door to any and all matters simply because they might conceivably relate to mitigation.   Relevant mitigating evidence is limited to

> evidence that concerns the character or history of the offender or the circumstances of the offense.
>
> Here, Gay did not introduce evidence that he had a calming influence on others but sought to submit the mitigating evidence based on an inference from Gay's lack of disciplinary record. However, Gay did not submit evidence to support this mitigating circumstance. Accordingly, we hold that the circuit court did not err in its refusal to submit the mitigation instruction regarding Gay's calming influence on others.

*Gay v. State,* 506 S.W.3d 851, 862-63 (Ark. 2016) (*Gay I*) (internal quotation marks and citations omitted).

### c. Discussion

The defense cites the case of *Skipper v. South Carolina,* 476 U.S. 1 (1986), in support of his argument. In *Skipper*, the Supreme Court held the trial court's exclusion from the sentencing hearing of testimony from two jailers and a regular visitor that the defendant had "made a good adjustment" during the 7 ½ months he had spent in jail between his arrest and trial deprived the defendant of his right to place before the sentencer relevant evidence in mitigation of punishment. *Id.* at 3-4. In so ruling the Court noted its holding "requires that in capital cases 'the sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Id.* at 4 (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982) (citation omitted)). "Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Id.* (quoting *Eddings,* 455 U.S. at 114). The Court held evidence that the defendant would in the "future pose a danger to the community if he were not executed" could be treated as an aggravator while "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Id.* at 5. In short, it held "a defendant's disposition to make

a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Id.* at 7.

In *McKoy v. North Carolina,* 494 U.S. 433 (1990), the Supreme Court reviewed North Carolina's capital sentencing scheme that prevented "the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find." *Id.* at 435. The Court held this scheme violated the Constitution. *Id.* In doing so it stated that "the State Supreme Court's holding that mitigating evidence is 'relevant' only if the jury unanimously finds that it proves the existence of a mitigating circumstance distorts the concept of relevance." *Id.* at 440. It noted that relevance as defined in Rule 41 of the Federal Rules of Evidence was evidence having "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting Fed. R. Evid. 401). It concluded the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding." *Id.*

In this case, Gay does not contend any evidence was introduced that he served as a calming influence on others. Instead, he contends the jurors should have been permitted to consider this as a mitigating factor because they could have made this inference from Gay's lack of a disciplinary record. The jurors were free to make whatever inferences they desired from the pen pack. The Arkansas Supreme Court held that Gay had not submitted evidence regarding any calming effect on other inmates to support this as a mitigating circumstance. This Court agrees. Certainly, the Court cannot say that the Arkansas Supreme Court's decision was an unreasonable application of clearly established federal law. Gay is entitled to no relief on this claim.

## V.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c)(1)(A), '[u]nless a . . . judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from the final order—in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." *Id.*   Section 2253(c)(2) provides "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.*   "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris,* 133 F.3d 565, 569 (8th Cir. 1997) (internal citation omitted).

The Court concludes reasonable jurists could not differ on any of the claims being denied. A certificate of appealability is denied.

## VI.   CONCLUSION

For the reasons stated, Gay's habeas petition (ECF No. 2) is **GRANTED** with respect to **CLAIMS 1-1 and 2-3.**   In all other respects, the petition is **DENIED**.   The State will be given a period of **120 days** from the date of this Opinion and Order to either indicate it will again seek to impose the death penalty in a new sentencing hearing **or** agree to commute Gay's sentence to life in prison without the possibility of parole.

ENTERED on this 27th day of March, 2026.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge